**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NOSTALGIC PARTNERS, LLC, d/b/a THE STATEN ISLAND YANKEES; ONEONTA ATHLETIC CORPORATION, d/b/a THE NORWICH SEA UNICORNS; SPORTS ENTERPRISES, INC. d/b/a SALEM-KEIZER VOLCANOES; and TRI-CITY VALLEYCATS, INC., | Civil Action No. |
| | **COMPLAINT** |
| Plaintiffs, | **DEMAND FOR JURY TRIAL** |
| v. | |
| THE OFFICE OF THE COMMISSIONER OF BASEBALL, AN UNINCORPORATED ASSOCIATION d/b/a MAJOR LEAGUE BASEBALL, | |
| Defendant. | |

Plaintiffs, by their undersigned attorneys for their Complaint, allege as follows:

**INTRODUCTION**

1.      Defendant Office of the Commissioner of Baseball, doing business as Major League Baseball ("MLB"), orchestrated a horizontal agreement among its 30 MLB Clubs ("Clubs" or "Franchises") to eliminate their affiliation with—and thus to effectively destroy—40 Minor League Baseball ("MiLB") teams. Plaintiffs are four of those teams: the Staten Island Yankees, the Tri-City Valley Cats, the Salem-Keizer Volcanoes, and the Norwich Sea Unicorns. Stripped of their affiliations with "big league" Clubs, Plaintiffs' very existence has been threatened by MLB's unlawful group boycott. Moreover, MLB's

1

anticompetitive conduct is depriving fans, communities, and players of the additional MiLB games that would be—and *were*—available in a competitive market.

2.      The Sherman Act requires free-market forces to determine which MiLB teams will survive and prosper with big league affiliations, and which will not. But MLB and the Clubs instead collectively decided to artificially reduce the number of such affiliations in order to cut expenses—principally, the cost of paying minor league baseball players. Their "Takeover Plan" aims to improve Club owners' profitability—not the MiLB product—and to solidify MLB's singular control over all of professional baseball. To accomplish this, MLB destroyed 40 out of 160 of MLB's previously affiliated MiLB teams (the "Ousted Teams"). As for the 120 "Remaining Teams," on information and belief, some 25 were already under common ownership with an MLB Club and thus participated in the Takeover Plan; the rest were coerced to consolidate under MLB's direct control.

3.      The Takeover Plan is nothing less than a naked, horizontal agreement to cement MLB's dominance over all professional baseball and to reduce output and boycott the 40 Ousted Teams from MLB affiliation. MLB Clubs are separately owned and economically distinct Franchises that compete against each other to have a greater number of MiLB affiliates with access to more minor league players. But they collectively decided to reduce their output and boycott the Ousted Teams. There is no plausible procompetitive justification for this anticompetitive agreement. Indeed, MLB chose how many and which MiLB teams' affiliations to cut without regard to competitive merit. Factors such as which MiLB teams were already owned by MLB Clubs or otherwise served MLB interests (e.g., politician-owned teams such as the Asheville Tourists, owned by Mike DeWine, Governor of Ohio) drove MLB and the Clubs' collective decision-making. If MLB actually intended

to improve the quality of MiLB teams, Plaintiffs would have satisfied any legitimate criterion to maintain their affiliations.

4.       Virtually no other business in the United States would have even *considered* such a brazen horizontal agreement among competing businesses. MLB and its Clubs, however, had no such qualms because for almost a century they have laid claim to an anomalous, judicially created "get-out-of-jail-free card" from antitrust scrutiny. The so-called "baseball exemption" from the Sherman Act was first articulated by the Supreme Court in *Federal Baseball Club v. National League*, 259 U.S. 200 (1922). If not for this anomalous precedent, MLB knows that the type of anticompetitive conduct challenged here would warrant *per se* condemnation. The time is at hand to cast the baseball exemption into the dust bin of antitrust history.

5.       In its recent unanimous decision in *NCAA v. Alston*, 141 S. Ct. 2141 (2021), the Supreme Court signaled its willingness to reconsider the application and scope of the baseball exemption recognized in *Federal Baseball*. *Alston* involved classes of college athletes challenging NCAA compensation restrictions under the antitrust laws. The athletes had to overcome an NCAA defense that a prior Supreme Court decision (*NCAA v. Board of Regents*, 468 U.S. 85 (1984)) provided special protection from antitrust scrutiny for the NCAA's "amateurism" rules. *Alston*, 141 S. Ct. at 2157. Citing this precedent, the NCAA asked the Supreme Court to apply a judicially created exemption from the antitrust laws. A unanimous Supreme Court rejected the NCAA's argument and made it clear that to the extent *Board of Regents* ever provided the NCAA and its members with protection from normal antitrust scrutiny, it would do so no longer—sports leagues are subject to the Sherman Act like every other business. *See id.* at 2159.

6.      In so holding, the Court specifically addressed—and criticized on similar grounds—its decision in *Federal Baseball*:

> To be sure, this Court once dallied with something that looks a bit like an antitrust exemption for professional baseball. In *Federal Baseball Club of Baltimore, Inc. v. National League of Professional Baseball Clubs*, 259 U.S. 200 (1922), the Court reasoned that "exhibitions" of "base ball" did not implicate the Sherman Act because they did not involve interstate trade or commerce—even though teams regularly crossed state lines (as they do today) to make money and enhance their commercial success. *Id.*, at 208–209. But this Court has refused to extend *Federal Baseball*'s reasoning to other sports leagues—and has even acknowledged criticisms of the decision as "unrealistic" and "inconsistent" and "aberration[al]." *Flood v. Kuhn*, 407 U.S. 258, 282 (1972) (quoting *Radovich v. National Football League*, 352 U.S. 445, 452 (1957)); *see also* Brief for Advocates for Minor Leaguers as *Amicus Curiae* 5, n.3 (gathering criticisms). Indeed, as we have seen, this Court has already recognized that the NCAA itself *is* subject to the Sherman Act.

*Id.* (emphasis in original).

7.      Plaintiffs thus have objectively good reasons to believe that the Supreme Court would no longer apply the "unrealistic," "inconsistent," and "aberration[al]" baseball antitrust exemption if presented with a proper case for reconsidering it. This is that case. Further, the principle of *stare decisis*, which caused the Supreme Court to continue the baseball exemption almost 50 years ago in *Flood v. Kuhn* (407 U.S. 258 (1972)), would not apply to the conspiracy challenged here. *Flood* clarified that the only remaining exemption concerned the "reserve clause" that limited player movement. This case has nothing to do with the reserve clause and no Supreme Court case has applied the baseball exemption to anything other than the reserve clause. As such, there would be no *stare decisis* justification for applying any baseball antitrust exemption here. *See Alston*, 141 S. Ct. at 2157 (noting that to the extent *Board of Regents* ever intended to provide protection from antitrust scrutiny for the NCAA's "amateurism" restraints, such protection could no

4

longer be justified in light of the very different facts presented in the record of the *Alston* litigation).

8.      The MLB-orchestrated, horizontal agreement among competing Clubs to restrict output and boycott the Ousted Teams should be condemned as *per se* illegal, or at least under an abbreviated rule of reason analysis, i.e., a "quick look," as a violation of Section 1 of the Sherman Act. MLB should not be permitted to shield itself with an anachronistic baseball exemption that the current Supreme Court would not apply to the facts of this case. MLB's anticompetitive agreement should be enjoined and declared illegal under Section 1 of the Sherman Act; MLB should be found liable for triple Plaintiffs' damages; and MLB should be ordered to pay Plaintiffs' reasonable attorneys' fees and litigation costs.

## **PARTIES**

9.      Plaintiff Nostalgic Partners, LLC d/b/a Staten Island Yankees ("SI Yankees"), is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in New York, New York. Until 2020, the SI Yankees played in MiLB's New York-Pennsylvania League ("NYPL"). Since 2000, the SI Yankees has won six NYPL championships. A New York City study recently found that Staten Island benefited from over $77 million in sales associated with the SI Yankees' presence, and the team and its stadium supported more than 1,500 local jobs. Since the team's inception in 1999, the SI Yankees has amassed a total of 42 players who have reached the major leagues—including, Robinson Canó, Mark Melancon, Melky Cabrera, George ("Andy") Phillips, Justin Anderson, Chien-Ming Wang, and Brett Gardner.

10.     Plaintiff Tri-City Valley Cats, Inc. ("ValleyCats") is a corporation organized under the laws of the State of New York with its principal place of business in New York, New

York. Until 2020, the ValleyCats played in MiLB's NYPL and were a Single-A team affiliated with the Houston Astros. Since 2002, the ValleyCats have won eight NYPL Stedler Division titles and three NYPL championships. Eighty-one former ValleyCats have gone on to play in MLB; 42 with the Astros, including three-time batting champion and American League MVP José Altuve and World Series MVP George Springer.[1] For over 18 years, the ValleyCats provided affordable entertainment for many families in the local community of Troy, New York, which has generated an extremely loyal fan base. From 2010 through 2018, average attendance was 93% for every game, and the ValleyCats had been in the top three teams in the NYPL for average attendance since 2015. The ValleyCats have also impacted its local community through charitable contributions, including financial contributions, volunteer efforts, donations, and fundraising partnerships, which have a value of approximately $500,000.[2]

11.     Plaintiff Sports Enterprises, Inc., d/b/a Salem-Keizer Volcanoes ("Volcanoes"), is a corporation organized under the laws of the State of Oregon with its principal place of business in Marion County, Oregon. For 26 years until 2020, the Volcanoes were members of MiLB's Northwest League and were affiliated with the San Francisco Giants. During that time, the Volcanoes received numerous awards and accolades, recognizing their on-field successes and their best-in-class business operations. During their affiliation with the Giants, the Volcanoes hosted several World Series champion players, including Buster

---

[1] *From 'The Joe' to 'The Show!'*, MiLB, https://www.milb.com/tri-city-valleycats/team/alumni.

[2] Letter from Patrick Madden, Mayor, City of Troy, to Robert D. Manfred, Comm'r, MLB, (Nov. 24, 2020), http://www.troyny.gov/wp-content/uploads/2020/12/2020-11-24-valleycats-letter-of-supprort_mayor-madden_MLB-commissioner.pdf.

Posey, Pablo Sandoval, Brandon Crawford, Sergio Romo, Tim Lincecum, and many others. A total of 112 Volcanoes players have gone on to play with MLB clubs.

12.     Plaintiff Oneonta Athletic Corporation, d/b/a Norwich Sea Unicorns ("Unicorns") is a corporation organized under the laws of the State of New York with its principal place of business in Norwich, Connecticut. Until 2020, the Unicorns played in MiLB's NYPL and were a Single-A team affiliated with the Detroit Tigers. Over the previous ten years, the Unicorns have drawn more than 700,000 fans and helped to raise more than $1.6 million for local charities.[3] Notable Unicorns players include MLB All-Stars Eugenio Suárez, Joe Jiménez, and Hall of Famer Al Kaline's grandson, Colin Kaline.

13.     Defendant Office of the Commissioner of Baseball d/b/a Major League Baseball is an unincorporated association with its principal place of business in New York, New York, and whose members are 30 separately owned and operated, and economically distinct, major league men's baseball Clubs in the United States and Canada. MLB and its member Clubs are engaged in the businesses of operating the top professional tier of baseball franchises, who compete with each other for, among other things, fans, sponsors, players, and minor league affiliates. The teams do not share profits and losses or a majority of their revenues.

14.     Non-defendant co-conspirators AZPB L.P. and AZPB I, Inc. (together, d/b/a "Arizona Diamondbacks") are an MLB Franchise.

15.     Non-defendant co-conspirator Atlanta National League Baseball Club, LLC. (d/b/a "Atlanta Braves") is an MLB Franchise.

---

[3] Dom Amore, *As the Norwich Sea Unicorns are born, the franchise is already in a fight for its life*, HARTFORD COURANT, https://www.courant.com/sports/hc-sp-minor-league-baseball-norwich-sea-unicorns-20191206-20191206-pypkrebakbfknow7g6qivygatm-story.html

16.     Non-defendant co-conspirators Baltimore Orioles Baseball Club, Inc., Baltimore Orioles, Inc., and Baltimore Orioles, L.P. (together, d/b/a "Baltimore Orioles") are an MLB Franchise.

17.     Non-defendant co-conspirator Boston Red Sox Baseball Club L.P. (together, d/b/a "Boston Red Sox") is an MLB Franchise.

18.     Non-defendant co-conspirator Chicago Cubs Baseball Club, LLC (d/b/a "Chicago Cubs") is an MLB Franchise.

19.     Non-defendant co-conspirator Chicago White Sox Ltd. (d/b/a "Chicago White Sox") is an MLB Franchise.

20.     Non-defendant co-conspirator The Cincinnati Reds, LLC (d/b/a "Cincinnati Reds") is an MLB Franchise.

21.     Non-defendant co-conspirator Cleveland Guardians Baseball Company, LLC (d/b/a "Cleveland Guardians") is an MLB Franchise.

22.     Non-defendant co-conspirators Colorado Baseball Partnership and Colorado Rockies Baseball Club, Ltd. (together, d/b/a "Colorado Rockies") are an MLB Franchise.

23.     Non-defendant co-conspirator Detroit Tigers, Inc. (d/b/a "Detroit Tigers") is an MLB Franchise.

24.     Non-defendant co-conspirator Houston Astros LLC (d/b/a "Houston Astros") is an MLB Franchise.

25.     Non-defendant co-conspirator Kansas City Royals Baseball Club, Inc. (d/b/a "Kansas City Royals") is an MLB Franchise.

26.     Non-defendant co-conspirator Angels Baseball LP (d/b/a "Los Angeles Angels of Anaheim") is an MLB Franchise.

27.     Non-defendant co-conspirator Los Angeles Dodgers, Inc. (d/b/a "Los Angeles Dodgers") is an MLB Franchise.

28.     Non-defendant co-conspirators Miami Marlins, L.P. and Miami Marlins, Inc. (together, d/b/a "Miami Marlins") are an MLB Franchise.

29.     Non-defendant co-conspirators Milwaukee Brewers Baseball Club and Milwaukee Brewers Holdings LLC (together, d/b/a "Milwaukee Brewers") are an MLB Franchise.

30.     Non-defendant co-conspirator Minnesota Twins, LLC (d/b/a "Minnesota Twins") is an MLB Franchise.

31.     Non-defendant co-conspirators Sterling Doubleday Enterprises LP and Mets Partners, Inc. (together, d/b/a "New York Mets") are an MLB Franchise.

32.     Non-defendant co-conspirators New York Yankees Partnership and Yankee Global Enterprises LLC (together, d/b/a "New York Yankees") are an MLB Franchise.

33.     Non-defendant co-conspirator Athletics Investment Group, LLC (d/b/a "Oakland Athletics") is an MLB Franchise.

34.     Non-defendant co-conspirator The Phillies L.P. (d/b/a "Philadelphia Phillies") is an MLB Franchise.

35.     Non-defendant co-conspirators Pittsburgh Baseball, Inc. and Pittsburgh Associates LP (together, d/b/a "Pittsburgh Pirates") are an MLB Franchise.

36.     Non-defendant co-conspirators Padres L.P., Padres Group, and the Padres, Inc. (together, d/b/a "San Diego Padres") are an MLB Franchise.

37.     Non-defendant co-conspirators San Francisco Baseball Associates LP and SF Giants Baseball Club (together, d/b/a "San Francisco Giants") are an MLB Franchise.

38.     Non-defendant co-conspirators The Baseball Club of Seattle, LLP and Baseball of Seattle, Inc. (together, d/b/a "Seattle Mariners") are an MLB Franchise.

39.     Non-defendant co-conspirators St. Louis Cardinals, LLC and St. Louis National Baseball Club Inc. (together, d/b/a "St. Louis Cardinals") are an MLB Franchise.

40.     Non-defendant co-conspirator Tampa Bay Rays Ltd. (d/b/a "Tampa Bay Rays") is an MLB Franchise.

41.     Non-defendant co-conspirators Rangers Baseball Express, LLC and Texas Rangers Baseball Club (together, d/b/a "Texas Rangers") are an MLB Franchise.

42.     Non-defendant co-conspirators Rogers Blue Jays Baseball Partnership and Toronto Blue Jays Baseball Ltd. (together, d/b/a "Toronto Blue Jays") are an MLB Franchise.

43.     Non-defendant co-conspirator Washington Nationals Baseball Club, LLC (d/b/a "Washington Nationals") is an MLB Franchise.

44.     Additional individuals, partnerships, corporations, associations, persons, and/or firms not named as Defendants in this Complaint may have also participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance of the conspiracy.

## JURISDICTION AND VENUE

45.     This Court has subject-matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1337 because Plaintiffs' claims arise under laws of the U.S. that regulate commerce and protect commerce against restraints and monopolies: Section 4 of the Clayton Act (15 U.S.C. § 15), Section 4 of the Sherman Act (15 U.S.C. § 4), Section 16 of the Clayton Act (15 U.S.C. § 26), and Section 1 of the Sherman Act (15 U.S.C. § 1).

46.     This Court has *in personam* jurisdiction over MLB because it transacts substantial business in this District; engaged in antitrust violations in substantial part in this District; and has entered into and engaged in a conspiracy and group boycott that is intended to have, and has had, an anticompetitive effect on commerce in this District.

47.     This Court additionally has *in personam* jurisdiction over MLB because it has its principal place of business in this District; sanctions entities to play professional baseball games in this District; and receives fees for MLB and MiLB events played in this District.

48.     Venue is proper in this Court pursuant to Section 12 of the Clayton Act (15 U.S.C. § 22) and 28 U.S.C. §§ 1391(b), (c) and (d), because MLB is subject to this Court's personal jurisdiction with respect to this action, a substantial part of the events giving rise to Plaintiffs' claims occurred in this District, and Plaintiffs have and will continue to suffer harm in this District as a result of the MLB conspiracy averred herein.

## BACKGROUND

### *A.*     MLB's Relationship with, and Control of, MiLB

49.     For over 100 years, MLB and MiLB—organized under the umbrella of the National Association of Professional Baseball Leagues ("National Association")—had an arrangement in which individual MLB Clubs could decide to affiliate with individual MiLB teams. This arrangement fostered a system in which MiLB players could be developed and promoted to their affiliated MLB teams. Over time, the competition among MLB Clubs to have MiLB affiliates resulted in a market in which 30 MLB Clubs had 160

affiliated MiLB teams, spanning across six MiLB leagues in the United States, Canada, and Mexico.[4]

50.     Specifically, in 1903, the National Association and MLB entered into an agreement to support the promotion of talented baseball players from MiLB teams to MLB by having individual MLB Clubs affiliate with individual MiLB teams. This arrangement was embodied for decades in what was known as the Professional Baseball Agreement ("PBA"). The PBA provided a high-level outline of the terms of the MLB/MiLB relationship and incorporated the Major League Baseball Rules ("MLR"). Pursuant to Rule 56 of the MLR, each MiLB club also signed an addendum to the MLR, known as a Player-Development Contract ("PDC"), with the MLB Club with which it was affiliated. The PDC formalized the affiliation between MiLB and MLB Clubs.

51.     Under the PBA, MiLB teams agreed to pay MLB eight percent (8%) of their ticket sales. Ticket sales constitute a significant portion of most MiLB teams' revenue. MLB Clubs could foster and develop their pool of baseball recruits without the cost and expense of fully operating their own MiLB teams.

52.     MiLB teams, on the other hand, benefited by having the opportunity to provide professional baseball games to their local communities, with an affiliated MLB Club to assist in obtaining (and paying) players and coaches, marketing endeavors, and financial commitments. Specifically, each "MLB club provides players, coaches, and trainers to its MiLB 'affiliate' at no cost" to the MiLB affiliate.

---

[4] Minor league teams in the Arizona Complex League, the Florida Complex League, and international summer baseball teams in the Dominican Summer League are "rookie" leagues that are owned by MLB clubs but are not a part of the National Association and were not included as part of MLB and its co-conspirator Clubs' Takeover Plan to reduce the number of affiliated minor league teams from 160 to 120.

53.     MLB Clubs compete with each other when choosing which MiLB teams to affiliate with, up to four (one from each of the Triple-A, Double-A, Class A Advanced, and Class A leagues).[5] Before the Takeover Plan, MLB Clubs similarly competed with each other to affiliate with up to six MiLB teams.

54.     Fans and (typically small) communities benefitted from this competition by MLB Clubs to have MiLB affiliates. Minor league games featured players with prospects for future big-league success as well as MLB players who had returned to the minor leagues for injury rehabilitation or further training. Indeed, nearly every MLB player has spent time developing his talent in one or more minor leagues—Mickey Mantle developed his Hall-of-Fame talent in Joplin, Missouri for the Joplin Miners in 1950, and Derek Jeter spent 1992 in Greensboro, North Carolina playing for the Greensboro Hornets.

55.     The PBA, and the market for MLB-affiliated MiLB teams it facilitated, was extraordinarily successful, and professional baseball in North America expanded significantly, growing to the 30 MLB Clubs and 160 affiliated MiLB teams that existed prior to the Takeover Plan. The 160 MiLB teams operated in 20 different minor leagues, which were located across the United States, Canada, and Mexico.

56.     Over time, a number of MLB Clubs purchased one or more of their post-Takeover affiliates. For example, the Atlanta Braves team owns three of its four remaining MiLB affiliates (the Gwinnett Stripers, the Mississippi Braves, and the Rome Braves); the Houston Astros team owns three of its four remaining MiLB affiliates (the Fayetteville Woodpeckers, the Corpus Christi Hooks, and the Sugar Land Skeeters); the New York Mets team owns three of its four remaining MiLB affiliates (the Syracuse Mets, the

---

[5] Prior to the implementation of the Takeover Plan, MLB Clubs could also affiliate with one MiLB team from each of the now-eliminated Short Season A (NYPL) and domestic non-complex-based Rookie leagues (Rookie Advanced).

Brooklyn Cyclones, and the St. Lucie Mets); the Philadelphia Phillies team owns two of its four remaining MiLB Affiliates (the Reading Fightin Phils and the Clearwater Threshers); the Texas Rangers team owns two of its four remaining MiLB Affiliates (Down East Wood Ducks and the Hickory Crawdads); the St. Louis Cardinals team owns two of its four remaining MiLB Affiliates (the Palm Beach Cardinals and the Springfield Cardinals); the New York Yankees team owns one of its four remaining MiLB Affiliates (the Tampa Tarpoons) and has partial ownership rights to another one of its remaining MiLB Affiliates (the Scranton/Wilkes-Barre RailRiders); the Los Angeles Dodgers team owns one of its four remaining MiLB Affiliates (the Oklahoma City Dodgers); the Miami Marlins team owns one of its four remaining MiLB Affiliates (the Jupiter Hammerheads); the Milwaukee Brewers team owns one of its four remaining MiLB Affiliates (the Carolina Mudcats); the Pittsburgh Pirates team owns one of its four remaining MiLB Affiliates (the Brandon Marauders); the Seattle Mariners team owns one of its four remaining MiLB Affiliates (the Modesto Nuts); the Toronto Blue Jays team owns one of its four remaining MiLB Affiliates (the Dunedin Blue Jays); the Detroit Tigers team owns one of its four remaining MiLB Affiliates (the Lakeland Flying Tigers); and the San Francisco Giants team has majority ownership of one of its four remaining MiLB Affiliates (the San Jose Giants). MLB Clubs also own all of the teams participating in two facilities-based leagues, the Gulf Coast League and the Arizona Rookie league, which continue to be operated by MLB Clubs and are not included in the 120 Remaining Teams.

57.     Acclaimed baseball writer, historian, and statistician Bill James has observed that "[b]y a long series of actions and agreements, inducements and rewards, the minor leagues

were reduced in tiny degrees from entirely independent sovereignties into vassal states, existing only to serve the needs of major league baseball."[6]

**B.      The Illegal Takeover Plan to Reduce MiLB Team Output**

58.      In 2019, MLB began talks with the National Association about a new PBA. But MLB's plan was not to continue the market for MiLB affiliates that had developed and generated a competitive output of 160 different MiLB teams. Rather, its plan was to reduce the number of MLB affiliates each MLB Club could have and to ultimately eliminate 40 MiLB teams. Those teams would be subject to a boycott from MLB affiliation. This solidified MLB's singular control over all of professional baseball, and enabled MLB Clubs to save the costs of being affiliated with as many teams while insulating those MLB Clubs from the competition of affiliating with additional MiLB Clubs to obtain access to additional players and resources.

59.      Most of the Ousted Teams received no notice whatsoever that their affiliation—in some cases decades-long—with an MLB Club would end. Many of the MLB Clubs even provided affirmative assurances to their affiliated MiLB teams that any change would not impact them, but then blindsided those same teams with the Takeover Plan.

60.      In September 2020, MLB let the PBA expire and announced the Takeover Plan, wherein each MLB club jointly agreed to implement a new minor league system, wholly controlled by MLB and its member teams, and to artificially constrict the number of minor league teams allowed to participate within it. Pursuant to this anticompetitive agreement, MLB and its 30 Clubs would: (a) reorganize MiLB into just four leagues with each Major League team limited in the number of affiliated teams it could have so that there would

---

[6] Bill James, *The New Bill James Historical Baseball Abstract* (2003).

only be the 120 Remaining Teams; and (b) MLB Clubs would not affiliate with the 40 Ousted Teams, including Plaintiffs, who fell victim to the group boycott. Because MLB Clubs had been responsible for the payrolls of their MiLB affiliates, this anticompetitive agreement enabled MLB and its Clubs to consolidate their control over MiLB and for the competing MLB Clubs to eliminate 40 payrolls and reduce the costs of competing with each other for players through the cultivation of more minor league affiliates.

61.     The Takeover Plan has no procompetitive objective or virtue. It was intended to restrict competition and output to increase the profitability of MLB Clubs. If the objective had been to improve the MiLB affiliated teams' product, then MLB and its Clubs would have permitted market forces to determine *how many* and *which* MiLB teams would be affiliated with each MLB club, because competition—not conspiracy—will yield the procompetitive outcome.

62.     As part of their reduction in output and boycott, MLB and its Clubs made sure to continue the affiliation of the vast majority of MiLB teams owned by an MLB Club regardless of how those teams compared on the merits to the Ousted Teams. This biased selection process further demonstrated that the Takeover Plan was not intended to further any objective of improving the quality of affiliated MiLB teams.

63.     To give a few examples: the Atlanta Braves continued its affiliation with all its self-owned MiLB teams (it now owns three of the four Remaining Teams affiliated with its Club); the Detroit Tigers, Los Angeles Dodgers, Miami Marlins, Milwaukee Brewers, Philadelphia Phillies, Pittsburgh Pirates, Seattle Mariners, Tampa Bay Rays, Texas Rangers, and Toronto Blue Jays each continued their affiliations with all of their self-owned MiLB teams; and the Houston Astros continued its affiliation with all of its self-

owned MiLB teams so that three of its four Remaining Teams are owned by the Houston Astros and its fourth Remaining Team is owned by former U.S. Senator and current Governor of Ohio, Mike DeWine.

64.     Notably, the National Association's Joint Committee Member David G. Elmore saw five of his MiLB teams continue their affiliation: the Amarillo Sod Poodles (affiliated with the Arizona Diamondbacks); the Lynchburg Hillcats (affiliated with the Cleveland Indians); the Inland Empire 66ers (affiliated with the Los Angeles Angels); the San Antonio Missions (affiliated with the San Diego Padres); and the Eugene Emeralds (affiliated with the San Francisco Giants).

65.     Jeff Goldklang, whose father is a longtime limited partner in the New York Yankees' ownership group, saw all three of his MiLB teams continue their affiliations: the St. Paul Saints (a previously independent team that became affiliated with the Minnesota Twins after the Takeover Plan was implemented); the Hudson Valley Renegades (affiliated with the New York Yankees); and the Charleston RiverDogs (affiliated with the New York Yankees).

66.     Larry Luchino, a longtime executive in MLB (including as previous president of the Baltimore Orioles, president and CEO of the San Francisco Padres, and president and CEO of the Boston Red Sox) and President/CEO Emeritus of Fenway Sports Group (owner of MiLB Remaining Team Salem Red Sox), saw his MiLB teams continue their affiliation, including the Salem Red Sox and the Worcester Red Sox.

67.     By contrast, Plaintiffs did not have any ownership overlap with, or sufficiently close connection to, MLB or any of its Clubs, and they thus became the victims of the output-reducing group boycott.

C.     **Plaintiffs' Antitrust Injuries**

68.     By agreeing to prohibit the individual MLB Clubs from affiliating with any Plaintiff, MLB and its co-conspirator Clubs have caused each of the Plaintiffs' enterprise value to decline precipitously and threatened their existence. Indeed, the SI Yankees has gone out of business and has ceased to exist as a going concern.

69.     MiLB teams affiliated with big-league Clubs are a distinctively superior product from unaffiliated MiLB teams. The affiliation enables the MiLB team to attract players with the prospect of being promoted to MLB and also MLB players sent down to work on rehabilitation assignments. MLB affiliation makes such MiLB teams uniquely attractive to fans, sponsors, and the communities in which minor league teams are located. If not for MLB's and co-conspirators' output-reduction agreement, Plaintiffs would each still have their MLB affiliation and still be able to offer that superior MiLB product.

70.     Stripped of their affiliations, however, it is highly likely that some—if not *all*—of the Plaintiffs' patrons will choose not to purchase tickets for admission to Plaintiffs' games, further decreasing the revenue that the Plaintiffs are able to generate and thereby placing the future of their teams in jeopardy.

71.     Stripped of their affiliations, it is highly likely that some—if not *all*—of the Plaintiffs' sponsors will choose not to honor their sponsorship agreements, further decreasing the revenue that the Plaintiffs are able to generate and thereby placing the future of their teams in even greater jeopardy.

72.     Stripped of their affiliations, Plaintiffs cannot attract top player talent, because there is no prospect for players to move up to MLB Clubs, and Plaintiffs will also no longer be able to gain access to players chosen by MLB Clubs in the MLB player draft.

73.     Meanwhile, Plaintiffs' fans, sponsors, and communities will also suffer antitrust injury because they have been deprived of the MLB-affiliated product that would have been offered to them if competition had not been restrained by the Takeover Plan. For example, a 2020 economic impact study found that the ValleyCats provided Troy, New York with approximately $55 million in beneficial economic impacts from one year of operations, visitor benefits, and capital improvements, and supported 763 local full and part-time jobs. The ValleyCats also produced $2.4 million in indirect business taxes. Similarly, Staten Island benefited from over $77 million in sales associated with the SI Yankees' presence, and the team and its stadium supported more than 1,500 local jobs. Absent an MLB affiliation, the economic benefits that the Plaintiffs have provided to their local communities will be significantly diminished—if not eliminated—and many of the jobs and other direct and indirect economic benefits that arose from these businesses will disappear.

74.     Many of the Ousted Teams are located in grass-roots baseball towns, where most of baseball's biggest stars passed through (and developed a forever fan base) on their way to the big leagues. The only way these communities can see professional baseball games in person is through their affiliated MiLB teams—fans often cannot afford to travel hundreds of miles to see MLB or other affiliated MiLB teams play.

75.     None of the above antitrust injuries to Plaintiffs or their fans, sponsors and communities would have occurred but for the Takeover Plan's restriction of output and boycott.

### D.   MLB Clubs Compete Horizontally On and Off the Field

76.     MLB, like a number of other sports leagues, has structured its governance to permit major decisions regarding on-field sporting competition and off-field business competition to be made jointly by separately owned and operated Club owners who otherwise compete against each other economically. When such agreements restrict the economic competition among the members of a sports league that would otherwise occur, they are subject to scrutiny under Section 1 of the Sherman Act. *See Am. Needle v. Nat'l Football League*, 560 U.S. 183, 184 (2010) ("[W]e have repeatedly found instances in which members of a legally single entity violated § 1 when the entity was controlled by a group of competitors and served, in essence, as a vehicle for ongoing concerted activity.").

77.     The 30 co-conspirator MLB Clubs are independently owned businesses that do not share profits and losses or a majority of their revenues. They compete with one another not just on the baseball diamond, but in various economic markets.

78.     For example, the Clubs are competing employers in labor markets. They compete fiercely for top talent. This includes not just professional baseball players, but managers, coaches, general managers, scouts, and non-baseball personnel—e.g., doctors, trainers, marketing, and sales personnel.

79.     Clubs also compete with each other for a wide range of revenue. They compete for ticket sales, sponsorship, and advertising dollars, and in the sale of their intellectual property (e.g., to be used in the manufacture of apparel and consumer products bearing team logos).

80.     As the Supreme Court observed in *American Needle* with respect to National Football League franchises, "[e]ach of them [the teams] is a substantial, independently

owned, and independently managed business." 560 U.S. at 196. And "[t]he teams compete with one another, not only on the playing field, but to attract fans, for gate receipts and for contracts with managerial and playing personnel." *Id.* (proceeding to evaluate National Football League Clubs' "compet[ition] in the market for intellectual property").

81.     Of particular relevance here, MLB Clubs' competition for players, in turn, leads them to compete for affiliations with MiLB teams so each MLB Club can develop the best group of future major league talent. This competition led to 160 MiLB teams—now reduced because of collective agreement, not competition.

82.     This economic competition between MLB Clubs was aptly described by the New York Yankees when it filed its own lawsuit against MLB and the other Clubs for restricting how the New York Yankees choose to independently license its intellectual property. Compl., *New York Yankees P'ship and Adidas Am., Inc. v. Major League Baseball Enters., Inc.*, Case No. 98-civ-0129 (S.D.N.Y.). As the New York Yankees explained:

> ***Defendants operate a horizontal cartel***, through which the Major League Clubs have agreed not to compete with each other and thereby to fix prices and to reduce output below competitive levels in the (i) professional baseball retail licensing markets; and (ii) the professional baseball sponsorship markets.

*Id.* at ¶ 153 (emphasis added.)

## INTERSTATE TRADE AND COMMERCE

83.     MLB and its 30 Clubs are engaged in the business of controlling and/or operating professional (both major and minor league) baseball teams, including the sale of tickets, advertising and promotional partnerships, and telecast rights to the public for the exhibition of the individual and collective professional baseball talents of players on such teams.

84.     MLB's and its Clubs' operation of and engagement in the businesses of professional baseball involves a substantial volume of interstate trade and commerce,

including, *inter alia*, the following interstate activities: travel; communications; purchases and movement of equipment; broadcasts of games; advertisements; promotions; sales of tickets and concession items; sales of merchandise and apparel; employment of coaches and administrative personnel; employment of umpires; and negotiations for all of the above.

85.     MLB's and MLB Clubs' interstate business involves billions of dollars in collective annual expenditures and receipts.

86.     MLB and MLB Clubs have engaged in illegal conduct with direct, substantial, and reasonably foreseeable effects on commerce throughout the United States.

## RELEVANT MARKET

87.     MLB's horizontal agreement to restrict output and boycott the Ousted Teams should be condemned as either *per se* illegal, illegal under the quick-look rule of reason, or illegal through direct evidence of anticompetitive effects, without the need for relevant market definition. However, to the extent the identification of a relevant market is found to be required, this action concerns competition in the relevant market in which MLB Clubs—as the only Franchises operating at the top-tier level of professional baseball competition in North America—compete with each other to affiliate with MiLB Teams. Plaintiffs are—or, rather, were—part of the supply side of that market.

88.     Before the Takeover Plan, individual MLB Clubs had as many as six affiliated MiLB teams (excluding teams outside the National Association, including the Dominican Summer League, the Arizona Complex League, and the Florida Complex League), which is the minimum output that a competitive market would yield. Plaintiffs have been shut out

of this market because of the artificial restriction on MLB Clubs having additional affiliated MiLB teams.

89.     MiLB teams affiliated with an MLB Club are not substitutes for MiLB teams with no such affiliation. The products such teams can offer are very different and not competitive with each other, because unaffiliated teams do not have access to the pool of top player talent that will be headed up to, or down from, the big leagues. Neither fans nor sponsors nor anyone else views an MLB-affiliated MiLB team to be interchangeable with a non-affiliated MiLB team.

90.     In addition, MLB-affiliated MiLB teams are prohibited by MLB rules from playing games with unaffiliated MiLB teams. Thus, Plaintiffs are—literally—barred from competing with the Remaining Teams. And the quality of games among unaffiliated MiLB teams is lesser and thus not an interchangeable product from the standpoint of fans.

91.     Within the relevant market for affiliated MiLB teams, unaffiliated teams would— absent the Takeover Plan's restraints—compete with each other to gain an affiliation. Conversely, MLB Clubs would compete with respect to how many and which MiLB teams to affiliate with. But all of that competition has been supplanted by the Takeover Plan.

92.     The relevant geographic market is North America. This is the geographic area in which MLB Clubs and MiLB teams seeking affiliations are located. The rookie leagues (i.e., Arizona Complex League, the Florida Complex League, and the Dominican Summer League) do not have access to the same type of affiliation with MLB Clubs as other minor league teams in North America and they thus were not part of the Takeover Plan and are not part of the relevant geographic market.

**MARKET POWER**

93.     MLB and its member Clubs have collective market power—indeed, monopoly power—in the relevant market. MLB and its Clubs possess absolute control over which, and how many, MiLB teams may affiliate with an MLB Club. They have a 100% market share in this relevant market and control all entry and access to this market.

94.     There is no competing first-tier professional baseball league to compete with MLB and its Clubs in North America. Accordingly, there is no alternative to MLB and its Clubs for any minor league team that seeks to affiliate with a top-tier professional league.

**THE RESTRAINTS HAVE NO
PROCOMPETITIVE JUSTIFICATIONS**

95.     In 2019, for the 15th straight year, more than 40,000,000 fans attended games played by the 160 MiLB teams—most located in smaller cities and communities throughout the United States (games did not take place in 2020 because of COVID-19). Now 25% of those MiLB teams will disappear, not because of competitive failure, but because of collective decision-making by a group of horizontal competitors seeking to restrict output and reduce their costs.

96.     MLB and its co-conspirator Clubs' decision to adopt and implement the Takeover Plan did not arise from, nor was it intended to redress, any market failure or other circumstance capable of justifying the artificial reduction in output imposed on the relevant market. The restriction was implemented to reduce the costs of MLB Clubs competing with each other to have more affiliated minor league teams. MLB's view that such competition was "too costly" or "destructive" is an attack on competition itself and not a procompetitive justification.

97.     The fact that the Takeover Plan was not designed to enhance the quality of the MiLB product for consumers is self-evident from the manner in which the Takeover Plan was implemented. For example, upon information and belief, the elimination of 40 teams was not based on any consumer or economic studies designed to identify the optimal number of MiLB teams. Nor would such a study serve a procompetitive purpose, as the most efficient amount of output must be determined by competition, not by competitors artificially agreeing upon the amount of output. Further, there was no effort made by MLB to set standards for higher-quality MiLB Clubs and then see how many teams, and which ones, could satisfy such standards (such as stadium quality, fan satisfaction, etc.). Instead, MLB stripped many of the most successful and highest quality MiLB teams—like Plaintiffs—of their affiliations, while sparing those that were owned by or closely connected to MLB or its Clubs, regardless of their comparative quality.

98.     MLB's public justification for the Takeover Plan is implausible pretext.[7] For example, it stated that the Takeover Plan is an effort to place MiLB affiliates geographically closer to MLB Clubs with which they are associated. But Plaintiffs are aware of no evidence that this is true. In fact, the Ousted Teams formerly affiliated with the New York Yankees—the Trenton Thunder of Trenton, New Jersey (approximately 75 miles away) and the Staten Island Yankees of Staten Island, New York (approximately 25 miles away)—were both significantly closer geographically than one of the Remaining Teams still affiliated with (and owned by) the New York Yankees—the Tampa Tarpons of Tampa, Florida (more than 1,150 miles away). Similarly, the Ousted Team formerly

---

[7] *See MLB Announces Minor League Baseball Teams*, MiLB (Feb. 15, 2021), https://www.milb.com/news/mlb-announces-minor-league-baseball-teamsteams-will-be-part-of-new-model-to-bett.

affiliated with the Philadelphia Phillies—the Williamsport Crosscutters of Williamsport, Pennsylvania (approximately 185 miles away from Philadelphia)—was far closer geographically than one of the Remaining Teams still affiliated with (and owned by) the Philadelphia Phillies—the Clearwater Threshers of Clearwater, Florida (more than 1,060 miles away).

99.     Nor does the geographic proximity argument justify restricting the competitive market output. If the individual MLB Clubs found it more desirable to have affiliated teams that were closer, they would decide this on their own in a competitive market. There is no procompetitive justification for MLB to second-guess market outcomes—believing that a competitive market yields an undesirable result is not a procompetitive justification for imposing anticompetitive restrictions.

100.    MLB further claimed that the Takeover Plan created a combined "integrated player development system" that includes 179 teams, with "[m]ore teams…joining the broader MLB player development system and other baseball leagues." This is mere pretext. The 179 teams (and "more") to which MLB refers include teams outside of the Remaining Teams and which are not a part of the structured MLB club affiliation system (A, AA, or AAA). Instead, MLB misleadingly counts rookie league teams, Dominican League teams, "Partner League" teams,[8] "MLB Draft League" teams,[9] and other undescribed teams in leagues that are not affiliated with a specific MLB club as the system proscribed for the last century.

---

[8] *Pioneer League becoming MLB 'Partner League'*, MiLB (Nov. 30, 2020), https://www.milb.com/news/pioneer-league-becoming-mlb-partner-league.
[9] *MLB Draft League Opening in 2021*, MiLB (Nov. 30, 2020), https://www.milb.com/news/mlb-draft-league-opening-in-2021.

101.    MLB has also claimed that the Takeover Plan will enable the Remaining Teams to improve amenities and working conditions for players and staffs. This is more pretext. If better amenities and working conditions were the objective, MLB could address this through improved standards, and teams like Plaintiffs would meet them. Further, while such improved standards may be a laudable objective, they are not a procompetitive one. No businesses may agree to reduce output in a market and defend the need for such an output-reducing agreement on the ground that the illegal cartel profits will be paid back to employees or used for some other societal purpose. Moreover, there is no evidence that the Remaining Teams have had any better amenities, facilities, or working conditions than the Ousted Teams or that this was the basis for determining which MiLB teams would lose and which would keep their affiliation. Once again, MLB's purported justification is neither procompetitive nor in any way linked to the realities of the Takeover Plan.

102.    At bottom, there is no legally cognizable, procompetitive justification for the Takeover Plan. And even if there were, it could have been accomplished in a far-less-restrictive fashion by permitting competitive forces to determine *whether*, *how many*, and *which* MiLB teams would have affiliations, subject to improved standards for the quality and working conditions of the affiliated teams that could pass antitrust scrutiny.

## MLB'S ANTITRUST EXEMPTION

103.    This lawsuit punctuates just how damaging the "baseball exemption" has become to market competition and why Plaintiffs have a good-faith belief that the Supreme Court will no longer apply it.

104.    The Supreme Court's decision in *Federal Baseball* rests on what the Supreme Court has since recognized to be a flawed conception that professional baseball involved purely intrastate, non-commercial activity. *See Federal Baseball Club*, 259 U.S. at 208–09 ("the

business [of] giving exhibitions of base ball" was "purely state affairs" such that it did not implicate the Sherman Act). The past century has revealed precisely the contrary: MLB and its co-conspirator Clubs cashed in on the big business of professional baseball and regularly conduct business across state lines.

105.    In *Alston*, a unanimous Supreme Court condemned the baseball exemption announced in *Federal Baseball*:

> To be sure, this Court once dallied with something that looks a bit like an antitrust exemption for professional baseball. In *Federal Baseball Club of Baltimore, Inc. v. National League of Professional Baseball Clubs*, 259 U.S. 200 (1922), the Court reasoned that "exhibitions" of "base ball" did not implicate the Sherman Act because they did not involve interstate trade or commerce—even though teams regularly crossed state lines (as they do today) to make money and enhance their commercial success. *Id.*, at 208–209. But this Court has refused to extend *Federal Baseball*'s reasoning to other sports leagues—and has even acknowledged criticisms of the decision as "unrealistic" and "inconsistent" and "aberration[al]." *Flood v. Kuhn*, 407 U.S. 258, 282 (1972) (quoting *Radovich v. National Football League*, 352 U.S. 445, 452 (1957)); *see also* Brief for Advocates for Minor Leaguers as *Amicus Curiae* 5, n.3 (gathering criticisms). Indeed, as we have seen, this Court has already recognized that the NCAA itself *is* subject to the Sherman Act.

141 S. Ct. at 2159 (emphasis in original).

106.    The *Alston* court simultaneously made clear, by rejecting the NCAA's reliance on a 37-year-old Supreme Court case (*Board of Regents*) stating that NCAA amateurism rules were entitled to special deference under the antitrust laws, that the Court would not support special antitrust treatment for sports business and would not adhere to decades-old rulings articulating such special treatment where the factual predicates do not apply. 141 S. Ct. at 2159.

107.    Further, the *stare decisis* rationale for continuing the baseball exemption, cited in *Flood*, 407 U.S. 258, makes no sense in this litigation. The previous Supreme Court

decision applying the baseball exemption all did so in the context of restrictions on competition for players. *See Piazza v. Major League Baseball*, 831 F. Supp. 420, 435–36 (E.D. Pa. 1993). Whatever argument there was at the time of *Flood* to adhere to such an exemption for player restrictions under principles of *stare decisis* in 1984, there is no basis to apply such principles to an unrelated restraint on competition in a different market. In fact, the Supreme Court has never applied the baseball exemption outside the context of the "reserve clause."

108.     Congress has repealed the baseball exemption for player restrictions, the one area where the Supreme Court has applied it. CURT FLOOD ACT OF 1998, 112 Stat. 2824, 2825 ("It is the purpose of this legislation to state that [MLB] players are covered under the antitrust laws (i.e., that [MLB] players will have the same rights under the antitrust laws as do other professional athletes, e.g., football and basketball players)[.]"). This is further reason to believe that the Supreme Court would not apply the exemption outside of the player-restraints context, given its view that the exemption itself was completely aberrational and unjustified. *Alston*, 141 S. Ct. at 2157; *see also Piazza*, 831 F. Supp. at 435–36. Even where Congress has conferred an antitrust exemption, Supreme Court precedents "consistently hold that exemptions from the antitrust laws must be construed narrowly." *Union Lab. Life Ins. Co. v. Pireno*, 458 U.S. 119, 126 (1982); *accord Nat'l Broiler Mktg. Ass'n v. United States*, 436 U.S. 816, 823 (1978); *Fed. Maritime Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 733 (1973) ("[R]epeals of the antitrust laws by implication * * * are strongly dis- favored.") (quotation omitted, collecting cases).

109.     As the Supreme Court further stated in *Alston*: "Whether an antitrust violation exists necessarily depends on a careful analysis of market realities . . . If those market

realities change, so may the legal analysis." *Id.* at 2158. Based on the changing market realities here, Plaintiffs believe that the Supreme Court would not apply any baseball exemption to the claims presented here. Instead, Plaintiffs believe that this case will be the vehicle that the Supreme Court will use, if presented the opportunity, to cast the baseball exemption aside. The factual and legal underpinnings of the baseball exemption set forth in the *Federal Baseball* decision are simply no longer applicable to the facts presented by the business of baseball today.

## CLAIM FOR RELIEF

### COUNT I

**Violation of Section 1 of the Sherman Act**

110.    Plaintiffs incorporate and reallege, as though fully set forth herein, each and every allegation set forth in the preceding paragraphs of this Complaint.

111.    MLB's Takeover Plan is a horizontal agreement between competitors that has artificially reduced and capped output in the market for MiLB teams affiliated with MLB Clubs. MLB and its co-conspirator Clubs implemented this agreement for the specific purpose of limiting output and reducing Club costs that would otherwise occur in an unconstrained market. Pursuant to the Takeover plan, output was reduced from 160 to 120 affiliated teams, and the 40 Ousted Teams—including Plaintiffs—are subject to a group boycott precluding them from competing for MLB affiliation.

112.    The Takeover Plan operates as a continuing horizontal agreement to reduce output and boycott the Ousted Teams and is *per se* unlawful.

113.    In the alternative, the Takeover Plan also constitutes an unreasonable restraint of trade under the "quick look" rule of reason analysis. MLB has market power, there is no

conceivable procompetitive justification for its Takeover Plan, and thus MLB's naked horizontal agreement can be condemned in the twinkling of an eye.

114.    The Takeover Plan is also, alternatively, a violation of the Rule of Reason under a direct-effects analysis. The restriction on competitive output is clear—40 MiLB affiliations have been extinguished—and does not require analysis of market power or relevant markets. There is no plausible procompetitive justification for the direct restriction on competition imposed by the Takeover Plan.

115.    Plaintiffs have suffered and will continue to suffer antitrust injury to their businesses and property by reason of the continuation of this unlawful contract, combination, or conspiracy in restraint of trade. The Takeover Plan has injured and will continue to injure Plaintiffs by depriving them of the ability to affiliate with MLB Clubs and to offer a MiLB product with access to top-quality players, coaches, and training staff.

116.    The Takeover Plan will also cause competitive injury to fans, sponsors, and communities, who will be deprived of access to higher-quality MiLB games in the localities where the Ousted Teams compete. The Takeover Plan will thus cause serious injury to competition, not just to the individual Ousted Teams and Plaintiffs.

117.    Monetary damages, alone, are not adequate to compensate Plaintiffs for the irreparable harm they have and will continue to suffer, if MLB and its co-conspirator Clubs' Takeover Plan is allowed to continue, warranting injunctive relief.

118.    MLB's conduct has also caused, and will continue to cause, substantial monetary injuries to Plaintiffs, by, among other things, depressing their enterprise values and depriving them of revenue streams, entitling them to individual damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for judgment with respect to their Complaint as follows:

1.      That the unlawful contract, conspiracy, and combination alleged herein (the Takeover Plan), and the acts done in furtherance thereof by MLB and its non-defendant co-conspirators, be adjudged and decreed a violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

2.      That the Court enjoin MLB from continuing to implement its unlawful Takeover Plan agreement with its non-defendant co-conspirator Clubs to unreasonably restrain output in the relevant market, all in violation of Section 1 of the Sherman Act, and that the Court permit such Clubs to compete with each other to make their own decisions as to with which MiLB teams—and how many—to affiliate;

3.      That the Court award compensatory and treble damages to each individual Plaintiff resulting from MLB's violation of Section 1 of the Sherman Act in an amount to be determined at trial;

4.      That the Court award pre-judgment and post-judgment interest at the maximum legal rate;

5.      That the Court award each Plaintiff its costs, expenses, and reasonable attorneys' fees in this action; and

6.      That the Court award such other relief as it may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff hereby demands a jury trial as provided by Rule 38(a) of the Federal Rules of Civil

Procedure.


DATED:   December 20, 2021                    Respectfully submitted,
          New York, New York

                                                 By:     /s/ David J. Lender
                                                   David J. Lender

David J. Lender (NY Bar 2583722)
Eric S. Hochstadt (NY Bar 4222683)
Zachary A. Schreiber (NY Bar 5612429)
**WEIL, GOTSHAL & MANGES LLP**
767 Fifth Avenue
New York, NY 10153
Tel: (212) 310-8000
Fax: (212) 310-8007
david.lender@weil.com
eric.hochstadt@weil.com
zach.schreiber@weil.com

James W. Quinn (NY Bar 1304500)
Emily M. Burgess (NY Bar 5307038)
**BERG & ANDROPHY**
120 W. 45th St., 38th Floor
New York, New York 10036
Tel: (646) 766-0073
Fax: (646) 219-1977
jquinn@bafirm.com
eburgess@bafirm.com

*Counsel for Plaintiffs*