# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------- x

NOSTALGIC PARTNERS, LLC, d/b/a THE STATEN ISLAND YANKEES; ONEONTA ATHLETIC CORPORATION, d/b/a THE NORWICH SEA UNICORNS; SPORTS ENTERPRISES, INC., d/b/a SALEM-KEIZER VOLCANOES; and TRI-CITY VALLEYCATS, INC.,

:
:
:
:
:
:
:
:
:

                              Plaintiffs,

        v.

THE OFFICE OF THE COMMISSIONER OF BASEBALL, AN UNINCORPORATED ASSOCIATION d/b/a MAJOR LEAGUE BASEBALL,

                              Defendant.

----------------------------------------------------- x

21 Civ. 10876 (ALC)

**ORAL ARGUMENT REQUESTED**

<br>

## DEFENDANT'S MEMORANDUM OF LAW
## IN SUPPORT OF ITS MOTION TO DISMISS

John L. Hardiman
Benjamin R. Walker
Jacob G. Singer
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Tel:  212-558-4000
Fax:  212-558-3558
hardimanj@sullcrom.com
walkerb@sullcrom.com
singerja@sullcrom.com

*Counsel for Defendant The Office of the Commissioner of Baseball*

April 22, 2022

# TABLE OF CONTENTS

*Page*

PRELIMINARY STATEMENT ..................................................................................................1

ALLEGATIONS OF THE COMPLAINT...............................................................................3

    A.    The Parties ..............................................................................................3

    B.    MLB's Minor League Player Development System................................4

    C.    The Expiration of the PBA and Reorganization of the Minor League System......................................................................................................5

    D.    Plaintiffs' Claim......................................................................................6

ARGUMENT ............................................................................................................................7

I.      BASEBALL'S ANTITRUST EXEMPTION BARS PLAINTIFFS' CLAIM. ...................8

II.    PLAINTIFFS DO NOT HAVE ANTITRUST STANDING...........................................13

III.   PLAINTIFFS FAIL TO PLEAD A PLAUSIBLE SHERMAN ACT CLAIM. ................17

    A.    The Complaint Does Not Plausibly Allege a Conspiracy To Boycott Plaintiffs.................................................................................................17

    B.    The Complaint Does Not Plausibly Allege That Any Agreement Was Unlawful. ...............................................................................................20

CONCLUSION......................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc.* v. *Fed. Trade Comm'n*,
   1 F.4th 102 (2d Cir. 2021) ...................................................................21

*Am. Needle, Inc.* v. *Nat'l Football League*,
   560 U.S. 183 (2010)............................................................................21

*Anderson News, L.L.C.* v. *Am. Media, Inc.*,
   899 F.3d 87 (2d Cir. 2018)................................................................18

*Arcesium, LLC* v. *Advent Software, Inc.*,
   2021 WL 1225446 (S.D.N.Y. Mar. 31, 2021) ....................................16

*Bell Atl. Corp.* v. *Twombly*,
   550 U.S. 544 (2007).............................................................................7

*Cal. Dental Ass'n* v. *FTC*,
   526 U.S. 756 (1999)......................................................................22, 23

*Cenedella* v. *Metro. Museum of Art*,
   348 F. Supp. 3d 346 (S.D.N.Y. 2018).................................................21

*Charles O. Finley & Co.* v. *Kuhn*,
   569 F.2d 527 (7th Cir. 1978) ...............................................................9

*Cinema Vill. Cinemart, Inc.* v. *Regal Ent. Grp.*,
   2016 WL 5719790 (S.D.N.Y. Sept. 29, 2016)........................17, 18, 21

*City of Cleveland* v. *Cleveland Elec. Illuminating Co.*,
   538 F. Supp. 1306 (N.D. Ohio 1980)..................................................23

*City of San Jose* v. *Off. of Comm'r of Baseball*,
   776 F.3d 686 (9th Cir. 2015) ...............................................................9

*Concord Assocs., L.P.* v. *Ent. Props. Trust*,
   2014 WL 1396524 (S.D.N.Y. Apr. 9, 2014)......................................17

*Cotiviti, Inc.* v. *Deagle*,
   501 F. Supp. 3d 243 (S.D.N.Y. 2020)................................................20

*Deutscher Tennis Bund* v. *ATP Tour, Inc.*,
   610 F.3d 820 (3d Cir. 2010)...............................................................22

*Fed. Baseball Club of Balt.* v. *Nat'l League of Pro. Baseball Clubs*,
259 U.S. 200 (1922)................................................................................1

*Flood* v. *Kuhn*,
407 U.S. 258 (1972)..........................................................................1, 9, 10

*Gatt Commc'ns, Inc.* v. *PMC Assocs., L.L.C.*,
711 F.3d 68 (2d Cir. 2013)......................................................... *passim*

*Harris* v. *Mills*,
572 F.3d 66 (2d Cir. 2009)....................................................................7

*Hu* v. *City of New York*,
927 F.3d 81 (2d Cir. 2019)....................................................................4

*In re Inclusive Access Course Materials Antitrust Litig.*,
2021 WL 2419528 (S.D.N.Y. June 14, 2021) ......................13, 14, 19

*In re Ins. Brokerage Antitrust Litig.*,
618 F.3d 300 (3d Cir. 2010)................................................................20

*Integrated Sys. & Power, Inc.* v. *Honeywell Int'l, Inc.*,
713 F. Supp. 2d 286 (S.D.N.Y. 2010).............................................18–19

*In re Interest Rate Swaps Antitrust Litig.*,
261 F. Supp. 3d 430 (S.D.N.Y. 2017)................................................19

*Kavanagh* v. *Zwilling*,
578 F. App'x 24 (2d Cir. 2014) .........................................................7–8

*LLM Bar Exam, LLC* v. *Barbri, Inc.*,
271 F. Supp. 3d 547 (S.D.N.Y. 2017)............................................17, 18

*MacDermid Printing Sols. LLC* v. *Cortron Corp.*,
833 F.3d 172 (2d Cir. 2016)................................................................25

*Mayor & City Council of Balt.* v. *Citigroup, Inc.*,
709 F.3d 129 (2d Cir. 2013)............................................................17, 20

*Miranda* v. *Selig*,
860 F.3d 1237 (9th Cir. 2017) ....................................................1, 9, 11, 24

*N. Am. Soccer League, LLC* v. *U.S. Soccer Fed'n*,
883 F.3d 32 (2d Cir. 2018)..........................................................3, 20–21

*NCAA* v. *Alston*,
141 S. Ct. 2141 (2021)........................................................................10

*Nostalgic Partners, LLC* v. *N.Y. Yankees P'ship*,
　　2021 WL 4143121 (N.Y. Sup. Ct. Sept. 9, 2021)...................................................7

*Ohio* v. *Am. Express Co.*,
　　138 S. Ct. 2274 (2018) ..............................................................................21

*Port Dock & Stone Corp.* v. *Oldcastle Ne., Inc.*,
　　507 F.3d 117 (2d Cir. 2007)........................................................................16

*Portland Baseball Club, Inc.* v. *Kuhn*,
　　491 F.2d 1101 (9th Cir. 1974) ....................................................................10

*Pro. Baseball Schools & Clubs, Inc.* v. *Kuhn*,
　　693 F.2d 1085 (11th Cir. 1982) ..................................................................10

*Radovich* v. *Nat'l Football League*,
　　352 U.S. 445 (1957).....................................................................................9

*Reapers Hockey Ass'n* v. *Amateur Hockey Ass'n Ill.*,
　　412 F. Supp. 3d 941 (N.D. Ill. 2019) .........................................................24

*Salerno* v. *Am. League of Pro. Baseball Clubs*,
　　429 F.2d 1003 (2d Cir. 1970).......................................................................9

*Sell It Social, LLC* v. *Acumen Brands, Inc.*,
　　2015 WL 1345927 (S.D.N.Y. Mar. 20, 2015) .............................................14

*Spinelli* v. *Nat'l Football League*,
　　903 F.3d 185 (2d Cir. 2018).......................................................................21

*Sports Enters., Inc.* v. *Office of the Comm'r of Baseball*,
　　No. 21CV06637 (Or. Cir. Ct., Marion Cnty., Dec. 7, 2021) ........................7

*Square D Co.* v. *Niagara Frontier Tariff Bureau, Inc.*,
　　476 U.S. 409 (1986)...................................................................................12

*Theatre Party Assocs., Inc.* v. *Shubert Org.*,
　　695 F. Supp. 150 (S.D.N.Y. 1988) .............................................................21

*Tommy Lee Handbags Mfg. Ltd.* v. *1948 Corp.*,
　　971 F. Supp. 2d 368 (S.D.N.Y. 2013).........................................................13

*Toolson* v. *N.Y. Yankees, Inc.*,
　　346 U.S. 356 (1953)..........................................................................1, 9, 10

*Tri-City ValleyCats, Inc.* v. *Houston Astros Inc.*,
　　Index No. 650308/2021 (N.Y. Sup. Ct. Jan. 14, 2021).............................23

*Tri-City ValleyCats, Inc.* v. *Houston Astros Inc.*,
    2021 WL 3745410 (N.Y. Sup. Ct. Aug. 24, 2021) ...............................................7

*Triple-A Baseball Club Assocs.* v. *Ne. Baseball, Inc.*,
    832 F.2d 214 (1st Cir. 1987) ...............................................................10

*United States* v. *Andreas*,
    216 F.3d 645 (7th Cir. 2000) ...............................................................22

*United States* v. *Apple, Inc.*,
    791 F.3d 290 (2d Cir. 2015)...................................................3, 17, 18

*Worldwide Basketball & Sport Tours, Inc.* v. *NCAA*,
    388 F.3d 955 (6th Cir. 2004) ...............................................................22

*Wyckoff* v. *Off. of Comm'r of Baseball*,
    211 F. Supp. 3d 615 (S.D.N.Y. 2016).......................................................9

*Wyckoff* v. *Off. of Comm'r of Baseball*,
    705 F. App'x 26 (2d Cir. 2017) .................................................8–9, 11

*Yong Ki Hong* v. *KBS Am., Inc.*,
    951 F. Supp. 2d 402 (E.D.N.Y. 2013) ..................................................14

**Statutes**

15 U.S.C. § 26b(b)(2) ...............................................................................1, 11

**Other Authorities**

H.R. 2511, 117th Cong. (2021)..................................................................12

H.R. 3288, 107th Cong. (2001)..................................................................12

H.R. 3452, 113th Cong. (2013)..................................................................12

S. 1111, 117th Cong. (2021) ......................................................................12

S. 1704, 107th Cong. (2001) ......................................................................12

S. 1721, 113th Cong. (2013) ......................................................................12

S. 3833, 117th Cong. (2022) ......................................................................12

144 Cong. Rec. H9943 (daily ed. Oct. 7, 1998)........................................12

*The Application of Federal Antitrust Laws to Major League Baseball: Hearing*
    *Before the S. Comm. on the Judiciary*, 107th Cong. 35 (2002) ...............12

Gary R. Roberts, *A Brief Appraisal of the Curt Flood Act of 1998 From the Minor League Perspective*, 9 Marq. Sports L. J. 413 (1999)............................................................12

## PRELIMINARY STATEMENT

Plaintiffs are four former minor league affiliates of Major League Baseball ("MLB") clubs whose affiliation contracts with MLB expired in 2020. Since then, Plaintiffs have been searching for a legal basis to justify a lawsuit seeking compensation from MLB for the loss of their affiliations. After a series of setbacks in cases filed in New York and Oregon state courts, in which Plaintiffs have asserted various inapposite contract and tort theories, Plaintiffs filed this action, this time asserting a patently frivolous claim under federal antitrust law. This latest iteration of Plaintiffs' futile quest to impose liability on MLB for not renewing Plaintiffs' contracts should be dismissed on three independent grounds.

*First*, under Supreme Court precedent stretching back for a century, the "business of baseball" is exempt from the Sherman Act. *Fed. Baseball Club of Balt.* v. *Nat'l League of Pro. Baseball Clubs*, 259 U.S. 200, 208–09 (1922); *Toolson* v. *N.Y. Yankees, Inc.*, 346 U.S. 356, 357 (1953) ("Congress had no intention of including the business of baseball within the scope of the federal antitrust laws."); *Flood* v. *Kuhn*, 407 U.S. 258, 285 (1972) (same). Plaintiffs assert in their Complaint that this broad exemption does not cover their claims (Compl. ¶ 7), but it clearly does. *See*, *e.g.*, *Miranda* v. *Selig*, 860 F.3d 1237, 1242 (9th Cir.) ("[I]t is undeniably true that minor league baseball . . . falls squarely within baseball's exemption from federal antitrust laws."), *cert. denied*, 138 S. Ct. 507 (2017). Indeed, Plaintiffs have essentially conceded the point publicly by boasting in the press that they see this case as a vehicle to convince the Supreme Court to overturn *Federal Baseball* and its progeny. This Court, of course, is bound by that precedent. In any event, in 1998, Congress passed the Curt Flood Act, which recognizes and explicitly preserves the antitrust exemption for, among other things, "any . . . matter relating to *organized professional baseball's minor leagues*." 15 U.S.C. § 26b(b)(2) (emphasis added). Congress has thus effectively codified the exemption for the precise matters at issue here.

*Second*, an equally fundamental obstacle to Plaintiffs' claim is that they do not have antitrust standing to challenge MLB's reorganized player development system, because any injury they have suffered is not "antitrust injury." The gravamen of the Complaint is that Plaintiffs were not selected to participate in the reorganized system, not that it is anticompetitive. Plaintiffs allege that the reorganized system violates the antitrust laws because the number of affiliations between MLB clubs and minor league clubs is limited to four per MLB club, but Plaintiffs acknowledge that in the old system, the number of affiliations was also limited; the limit was just six instead of four. (Compl. ¶ 53.) Moreover, in the old system, unlike in the new system, the minor league clubs that historically had affiliations were effectively guaranteed to keep them, regardless of competitive merit. Thus, Plaintiffs' "injury"—the alleged reduction in the value of their clubs attributable to their prior participation in the minor league system—stems from the fact that they no longer benefit from an arrangement that, based on their own theory, was always anticompetitive. Second Circuit precedent is clear that harm "flow[ing] from . . . participation [in] and then exclusion from" an allegedly anticompetitive arrangement is not the kind of injury that the antitrust laws were designed to remedy. *Gatt Commc'ns, Inc.* v. *PMC Assocs., L.L.C.*, 711 F.3d 68, 77 (2d Cir. 2013).

*Third*, even if the relationships between MLB and minor league clubs were not exempt from the antitrust laws, and even if Plaintiffs had standing to bring an antitrust claim here, the Complaint does not plausibly plead a Sherman Act violation. The crux of Plaintiffs' claim is their allegation that, as part of the reorganization of MLB's player development system, MLB's 30 clubs collectively agreed that none of them would affiliate with any of Plaintiffs in the new system. But the Complaint does not allege any facts from which the Court could infer such an agreement. Beyond conclusory legal assertions that MLB clubs conspired to "boycott" Plaintiffs

(allegations that carry no weight on a motion to dismiss), the Complaint alleges nothing more than that some (but not all) of MLB's clubs chose other affiliates because they had economically self-interested reasons to do so, such as ownership stakes in the affiliates they selected. Even if that is true, it is entirely consistent with independent, rational decision-making, and is thus insufficient to give rise to a plausible inference of conspiracy as a matter of law. *See, e.g.*, *United States* v. *Apple, Inc.*, 791 F.3d 290, 315, 318 (2d Cir. 2015).

The Complaint also does not plausibly plead that any alleged agreement among MLB's clubs was an unreasonable restraint of trade under the Sherman Act. An agreement between members of a sports league that is subject to the antitrust laws can be unlawful only if it violates the "rule of reason." *N. Am. Soccer League, LLC* v. *U. S. Soccer Fed'n* ("*NASL*"), 883 F.3d 32, 41 (2d Cir. 2018). To allege such a violation, Plaintiffs must plead facts demonstrating an actual adverse effect on a cognizable economic "market." *Id.* at 42. But Plaintiffs' self-contradictory Complaint does not even identify a coherent market, much less anticompetitive harm to that market.

## ALLEGATIONS OF THE COMPLAINT[1]

### A. The Parties

Plaintiffs Nostalgic Partners, LLC, d/b/a Staten Island Yankees ("SI Yankees"); Tri-City ValleyCats, Inc. ("ValleyCats"); Sports Enterprises, Inc., d/b/a Salem-Keizer Volcanoes ("Volcanoes"); and Oneonta Athletic Corporation, d/b/a Norwich Sea Unicorns ("Sea Unicorns") are the corporate owners of four baseball clubs formerly affiliated with, respectively, the New York Yankees, the Houston Astros, the San Francisco Giants, and the Detroit Tigers. (Compl.

---

[1] MLB disputes many of the allegations in the Complaint but accepts Plaintiffs' well-pled allegations as true solely for purposes of this motion. (*See infra* at 7.)

¶¶ 9–12, 98.)  Defendant The Office of the Commissioner of Baseball, d/b/a MLB, is an unincorporated association consisting of 30 member clubs, including the clubs with which Plaintiffs were previously affiliated.  (*Id.* ¶ 13.)

## B.    MLB's Minor League Player Development System

For over 100 years, MLB clubs have affiliated with minor league clubs for the purpose of developing the skills of players who are under contract with MLB clubs but not ready for the major leagues—an arrangement colloquially known as baseball's "farm system."  Until the end of the 2020 baseball season, these affiliations were governed by the Professional Baseball Agreement (the "PBA"), a contract between MLB and the National Association of Professional Baseball Leagues, Inc. (the "National Association"), an organization of minor leagues and minor league clubs.  (Ex. 1 at 1; Compl. ¶ 50.[2])  Under the PBA, MLB clubs could affiliate with "up to six [minor league] teams" in six separate tiers of minor league baseball, with each tier comprised of a number of separate leagues.  (Ex. 1 at 4; Compl. ¶¶ 49, 53, 55, 88 & n.5.)  The six tiers were: Triple-A, Double-A, Class A Advanced, Class A, Short Season A, and Rookie Advanced.  (Compl. ¶ 53 & n.5.)

The PBA incorporated the Major League Rules ("MLR") into its terms.  (Ex. 1 at 3; Compl. ¶ 50.)  Rule 56 of the MLR sets forth the detailed provisions of a standard "Player Development Contract" ("PDC") to which each of the MLB clubs and their minor league affiliates were required to agree pursuant to the PBA.  (Ex. 2 at 185–97; Compl. ¶ 50.)  Rule 56 also provided that "[n]o PDC may have a term extending beyond the expiration of the PBA and the rights and

---

[2] Citations to "Ex." refer to the exhibits to the Declaration of Benjamin R. Walker, all of which are documents referenced in the Complaint.  *See Hu* v. *City of New York*, 927 F.3d 81, 88 (2d Cir. 2019) ("In deciding a Rule 12(b)(6) motion, the court may consider only the facts alleged in the pleadings, documents attached as exhibits or incorporated by reference in the pleadings[,] and matters of which judicial notice may be taken.").

obligations of all parties to a PDC shall terminate (and be of no force and effect) as of the expiration of the PBA." (Ex. 2 at 189.)

Under the PBA and PDCs, each "MLB club provide[d] players, coaches, and trainers to its [minor league affiliates] at no cost," and the minor league clubs shared a portion of their ticket revenues with MLB. (Ex. 2 at 191–95; Compl. ¶¶ 51–52.) The PBA and PDCs also provided for expense allocation between the MLB clubs and their affiliates, as well as other support that MLB clubs provided to their affiliates. (Ex. 2 at 191–95.) In addition, the PBA required MLB and its clubs to maintain at least 160 affiliations with National Association clubs, and the PBA and MLR imposed significant limitations on MLB clubs' abilities to change or reduce their affiliations. (Ex. 1 at 4–5; Ex. 2 at 187–90.)

## C. The Expiration of the PBA and Reorganization of the Minor League System

On September 30, 2020, the PBA expired by its terms (Ex. 1 at 2; Compl. ¶ 60), which automatically terminated all existing PDCs and, more broadly, ended the PDC as the mechanism by which MLB clubs and minor league clubs affiliated with one another.

After the expiration of the PBA, MLB reorganized its player development system into a new "Professional Development League" ("PDL") structure. (Ex. 3 at 1.) As part of the reorganization, rather than agree to a new umbrella contract with the National Association, MLB contracted directly with minor league clubs through PDL license agreements. (*Id.*) In the new system, two of the six minor league tiers (Short Season A and Rookie Advanced) were eliminated, and each MLB club took on one affiliate in each remaining tier, resulting in 120 affiliations between MLB clubs and minor league clubs in total. (Compl. ¶ 60.) Plaintiffs were not among the 120 minor clubs chosen to participate in the four affiliated tiers.

As MLB explained in a press release describing the reorganized system (cited in

the Complaint, *see* Compl. ¶ 98 n.7):

> Each MLB Club will provide Minor League players and staffs to their four affiliates – one at each of the Triple-A, Double-A, High-A and Low-A levels. Minor League Clubs will receive PDL licenses from MLB that entitle them to operate in the Professional Development Leagues, ensuring a new set of standards in terms of facilities and player working conditions. The licenses will create many improvements to the experience and lifestyle of Minor League players, such as:
>
> - Player salary increases ranging from 38-72% for the 2021 season.
> - Modernized facility standards better suited for professional athletes.
> - Improved amenities and working conditions for players and staff.
> - Reduced in-season travel for players and coaches.
> - Better geographical alignment.
>
> . . . The new system will better serve fans, players and Clubs throughout the United States and Canada; preserve high-level, sustainable baseball in nearly every community where the game has historically been played; and position the sport for growth in future years.

(Ex. 3 at 2.)

### D. Plaintiffs' Claim

Prior to filing this action, the SI Yankees, ValleyCats, and Volcanoes all brought individual lawsuits against MLB asserting a smorgasbord of state-law claims in state courts in New York and Oregon, including claims for breach of implied contract, promissory estoppel, breach of fiduciary duty, tortious interference with contract, tortious interference with business relations, civil conspiracy, unjust enrichment, and violations of the New York Franchise Sales Act. All alleged in substance that MLB and its clubs had a legal obligation to remain affiliated with Plaintiffs in perpetuity, despite the expiration of the PBA and PDCs, and sought to recover the alleged lost enterprise value resulting from the end of their affiliations. The SI Yankees' claims against MLB were dismissed; the Volcanoes' claims against MLB were stayed (over the Volcanoes' objection) pending arbitration between the Volcanoes and other defendants; and the ValleyCats' claims were mostly dismissed, with the exception of certain claims for tortious

interference with contract.[3] The denial of MLB's motion to dismiss with respect to the tortious

interference claims is currently on appeal. The Sea Unicorns have now filed a state-law action

asserting copycat tortious interference claims, and the SI Yankees have filed an amended

complaint doing the same.

Plaintiffs' sole claim in this action asserts that, in reorganizing its player

development system, MLB and its member clubs violated Section 1 of the Sherman Act by entering

into "a horizontal agreement . . . to eliminate their affiliation with . . . 40 [minor league] teams,"

including Plaintiffs. (Compl. ¶ 1.) Plaintiffs seek the same alleged damages—their purported lost

"enterprise values"—as they do in their other actions. (*Id.* ¶ 118.)[4]

## ARGUMENT

A complaint should be dismissed under Rule 12(b)(6) where it fails to state a legal

claim or does not contain sufficient well-pled facts to support "a plausible entitlement to relief."

*Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 559 (2007).[5] "[A]lthough a court must accept as true

all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and

threadbare recitals of the elements of a cause of action, supported by mere conclusory statements,

do not suffice." *Harris* v. *Mills*, 572 F.3d 66, 72 (2d Cir. 2009). A court also should "not accept

as true conclusions unsupported by the facts alleged, . . . bald assertions or unwarranted

---

[3] *See Nostalgic Partners, LLC* v. *N.Y. Yankees P'ship*, 2021 WL 4143121 (N.Y. Sup. Ct. Sept. 9, 2021); *Tri-City ValleyCats, Inc.* v. *Houston Astros Inc.*, 2021 WL 3745410 (N.Y. Sup. Ct. Aug. 24, 2021); *Sports Enters., Inc.* v. *Office of the Comm'r of Baseball*, No. 21CV06637 (Or. Cir. Ct., Marion Cnty., Dec. 7, 2021).

[4] MLB objects to Plaintiffs splitting their claims challenging the loss of their affiliations across five different cases in three different courts. MLB (on behalf of itself and its clubs) reserves the right to rely on a final judgment in this action as precluding any theory of recovery that could have been asserted in this action.

[5] Except as otherwise noted, all internal quotation marks and citations are omitted.

inferences." *Kavanagh* v. *Zwilling*, 578 F. App'x 24, 24 (2d Cir. 2014).

Here, Plaintiffs' claim should be dismissed because it is plainly barred by baseball's exemption from the antitrust laws, first recognized by the Supreme Court 100 years ago and now effectively codified by Congress with respect to the minor league relationships at issue here. Plaintiffs also lack antitrust standing to bring their claim because harm caused by expulsion from an allegedly anticompetitive agreement is not redressable by the antitrust laws. In addition to those threshold issues, Plaintiffs also have not alleged sufficient facts to state a claim for relief under the Sherman Act because the Complaint does not allege facts giving rise to a plausible inference that the 30 MLB clubs agreed that none of them would affiliate with Plaintiffs in the reorganized PDL system, nor does it plead sufficient facts to establish that any agreement among the MLB clubs was unlawful.

In their response to MLB's pre-motion letter, Plaintiffs encourage the Court to ignore the non-exemption grounds for dismissal. (Dkt. No. 21 at 4.) Plaintiffs want to make this case a vehicle for reconsidering the antitrust exemption, and so they are anxious for this Court to gloss over their lack of antitrust standing and their failure to plausibly allege a Sherman Act violation. But Plaintiffs are putting the cart before the horse. Given the other defects with their Complaint, this Court need not start with, stop with, or even reach, the antitrust exemption. And if Plaintiffs' Complaint fails on other grounds, the Second Circuit or Supreme Court also would never need to consider addressing the antitrust exemption. The Court should decline Plaintiffs' invitation to manufacture an artificial test case by ignoring the other fatal problems with their Complaint.

## I.  BASEBALL'S ANTITRUST EXEMPTION BARS PLAINTIFFS' CLAIM.

"Since 1922 . . . the Supreme Court has recognized a judicially created exemption

from antitrust regulation for the business of baseball." *Wyckoff* v. *Off. of Comm'r of Baseball*, 705 F. App'x 26, 28 (2d Cir. 2017) (citing *Fed. Baseball Club of Balt.*, 259 U.S. at 208–09), *cert. denied*, 138 S. Ct. 2621 (2018); *see Flood*, 408 U.S. at 279; *Radovich* v. *Nat'l Football League*, 352 U.S. 445, 451 (1957); *Toolson*, 346 U.S. at 357; *Salerno* v. *Am. League of Pro. Baseball Clubs*, 429 F.2d 1003, 1005 (2d Cir. 1970) (Friendly, J.) ("[P]rofessional baseball is not subject to the antitrust laws."), *cert. denied*, 400 U.S. 1001 (1971). This exemption remains "binding precedent from the Supreme Court and from this Circuit" and thus compels dismissal of Plaintiffs' claim here. *Wyckoff*, 706 F. App'x at 29.

The Complaint presents a misleading portrayal of prior case law in an attempt to buttress a clearly specious assertion that the exemption is limited to "the player-restraints context" and thus does not encompass Plaintiffs' claim here. (Compl. ¶¶ 7, 108.) But courts in this circuit and elsewhere have repeatedly recognized the opposite. *See*, *e.g.*, *Wyckoff* v. *Off. of Comm'r of Baseball*, 211 F. Supp. 3d 615, 625 (S.D.N.Y. 2016) (rejecting argument that exemption "encompass[ed] only league structure and player contracts" because "leading Supreme Court cases broadly exempt the 'business of baseball'—not discrete aspects of that business—from antitrust regulation"), *aff'd*, 705 F. App'x at 28; *see also City of San Jose* v. *Off. of Comm'r of Baseball*, 776 F.3d 686, 690 (9th Cir.) ("[N]othing in *Flood* suggests that the reserve clause was exempted based on some fact-sensitive analysis of the role the clause played within the baseball industry."), *cert. denied*, 136 S. Ct. 36 (2015); *Charles O. Finley & Co.* v. *Kuhn*, 569 F.2d 527, 541 (7th Cir. 1978) ("[T]he Supreme Court intended to exempt the business of baseball, not any particular facet of that business, from the federal antitrust laws."), *cert. denied*, 439 U.S. 876 (1978). "[I]t is undeniably true that minor league baseball . . . falls squarely within baseball's exemption from federal antitrust laws." *Miranda*, 860 F.3d at 1242. Accordingly, the Supreme Court and

numerous courts of appeals have applied the exemption in cases involving the minor leagues. *See*, *e.g.*, *Toolson*, 346 U.S. at 357 (affirming dismissal of challenge to uniform minor league player contract).[6] Plaintiffs retreated from their obviously baseless position in responding to MLB's pre-motion letter, conceding that the exemption "likely" precludes this action unless the Supreme Court decides to reverse a century of precedent. (Dkt. No. 21 at 1.) Plaintiffs thus have effectively acknowledged that their action has to be dismissed.

Plaintiffs primarily contend that baseball's exemption is "anomalous" and that the Supreme Court's recent decision in *NCAA* v. *Alston*, 141 S. Ct. 2141 (2021), casts doubt on its continued vitality. But the Supreme Court has repeatedly emphasized that any reconsideration of the exemption is for Congress, not the courts. In reaffirming the exemption in *Toolson*, for example, the Court held that "if there are evils in this field which now warrant application to it of the antitrust laws it should be by legislation." 346 U.S. at 357. Subsequently, in *Flood*, the Court "adhere[d] once again to *Federal Baseball* and *Toolson*," reiterating that any change to the exemption is to be made "by the Congress and not by this Court." 407 U.S. at 284. Pointing to repeated unsuccessful legislative attempts to revoke the exemption, the Court reasoned that the exemption should remain the law because "Congress, by its positive inaction, has allowed [*Federal Baseball* and *Toolson*] to stand for so long and, far beyond mere inference and implication, has clearly evinced a desire not to disapprove them legislatively." *Id.* at 283–84.

---

[6] *See also Triple-A Baseball Club Assocs.* v. *Ne. Baseball, Inc.*, 832 F.2d 214, 216 n.1 (1st Cir. 1987) (baseball's "long-standing exemption from the antitrust laws" would preclude antitrust claims based on minor league club relocation decision); *Pro. Baseball Schools & Clubs, Inc.* v. *Kuhn*, 693 F.2d 1085, 1085–86 (11th Cir. 1982) (exemption barred challenges by minor league club owner to "the player assignment system and the franchise location system" and rule "requiring member teams to only play games with other teams that also belong to the National Association"); *Portland Baseball Club, Inc.* v. *Kuhn*, 491 F.2d 1101, 1103 (9th Cir. 1974) (affirming dismissal of antitrust claim based on relocation of MLB club into territory of a minor league club).

That reasoning is even stronger now than it was then, and it applies particularly forcefully in this case, because Congress has since enacted legislation concerning baseball's antitrust exemption and explicitly endorsed its application to matters involving the minor leagues. Specifically, in 1998, Congress passed the Curt Flood Act, which "created an exception to baseball's antitrust exemption for major league baseball players." *Wyckoff*, 705 F. App'x at 29. In doing so, Congress made abundantly clear that it intended to otherwise preserve the exemption. Moreover, it codified its specific intent not to "permit" antitrust claims concerning, among certain other things, "the relationship between organized professional major league baseball and organized professional minor league baseball, or any other matter relating to organized professional baseball's minor leagues." 15 U.S.C. § 26b(b)(2). By "explicitly maintain[ing] the baseball exemption for anything related to . . . the relationship between organized professional major and minor league baseball," Congress precluded precisely the type of claim that Plaintiffs assert here. *Miranda*, 860 F.3d at 1242 (citing 15 U.S.C. §§ 26b(a), (b)(1)–(2)). As the Ninth Circuit explained in a case about franchise relocation, another area where the Curt Flood Act expressly recognized the exemption:

> The exclusion of franchise relocation from the Curt Flood Act demonstrates that Congress (1) was aware of the possibility that the baseball exemption could apply to franchise relocation; (2) declined to alter the status quo with respect to relocation; and (3) had sufficient will to overturn the exemption in other areas. *Flood's* clear implication is that the scope of the baseball exemption is coextensive with the degree of congressional acquiescence, and the case for congressional acquiescence with respect to franchise relocation is in fact far stronger than it was for the reserve clause at issue in *Flood* itself.

*City of San Jose*, 776 F.3d at 691; *see id.* ("[W]hen Congress specifically legislates in a field and explicitly exempts an issue from that legislation, our ability to infer congressional intent to leave that issue undisturbed is at its apex."). The same analysis applies to the minor leagues.

Indeed, the legislative history of the Curt Flood Act demonstrates that Congress's primary motivation for "clarify[ing] the limited reach of the bill" was "to address concerns raised by owners of the minor league teams," like Plaintiffs, "that the original version of [the bill] was not sufficiently clear to preserve antitrust protection for," among other things, "the relationship between the major league clubs and the minor league clubs." 144 Cong. Rec. H9943 (daily ed. Oct. 7, 1998) (Statement of Rep. Henry Hyde).[7] When "legislative history reveals clear congressional awareness" of a judicial interpretation and Congress "specifically address[es] this area" while leaving the interpretation "undisturbed," Congress's action "lends powerful support to [the] continued viability" of the interpretation. *Square D Co.* v. *Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 419 (1986).

Attempts to revoke the exemption in Congress have continued since the Curt Flood Act.[8] Indeed, since the Supreme Court's 1972 decision in *Flood*, Congress has held a total of 45 hearings on the business of baseball, including six since passage of the Curt Flood Act, without making any other change to the exemption, further reinforcing the legislative intent for the antitrust laws not to apply to baseball. (*See* Appx. A.) Accordingly, baseball's longstanding antitrust

---

[7] *See The Application of Federal Antitrust Laws to Major League Baseball: Hearing Before the S. Comm. on the Judiciary*, 107th Cong. 35 (2002) (Statement of Stanley M. Brand, Vice President, Minor League Baseball) ("Repeal or alteration of the exemption is a serious threat to the survival of minor league baseball. . . . That is why we . . . fought hard to include a clear and comprehensive carve-out for the minors during enactment of the Curt Flood Act."); Gary R. Roberts, *A Brief Appraisal of the Curt Flood Act of 1998 From the Minor League Perspective*, 9 Marq. Sports L. J. 413, 417, 424 (1999) ("[S]enators and Committee staff . . . consistently told the [minor leagues] that they did not want to do anything to cause antitrust law to be applied to the minor leagues," and multiple "protections written into the language of the Act [were added] at the behest of the minor leagues.").

[8] *See* S. 3833, 117th Cong. (2022); S. 1111, 117th Cong. (2021); H.R. 2511, 117th Cong. (2021); S. 1721, 113th Cong. (2013); H.R. 3452, 113th Cong. (2013); S. 1704, 107th Cong. (2001); H.R. 3288, 107th Cong. (2001).

exemption, reinforced by express congressional preservation of that exemption with respect to matters involving MLB's relationship with minor league clubs, bars Plaintiffs' claim here.

## II.  PLAINTIFFS DO NOT HAVE ANTITRUST STANDING.

Even if the antitrust laws applied to MLB's minor league player development system, Plaintiffs lack standing to assert an antitrust claim relating to their alleged exclusion from that system.  Antitrust standing is "a threshold, pleading-stage inquiry" that should be addressed at the outset of a case.  *Tommy Lee Handbags Mfg. Ltd.* v. *1948 Corp.*, 971 F. Supp. 2d 368, 384 (S.D.N.Y. 2013) (Carter, J.).  To plead antitrust standing, a plaintiff must plausibly allege, among other things, that it "suffered a special kind of antitrust injury," which "ensures that the harm claimed by the plaintiff corresponds to the rationale for finding a violation of the antitrust laws in the first place."  *Gatt*, 711 F.3d at 76.  Accordingly, pleading antitrust injury requires more than allegations that a plaintiff's harm is "causally linked" to an antitrust violation.  *Id.*  "Rather, in order to establish antitrust injury, the plaintiff must demonstrate that its injury is of the type the antitrust laws were intended to prevent and that flows from that which makes or might make defendants' acts unlawful."  *Id.*; *see In re Inclusive Access Course Materials Antitrust Litig.*, 2021 WL 2419528, at *6 (S.D.N.Y. June 14, 2021) ("Absent such boundaries, the potent private enforcement tool that is an action for treble damages could be invoked without service to—and potentially in disservice of—the purpose of the antitrust laws: to protect competition.").

Here, Plaintiffs allege that they have been injured by a purported reduction in their "enterprise values" because of their exclusion from MLB's allegedly anticompetitive player development system.  (Compl. ¶¶ 68, 118; *see id.* ¶¶ 1, 70–72, 115.)  But that does not amount to antitrust injury because the Second Circuit squarely held in *Gatt* that harm caused by expulsion from an allegedly anticompetitive agreement is not the type of injury that the antitrust laws were

designed to remedy. *Gatt*, 711 F.3d 68 at 77. In that case, the plaintiff was a licensed dealer of a supplier's mobile radios under an agreement terminable at will by either party. *Id.* at 71–72. The supplier "orchestrated a 'bid-rigging' or 'bid rotation' scheme" among its licensed dealers with the effect of fixing prices for government contracts. *Id.* at 72. The plaintiff participated in the scheme, but then the supplier terminated the plaintiff's dealer agreement and excluded it from the scheme going forward. *Id.* at 72–73. The plaintiff brought suit, alleging that the scheme violated Section 1 of the Sherman Act. *Id.* The Second Circuit affirmed dismissal of the complaint, holding that the plaintiff lacked antitrust standing because its "injuries flow from its participation [in] and then exclusion from a distribution network that, allegedly, featured intra-brand price-fixing, and in which it had no right *ab initio* to participate." *Id.* at 77; *see Inclusive Access*, 2021 WL 2419528, at *7 ("The antitrust laws are not concerned with injuries to *competitors* resulting from their participation in or exile from anticompetitive schemes.") (emphasis in original); *Sell It Social, LLC* v. *Acumen Brands, Inc.*, 2015 WL 1345927, at *5 (S.D.N.Y. Mar. 20, 2015) (no antitrust injury where plaintiff alleged an "adverse effect upon its individual business prospects" from exclusionary agreement, not from "market-wide anticompetitive effects"); *Yong Ki Hong* v. *KBS Am., Inc.*, 951 F. Supp. 2d 402, 418 (E.D.N.Y. 2013) ("[L]ost profits [caused by exclusion from conspiracy], though economic injury, is simply not the type of injury that confers antitrust standing on a claimant.").

Just like the plaintiff in *Gatt*, Plaintiffs here seek to recover the lost value of their prior participation in an arrangement that they now claim is anticompetitive. Plaintiffs assert that the reorganization of minor league baseball "into just four [tiers]," in which MLB clubs affiliate with one minor league club in each tier, "limit[ed] output and reduc[ed] Club costs that would otherwise occur in an unconstrained market." (Compl. ¶¶ 53, 60, 111.) The prior minor league

system, which Plaintiffs happily participated in and benefitted from, was at least as "anticompetitive" under Plaintiffs' theory, because it also limited MLB clubs to one affiliate per minor league tier. (*See id.* ¶ 53 & n.5 (prior system allowed "up to six" minor league affiliates per MLB club, one in each minor league tier).) Plaintiffs do not challenge this prior practice—indeed, their damages theory depends on it—nor do they explain why limiting MLB clubs to one affiliate per tier is anticompetitive if there are four tiers but not if there are six.

In addition, the prior system effectively locked in place, for the life of the PBA, the minor league clubs (including Plaintiffs) that already had affiliations by guaranteeing that a club whose PDC expired would be granted a new one with a different MLB club. (Ex. 1 at 5; Ex. 2 at 187–89.) Plaintiffs proclaim that antitrust law requires "free-market forces to determine which [minor league] teams will survive and prosper with big league affiliations, and which will not" (Compl. ¶ 2), but make no attempt to square that laissez-faire approach with the protection that Plaintiffs themselves received from the prior system. The obvious reason is that Plaintiffs' real complaint is not that the new system is anticompetitive, but that they are now on the outside looking in. *Gatt* makes clear that the antitrust laws offer no remedy in such circumstances.

In responding to MLB's pre-motion letter, Plaintiffs claimed that their alleged injuries "do not flow from the loss of their prior affiliation with MLB," but from the fact that "they could compete for affiliation today – if not for the group boycott." (Dkt. No. 21 at 2.) But Plaintiffs do not and cannot dispute that the lost "enterprise value" they seek to recover in this action is a direct consequence of their prior participation in a system they now claim violates the antitrust laws. And Plaintiffs' argument is simply contrary to their own Complaint, which, beginning with the very first paragraph, repeatedly attributes their injury to the end of their prior affiliations. (*See, e.g.*, Compl. ¶ 1 ("Stripped of their affiliations . . . Plaintiffs' very existence has been

threatened . . . ."); *see also id.* ¶¶ 58–59, 68, 70–72, 115, 118.)  Moreover, even if Plaintiffs' injury were conceptualized as an inability to compete, the same could be said of the plaintiff in *Gatt*.  *See* 711 F.3d at 74 (plaintiff "[n]o longer authorized to sell" the supplier's radios and "could not rebid" for contract).

No amount of window-dressing can change the fact that, at bottom, MLB made an organizational change—moving from six tiers of minor league clubs to four tiers—that does not implicate the antitrust laws.  The Sherman Act does not somehow prescribe that there should be six minor league tiers or 160 minor league clubs.  When the PBA between MLB and the minor league clubs expired by its own terms, MLB was free to reduce the number of affiliates in an effort to improve the quality of its farm system.  That necessarily meant some minor league clubs like Plaintiffs would no longer be affiliated, but the antitrust laws offer no more legal basis for a challenge than any of the other theories that Plaintiffs have unsuccessfully pursued in their other lawsuits.[9]  *See Port Dock & Stone Corp.* v. *Oldcastle Ne., Inc.*, 507 F.3d 117, 123 (2d Cir. 2007) (no antitrust standing where alleged injury resulted from termination of relationship, not imposition of anticompetitive transaction terms); *Arcesium, LLC* v. *Advent Software, Inc.*, 2021 WL 1225446, at *8 (S.D.N.Y. Mar. 31, 2021) (no antitrust injury caused by "Defendants' refusal to renew the Reseller Agreement" because "Defendants were exercising their express contractual right").[10]

---

[9] Apparently recognizing that their own injuries do not suffice to establish standing, Plaintiffs devote multiple paragraphs of their Complaint to alleging supposed injuries to fans and communities.  (Compl. ¶¶ 1, 54, 73–75, 116.)  But injuries to others, even if plausibly pleaded (and they are not here), obviously cannot confer standing on Plaintiffs.  *See Gatt*, 711 F.3d at 76 ("[T]he plaintiff must demonstrate that *its* injury is of the type the antitrust laws were intended to prevent . . . .") (emphasis added).

[10] Plaintiffs do not have antitrust standing for the additional reason that they are not "efficient enforcers" of the antitrust laws, because they are not proper parties to "perform the office of a

### III. PLAINTIFFS FAIL TO PLEAD A PLAUSIBLE SHERMAN ACT CLAIM.

To plead a violation of Section 1 of the Sherman Act, a plaintiff must plausibly allege "(1) a combination or some form of concerted action between at least two legally distinct economic entities; and (2) such combination or conduct constituted an unreasonable restraint of trade either *per se* or under the rule of reason." *Concord Assocs., L.P.* v. *Ent. Props. Trust*, 2014 WL 1396524, at *10 (S.D.N.Y. Apr. 9, 2014), *aff'd*, 817 F.3d 46 (2d Cir. 2016). Plaintiffs fail to plausibly allege a concerted agreement among MLB's 30 member clubs to "boycott" Plaintiffs in the new player development system, and they fail to plausibly allege that any purported agreement among MLB clubs was an unreasonable restraint of trade.

#### A. The Complaint Does Not Plausibly Allege a Conspiracy To Boycott Plaintiffs.

Section 1 of the Sherman Act prohibits only those unreasonable restraints of trade that are "effected by a contract, combination, or conspiracy." *Cinema Vill. Cinemart, Inc.* v. *Regal Ent. Grp.*, 2016 WL 5719790, at *2 (S.D.N.Y. Sept. 29, 2016), *aff'd*, 708 F. App'x 29 (2d Cir. 2017). "The first crucial question in a Section 1 case is therefore whether the challenged conduct stems from independent decision or from an agreement." *Apple*, 791 F.3d at 320. To "overcome a motion to dismiss," a plaintiff must "allege enough facts to support the inference that a conspiracy actually existed." *Mayor & City Council of Balt.* v. *Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). A "conclusory allegation of agreement" is not enough. *Id.* Instead, a plaintiff must plead "direct evidence that the defendants entered into" an anticompetitive agreement, such

---

private attorney general and thereby vindicate the public interest in antitrust enforcement." *Gatt*, 711 F.3d at 80. The Second Circuit's decision in *Gatt* is once again instructive. In that case, because the plaintiff did not withdraw from the allegedly anticompetitive scheme of its own volition after "it recognized the error of its ways," it was not "a suitable plaintiff for [] standing purposes." *Id.* Here, Plaintiffs participated in and benefited from the prior player development system—in fact, they want it back—and their participation concluded only upon the expiration of the agreements governing their affiliation, not because they "recognized the error of [their] ways."

as "a recorded phone call in which two competitors agreed to fix prices at a certain level," *LLM Bar Exam, LLC* v. *Barbri, Inc.*, 271 F. Supp. 3d 547, 577 (S.D.N.Y. 2017), *aff'd*, 922 F.3d 136 (2d Cir. 2019), or "circumstantial facts supporting the inference that a conspiracy existed," *Citigroup*, 709 F.3d at 136.

Because "conduct resulting solely from competitors' independent business decisions" is not unlawful, "[p]arallel action is not, by itself, sufficient to prove the existence of a conspiracy." *Apple*, 791 F.3d at 315, 318. "[S]uch behavior could be the result of coincidence, independent responses to common stimuli, or mere interdependence unaided by an advance understanding among the parties." *Id.* at 315; *see Cinema Vill. Cinemart, Inc.*, 2016 WL 5719790, at *2 ("Since business arrangements that result from independent action can often resemble those that result from unlawful agreement, a complaint must provide some factual context suggesting that the parties reached an agreement, not facts that would be merely consistent with an agreement."). Accordingly, a plaintiff must allege "plus factors and/or other circumstantial evidence" that, "along with the parallel conduct, make it plausible to infer an agreement among competitors." *LLM Bar Exam, LLC*, 271 F. Supp. 3d at 578. No inference of conspiracy arises when parallel conduct "made perfect business sense, there are obvious alternative explanations for the facts alleged, or the alleged facts suggest competition at least as plausibly as they suggest anticompetitive conspiracy," *id.*, because "a business entity has a right to deal, or refuse to deal, with whomever it likes, as long as it does so independently," *Anderson News, L.L.C.* v. *Am. Media, Inc.*, 899 F.3d 87, 103 (2d Cir. 2018).

Here, the Complaint does not allege direct evidence of an agreement among MLB's 30 member clubs that none of them would affiliate with Plaintiffs (or any other clubs that were not selected for affiliations). Instead, all the Complaint contains are conclusory statements that MLB

clubs made a "horizontal agreement to . . . boycott" Plaintiffs. (*E.g.*, Compl. ¶ 87.) Conclusory statements, especially ones that make no sense, are insufficient to state a claim. *See*, *e.g.*, *Integrated Sys. & Power, Inc.* v. *Honeywell Int'l, Inc.*, 713 F. Supp. 2d 286, 290 (S.D.N.Y. 2010) ("While Plaintiff repeatedly asserts that Defendant's conduct constitutes a 'horizontal conspiracy,' . . . this characterization is a legal conclusion that the Court does not accept as true on a motion to dismiss.").

    Nor does the Complaint allege any circumstantial evidence that the 30 MLB clubs agreed to boycott Plaintiffs and the other "Ousted Teams." (Compl. ¶ 2.) Plaintiffs' sole attempt to support the existence of an agreement appears to be their allegation that MLB clubs chose not to affiliate with Plaintiffs in favor of clubs "that were owned by or closely connected to MLB or its Clubs, regardless of their comparative quality." (*Id.* ¶¶ 3, 97.) For starters, the Complaint does not allege a single fact concerning the "comparative quality" of any clubs selected for affiliations in the new system relative to Plaintiffs. Further, the notion that MLB clubs decided to affiliate with minor league clubs other than Plaintiffs because doing so served their own economic interests does not in any way suggest that MLB clubs collectively agreed to blacklist Plaintiffs. At most, Plaintiffs allege a common motive to select affiliates other than Plaintiffs, not a motive (or a need) for MLB clubs to agree among themselves to exclude Plaintiffs. *Compare Inclusive Access*, 2021 WL 2419528, at *9 ("While the SAC describes a commercial environment that would motivate any textbook publisher to independently consider the advantages of adopting a digital textbook regime like Inclusive Access, it does not describe an environment that encouraged or required them to conspire with each other to do so."), *with In re Interest Rate Swaps Antitrust Litig.*, 261 F. Supp. 3d 430, 441, 476 (S.D.N.Y. 2017) (complaint plausibly alleged "common motive to conspire" to boycott competing electronic platforms which "threatened to erode the [defendants']

profit margins" collectively). But even if *some* MLB clubs agreed to affiliate with minor league clubs they owned or were closely connected to, only *one* of the 30 MLB clubs owns or is closely connected to all four of its current minor league affiliates (*see* Compl. ¶¶ 56, 63–66), and Plaintiffs do not allege *any* connection between eight MLB clubs and all four of their minor league affiliates.[11] None of this adds up to a group boycott of Plaintiffs, as opposed to MLB clubs making their own choices about affiliations.

In the end, Plaintiffs' only allegation of truly parallel conduct is that none of the 30 MLB clubs selected Plaintiffs as affiliates. That is simply not enough to give rise to an inference that this was the result of an agreement among the 30 MLB clubs that Plaintiffs were off-limits. *See Citigroup*, 709 F.3d at 138 (allegations that defendants acted "in a virtually simultaneous manner" did not "suggest that this parallel conduct flowed from a preceding agreement rather than from their own business priorities"); *see also In re Ins. Brokerage Antitrust Litig.*, 618 F.3d 300, 324–26 (3d Cir. 2010) (allegations of "parallel conduct that could just as well be independent action" insufficient); *Cotiviti, Inc.* v. *Deagle*, 501 F. Supp. 3d 243, 254 (S.D.N.Y. 2020) ("[A] complaint must contain sufficient factual matter to state a claim to relief that is plausible—not merely possible—on its face.").

**B.     The Complaint Does Not Plausibly Allege That Any Agreement Was Unlawful.**

Beyond Plaintiffs' failure to plausibly allege an agreement to boycott Plaintiffs, the Complaint also does not allege facts sufficient to plead that any agreement among the 30 MLB clubs was an unreasonable restraint of trade. An agreement restraining competition may violate Section 1 of the Sherman Act if "it fits within a class of restraints that has been held to be '*per se*'

---

[11] Those clubs are the Baltimore Orioles, Chicago Cubs, Chicago White Sox, Cincinnati Reds, Colorado Rockies, Kansas City Royals, Oakland Athletics and Washington Nationals.

unreasonable," or if it violates the "rule of reason," under which the anticompetitive effects of the restraint are weighed against its procompetitive advantages. *NASL*, 883 F.3d at 41–43. Although the Complaint argues that MLB's reorganization of the minor leagues was "*per se* unlawful" (Compl. ¶ 112), "[r]egulation of league sports is a textbook example of when the rule of reason applies," *NASL*, 883 F.3d at 41, because professional sports clubs competing in the same league "share an interest in making the entire league successful and profitable," which "provides a perfectly sensible justification for making a host of collective decisions," *Am. Needle, Inc.* v. *Nat'l Football League*, 560 U.S. 183, 202 (2010).

To state a claim under the rule of reason, a plaintiff must "identify the relevant market affected by the challenged conduct and allege an actual adverse effect on competition in the identified market." *Cenedella* v. *Metro. Museum of Art*, 348 F. Supp. 3d 346, 360 (S.D.N.Y. 2018). Dismissal is appropriate where "a plaintiff has defined the relevant market in an inconsistent and facially implausible way," *Cinema Vill. Cinemart, Inc.*, 2016 WL 5179790, at *6, or where the plaintiff's allegations do not reflect "commercial realities" or represent "an awkward attempt to conform [the plaintiff's] theory to the facts," *Theatre Party Assocs., Inc.* v. *Shubert Org.*, 695 F. Supp. 150, 154 (S.D.N.Y. 1988). And even if a plaintiff plausibly alleges a relevant market, dismissal is appropriate when the complaint fails to plead "that the challenged action has had an *actual* adverse effect on competition as a whole in the relevant market." *Spinelli* v. *Nat'l Football League*, 903 F.3d 185, 212 (2d Cir. 2018) (emphasis in original); *see Ohio* v. *Am. Express Co.*, 138 S. Ct. 2274, 2284 (2018) (plaintiff must show "that the challenged restraint has a substantial anticompetitive effect that harms consumers in the relevant market").[12]

---

[12] The Complaint asserts that Plaintiffs' purported "direct evidence of anticompetitive effects" obviates their burden to plead a relevant market. (Compl. ¶ 87.) It does not. *See 1-800 Contacts,*

Here, although MLB and Plaintiffs do participate in a well-known market of entertainment products offered to consumers, Plaintiffs do not base their claim on any alleged impact on that market. Instead, Plaintiffs invent a separate "market for affiliated [minor league] teams." (Compl. ¶ 91.) But Plaintiffs' attempt to allege the economic dynamics of this "market," and the anticompetitive harm caused by the reorganization of MLB's player development system, falls far short of meeting their pleading burden.[13]

*First*, Plaintiffs' repeated characterization of the PDL system as an "output restriction" makes no sense. (*See, e.g.*, Compl. ¶¶ 8, 61, 75, 87, 95, 114.) An output restriction occurs when suppliers that economically compete with respect to a particular product—*i.e.*, on that product's price or quality—conspire to produce less of that product, to reduce supply and extract supracompetitive prices from customers. *See United States* v. *Andreas*, 216 F.3d 645, 667 (7th Cir. 2000) ("A prototypical output restriction raises prices by reducing supply below demand."), *cert. denied*, 531 U.S. 1014 (2000). Plaintiffs allege nothing like that here. Moreover, the

_____

*Inc.* v. *Fed. Trade Comm'n*, 1 F.4th 102, 117–18 (2d Cir. 2021) ("Anticompetitive effects *in a relevant market* may be shown through direct evidence of output reductions, increased prices, or reduced quality *in the relevant market*.") (emphasis added).

[13] Plaintiffs' alternative argument that the Court should apply only a "quick look" version of the rule of reason also has no basis in the law. (Compl. ¶ 113.) Quick look review is appropriate only when "an observer with even a rudimentary understanding of economics could conclude that the arrangements in question would have an anticompetitive effect on customers and markets." *Cal. Dental Ass'n* v. *FTC*, 526 U.S. 756, 770 (1999); *see Deutscher Tennis Bund* v. *ATP Tour, Inc.*, 610 F.3d 820, 832 (3d Cir.) (rejecting quick look "[b]ecause the contours of the market here are not sufficiently well known or defined to permit the court to ascertain without the aid of extensive market analysis whether the challenged practice impairs competition"), *cert. denied*, 562 U.S. 1064 (2010); *Worldwide Basketball & Sport Tours, Inc.* v. *NCAA*, 388 F.3d 955, 961 (6th Cir. 2004) (reversing application of quick look rule because "the precise product market is neither obvious nor undisputed," making it "impossible to assess the effect of the [alleged restraint] on customers rather than merely on competitors"), *cert. denied*, 546 U.S. 813 (2005). At a minimum, the dispute over whether Plaintiffs have plausibly alleged a market means that quick look review is inappropriate here.

Complaint makes contradictory allegations that MLB clubs agreed "to reduce their output" to the supposed market for affiliations, but also that *Plaintiffs* are "part of the *supply side*" of that market. (Compl. ¶¶ 3, 87 (emphasis added).) If the minor league clubs are the "suppliers," then *they* produce the "output." MLB clubs would be buyers and thus produce no "output" to restrict. *See Cal. Dental*, 526 U.S. at 777 ("[I]t is of course the producers' supply of a good in relation to demand that is normally relevant in determining whether a producer-imposed output limitation has the anticompetitive effect of artificially raising prices.").

   *Second*, even if MLB clubs somehow supply an "output" of affiliations, the Complaint does not plausibly allege a market. Affiliations are not discrete goods or services that are bought and sold by consumers and suppliers. *See City of Cleveland* v. *Cleveland Elec. Illuminating Co.*, 538 F. Supp. 1306, 1310 (N.D. Ohio 1980) ("The basic tests developed by the Supreme Court in defining product and geographic markets only have meaning in the context of transactions between buyer and seller. . . . No relevant product market can be defined unless focus is made on particular services and actual commercial transactions between buyers and sellers."). Baseball's farm system is made up of complex, symbiotic, ongoing contractual affiliations. MLB clubs supply players and coaches to their affiliated minor league clubs.[14] The minor league clubs provide opportunities for those players to develop. The clubs share expenses. They work together. These are not the type of supplier-consumer transactions that are regulated by the antitrust laws. Indeed, Plaintiffs themselves have acknowledged as much in their state court actions. (*See*, *e.g.*, Compl. ¶ 2, *Tri-City ValleyCats, Inc.* v. *Houston Astros Inc.*, Index No. 650308/2021 (N.Y. Sup.

---

[14] In another example of inconsistent pleading, Plaintiffs allege that, absent the purported conspiracy, MLB clubs would engage in "the competition of affiliation with additional [minor league] clubs *to obtain access to additional players* and resources" (Compl. ¶ 58 (emphasis added)), but Plaintiffs separately acknowledge that MLB clubs do not "obtain access" to players by affiliating with minor league clubs—the players are supplied by the MLB clubs (*id.* ¶ 52).

Ct. Jan. 14, 2021) ("[T]he business activities of MLB and MiLB have been and are inextricably intertwined . . . .").) The Ninth Circuit has also recognized the unique nature of the interconnected relationships between MLB clubs and minor league clubs:

> MLB's farming structure belies the claim that major and minor league baseball are separate and distinct in a meaningful way for the purposes of the Sherman Act. Minor league baseball players are employed and paid by MLB, and MLB employs minor league players with the hope that some of them will develop into major league players.

*Miranda*, 860 F.3d at 1242. Plaintiffs' attempt to fit the square peg of baseball's farm system into the round hole of the antitrust laws simply does not work.[15]

*Third*, Plaintiffs' dual theories of "output restriction" and "group boycott" are economically incompatible. On the one hand, Plaintiffs allege that MLB restricted the supply of affiliations by reducing the number from 160 to 120. (Compl. ¶ 111.) Plaintiffs acknowledge that "[b]y reducing the supply of affiliate relationships, MLB has *increased* the value of such relationships." (Dkt. No. 21 at 4 (emphasis in original).) But the Complaint advances the diametrically opposed theory that, through the purported boycott, MLB sought to "destroy" and "eliminate 40 [minor league] teams" as customers for affiliations. (Compl. ¶¶ 1, 58.) Removing 40 potential affiliates would reduce demand for affiliations, *lowering* their value.

*Fourth*, Plaintiffs fail to allege any actual anticompetitive harm to the affiliation "market." *See Reapers Hockey Ass'n* v. *Amateur Hockey Ass'n Ill.*, 412 F. Supp. 3d 941, 954 (N.D. Ill. 2019) (dismissing claim that league-imposed limit of four clubs in hockey division

---

[15] Limiting the number of affiliates per minor league tier is not unique to baseball, but instead is a common feature of minor league systems across professional sports, including those that are not exempt from the antitrust laws. Indeed, clubs in both the National Hockey League and National Basketball Association only affiliate with, at most, one minor league club in their respective minor league tiers. *See Team Affiliates*, Nat'l Hockey League, https://records.nhl.com /franchises/team-affiliates (last accessed Apr. 22, 2022); *What You Need to Know About the NBA G League*, NBA G League, https://gleague.nba.com/about/ (last accessed Apr. 22, 2022).

amounted to anticompetitive restraint).  Nowhere does the Complaint explain why reorganizing the minor league system into fewer tiers and leagues is detrimental to the supposed "market for affiliations."  Plaintiffs do not even allege who they claim are the consumers in that "market," much less that those consumers are paying supracompetitive prices, the paradigmatic indication of an anticompetitive output restriction.  *See MacDermid Printing Sols. LLC* v. *Cortron Corp.*, 833 F.3d 172, 185 n.49 (2d Cir. 2016) ("Basic principles of economics teach us that, all things being equal, price and output have an inverse relationship. . . . Therefore, if [defendant's] actions had resulted in reduced quantity, they should also have resulted in higher prices, absent some other explanation.").  Plaintiffs allege that MLB clubs reduced their *aggregate* costs by limiting the number of affiliations, not that the limitation affected the price terms (or any other terms) of any particular affiliation transaction.

Plaintiffs' praise of the prior minor league system under the PBA underscores the incoherence of their theory of harm to the market they purport to allege.  Plaintiffs assert that the PBA "facilitated" "the market for MLB-affiliated teams" and "was extraordinarily successful," and they describe the prior system as having "generated a competitive output of 160 different MiLB teams."  (Compl. ¶¶ 55, 58.)  But Plaintiffs do not explain why 160 affiliations supposedly constitutes "competitive output," but 120 affiliations does not.  Again, the prior system also limited the number of affiliations, and it guaranteed that the 160 clubs that had affiliations would keep them—to the exclusion of others—regardless of relative merit.  It makes no sense to suggest that such a system passes muster under the antitrust laws, but the reorganized system—which includes no such guarantees—does not.

## CONCLUSION

For the foregoing reasons, the Complaint should be dismissed with prejudice.

Dated: April 22, 2022

Respectfully submitted,

/s/ John L. Hardiman
John L. Hardiman
Benjamin R. Walker
Jacob G. Singer
SULLIVAN & CROMWELL LLP
125 Broad Street
New York, NY 10004
Tel: 212-558-4000
Fax: 212-558-3558
hardimanj@sullcrom.com
walkerb@sullcrom.com
singerja@sullcrom.com

*Counsel for Defendant The Office of the Commissioner of Baseball*

# APPENDIX A

## Congressional Hearings on Business of Baseball
### (1972–2018)

1. *Professional Sports Blackouts: Hearing Before the H. Comm. on Interstate and Foreign Commerce, Subcomm. on Communications and Power*, 93rd Cong., 1st Sess. (1973).

2. *Rights of Professional Athletes: Hearing Before the H. Comm. on the Judiciary, Subcomm. on Monopolies and Commercial Law*, 94th Cong., 1st Sess. (1975).

3. *Professional Sports and the Law: Hearing Before the H. Comm. on Professional Sports*, 94th Cong., 2d Sess. (1976).

4. *Inquiry into Professional Sports: Hearing Before the H. Comm. on Professional Sports*, 94th Cong., 2d Sess. (1976).

5. *Inquiry into Professional Sports: Hearing Before the H. Comm. on Professional Sports*, 94th Cong., 2d Sess. (1976).

6. *Rights of Professional Athletes: Hearing Before the H. Comm. on the Judiciary, Subcomm. on Monopolies and Commercial Law*, 95th Cong., 1st Sess. (1977).

7. *Sports Anti-blackout Legislation: Hearing Before the H. Comm. on Interstate and Foreign Commerce, Subcomm. on Communications*, 95th Cong., 2d Sess. (1978).

8. *Sports Anti-blackout Legislation: Hearing Before the H. Comm. on Interstate and Foreign Commerce, Subcomm. on Communications and Power*, 96th Cong., 1st Sess. (1979).

9. *Antitrust Policy and Professional Sports: Hearing Before the H. Comm. on the Judiciary, Subcomm. on Monopolies and Commercial Law*, 97th Cong., 1st & 2d Sess. (1981).

10. *Antitrust Policy and Professional Sports: Hearing Before the H. Comm. on the Judiciary, Subcomm. on Monopolies and Commercial Law*, 97th Cong., 1st & 2d Sess. (1982).

11. *Professional Sports Antitrust Immunity: Hearing Before the Sen. Comm. on the Judiciary*, 97th Cong., 2d Sess. (1982).

12. *Professional Sports Antitrust Immunity: Hearing Before the Sen. Comm. on the Judiciary*, 98th Cong., 1st Sess. (1983).

13. *Professional Sports Team Community Protection Act: Hearing Before the H. Comm. on Energy and Commerce, Subcomm. on Commerce, Transportation, and Tourism*, 98th Cong., 2d Sess. (1984).

14. *Professional Sports Team Community Protection Act: Hearing Before the Sen. Comm. on Commerce, Science, and Transportation*, 98th Cong., 2d Sess. (1984).

15. *Professional Sports: Hearing Before the H. Comm. on Energy and Commerce, Subcomm. on Commerce, Transportation, and Tourism*, 99th Cong., 1st Sess. (1985).

16. *Professional Sports Antitrust Immunity: Hearing Before the Sen. Comm. on the Judiciary*, 99th Cong., 1st Sess. (1985).

17. *Professional Sports Community Protection Act of 1985: Hearing Before the Sen. Comm. on Commerce, Science, and Transportation*, 99th Cong., 1st Sess. (1985).

18. *Professional Sports Antitrust Immunity: Hearing Before the Sen. Comm. on the Judiciary*, 99th Cong., 2d Sess. (1986).

19. *Antitrust Implications of the Recent NFL Television Contract: Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Monopolies, and Business Rights*, 100th Cong., 1st Sess. (1987).

20. *Professional Sports Antitrust Immunity: Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Monopolies, and Business Rights*, 100th Cong., 2d Sess. (1988).

21. *Competitive Issues in the Cable Television Industry: Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Monopolies, and Business Rights*, 100th Cong., 2d Sess. (1988).

22. *Sports Programming and Cable Television: Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Monopolies, and Business Rights*, 101st Cong., 1st Sess. (1989).

23. *Competitive Problems in the Cable Television Industry: Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Monopolies, and Business Rights*, 101st Cong., 1st Sess. (1990).

24. *Cable Television Regulation (Part 2): Hearing Before the H. Comm. on Energy and Commerce, Subcomm. on Telecommunications and Finance*, 101st Cong., 2d Sess. (1990).

25. *Sports Programming and Cable Television: Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Monopolies, and Business Rights*, 101st Cong., 2d Sess. (1991).

26. *Prohibiting State-Sanctioned Sports Gambling: Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Patents, Copyrights, and Trademarks*, 102nd Cong., 1st Sess. (1991).

27. *Baseball's Antitrust Immunity: Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Monopolies, and Business Rights*, 102nd Cong., 2d Sess. (1992).

28. *Baseball's Antitrust Immunity: Hearing Before the H. Comm. on the Judiciary, Subcomm. on Economic and Commercial Law*, 103rd Cong., 1st Sess. (1993).

29. *Key Issues Confronting Minor League Baseball: Hearing Before the H. Comm. on Small Business*, 103rd Cong., 2d Sess. (1994).

30. *Baseball's Antitrust Exemption (Part 2): Hearing Before the H. Comm. on the Judiciary, Subcomm. on Economic and Commercial Law*, 103rd Cong., 2d Sess. (1994).

31. *Impact on Collective Bargaining of the Antitrust Exemption, Major League Play Ball Act of 1995: Hearing Before the H. Comm. on Education and Labor, Subcomm. on Labor-Management Relations*, 103rd Cong., 2d Sess. (1994).

32. *Professional Baseball Teams and the Anti-trust Laws: Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Monopolies, and Business Rights*, 103rd Cong., 2d Sess. (1994).

33. *The Court-Imposed Major League Baseball Antitrust Exemption: Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Business Rights, and Competition*, 104th Cong., 1st Sess. (1995).

34. *Antitrust Issues in Relocation of Professional Sports Franchises: Hearing Before the Sen. Comm. on the Judiciary, Subcomm. on Antitrust, Business Rights, and Competition*, 104th Cong., 1st Sess. (1995).

35. *The Court-Imposed Major League Baseball Antitrust Exemption: Hearing Before the Sen. Comm. on Antitrust, Business Rights, and Competition*, 104th Cong., 1st Sess. (1995).

36. *Professional Sports Franchise Relocation: Hearing Before the H. Comm. on the Judiciary*, 104th Cong., 2d Sess. (1996).

37.   *Professional Sports: The Challenges Facing the Future of the Industry: Hearing Before the Sen. Comm. on the Judiciary*, 104th Cong., 2d Sess. (1996).

38.   *Major League Baseball Reform Act of 1995: Hearing Before the Sen. Comm. on the Judiciary*, 104th Cong., 2d Sess. (1996).

39.   *Major League Baseball Antitrust Reform: Hearing Before the Sen. Comm. on the Judiciary*, 105th Cong., 1st Sess. (1997).

40.   *Stadium Financing and Franchise Relocation Act of 1999: Hearing Before the Sen. Comm. on the Judiciary*, 106th Cong., 1st Sess. (1999).

41.   *Baseball's Revenue Gap: Pennant for Sale?: Hearing Before the Sen. Comm. on the Judiciary*, 106th Cong., 2d Sess. (2000).

42.   *Fairness in Antitrust in National Sports (Fans) Act of 2001: Hearing Before the H. Comm. on the Judiciary*, 107th Cong., 1st Sess. (2001).

43.   *The Application of Federal Antitrust Laws to Major League Baseball: Hearing Before the Sen. Comm. on the Judiciary*, 107th Cong., 2d Sess. (2002).

44.   *Out at Home: Why Most Nats Fans Can't See Their Team on TV: Hearing Before the H. Comm. on Gov't Reform*, 109th Cong., 2d Sess. (2006).

45.   *Exclusive Sports Programming: Examining Competition and Consumer Choice: Hearing Before the Sen. Comm. on Commerce, Science and Transportation*, 110th Cong., 1st Sess. (2007).