**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| NOSTALGIC PARTNERS, LLC, d/b/a THE STATEN ISLAND YANKEES; ONEONTA ATHLETIC CORPORATION, d/b/a THE NORWICH SEA UNICORNS; SPORTS ENTERPRISES, INC. d/b/a SALEM-KEIZER VOLCANOES; and TRI-CITY VALLEYCATS, INC., | |
| Plaintiffs, | Case No. 1:21-cv-10876-ALC |
| v. | Hon. Andrew L. Carter |
| THE OFFICE OF THE COMMISSIONER OF BASEBALL, AN UNINCORPORATED ASSOCIATION d/b/a MAJOR LEAGUE BASEBALL, | |
| Defendant. | |

**PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS**

## <u>TABLE OF CONTENTS</u>

**Page**

PRELIMINARY STATEMENT ....................................................................................................1

BACKGROUND ........................................................................................................................3

LEGAL STANDARD.................................................................................................................5

ARGUMENT ............................................................................................................................6

I.      The Judicially-Created "Baseball Exemption" Is the Only (Unfortunate) Legitimate Ground for MLB's Motion ......................................................................6

          A.      The Supreme Court's Baseball Trilogy: *Federal Baseball*, *Toolson*, and *Flood* ......................................................................................................6

          B.      The Lower-Courts' Non-Uniform Application of the Judicially-Created Antitrust Exemption.................................................................................7

          C.      The Narrowly Confined Curt Flood Act of 1998..................................................10

II.     Plaintiffs Have Antitrust Standing to Bring this Claim ....................................................12

III.    Plaintiffs Plead a Violation of the Sherman Act ............................................................18

          A.      Plaintiffs Plausibly Allege a Conspiracy to Boycott Plaintiffs............................18

          B.      Plaintiffs Allege an Agreement That Is an Unreasonable Restraint of Trade........20

CONCLUSION.........................................................................................................................25

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*1-800 Contacts, Inc. v. F.T.C.*,
  1 F.4th 102 (2d Cir. 2021) ........................................................................................23

*Am. Airlines, Inc. v. Travelport Ltd.*,
  2012 WL 3737037 (N.D. Tex. Aug. 7, 2012) ...................................................16, 17

*Am. Needle, Inc. v. NFL*,
  560 U.S. 183 (2010) .........................................................................................3, 21, 25

*Anderson News, L.L.C. v. Am. Media, Inc.*,
  680 F.3d 162 (2d Cir. 2012) ......................................................................................20

*Arcesium, LLC v. Advent Software, Inc.*,
  2021 WL 1225446 (S.D.N.Y. Mar. 31, 2021) .........................................................17

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) .....................................................................................................5

*Atl. Richfield Co. v. USA Petroleum Co.*,
  495 U.S. 328 (1990) ...................................................................................................13

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) .............................................................................................5, 18

*Broadcom Corp. v. Qualcomm Inc.*,
  501 F.3d 297 (3d Cir. 2007) ......................................................................................23

*Butterworth v. Nat'l League of Prof'l Baseball Clubs*,
  644 So. 2d 1021 (Fla. 1994) ..................................................................................8, 11

*Calif. Dental Ass'n v. F.T.C.*,
  526 U.S. 756 (1999) ...................................................................................................20

*City of San Jose v. Off. of the Comm'r of Baseball*,
  776 F.3d 686 (9th Cir. 2015) .......................................................................................9

*In re Currency Conversion Fee Antitrust Litig.*,
  265 F. Supp. 2d 385 (S.D.N.Y. 2003)........................................................................20

*Daniel v. Am. Bd. of Emergency Med.*,
  428 F.3d 408 (2d Cir. 2005)........................................................................................17

*F.T.C. v. Superior Ct. Trial Laws. Ass'n*,
  493 U.S. 411 (1990)..........................................................................................20

*Fed. Baseball Club of Balt. v. Nat'l League of Prof'l Baseball Clubs*,
  259 U.S. 200 (1922).....................................................................................1, 7, 8, 10

*Fleer Corp. v. Topps Chewing Gum, Inc.*,
  658 F.2d 139 (3d Cir. 1981)...........................................................................9

*Flood v. Kuhn*,
  Respondents' Brief, 1972 WL 125826 (1972)...........................................9

*Flood v. Kuhn*,
  407 U.S. 258 (1972)............................................................................... *passim*

*Full Draw Prods. v. Easton Sports, Inc.*,
  182 F.3d 745 (10th Cir. 1999) .......................................................................24

*Gatt Commc'ns, Inc. v. PMC Associates*,
  711 F.3d 68 (2d Cir. 2013)...................................................................15, 16, 17

*Henderson Broad. Corp. v. Houston Sports Ass'n*,
  541 F. Supp. 263 (S.D. Tex. 1982) ...............................................................9

*In re Inclusive Access Course Materials Antitrust Litig.*,
  2021 WL 2419528 (S.D.N.Y. June 14, 2021) .............................................16

*Int'l Boxing Club v. U.S.*,
  358 U.S. 242 (1959)...........................................................................................22

*Iowa Pub. Emp. Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc.*,
  340 F. Supp. 3d 285 (S.D.N.Y. 2018)...........................................................19

*IQ Dental Supply, Inc. v. Henry Schein, Inc.*,
  924 F.3d 57 (2d Cir. 2019)...................................................................13, 14, 17

*In re Currency Conversion Fee Antitrust Litig.*,
  264 F.R.D. 100 (S.D.N.Y. 2010) ...................................................................19

*In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*,
  383 F. Supp. 3d 187 (S.D.N.Y. 2019)...........................................................17

*In re NFL Sunday Ticket Antitrust Litig.*,
  933 F.3d 1136 (9th Cir. 2019) .................................................................13, 22

*Laumann v. Nat'l Hockey League*,
  56 F. Supp. 3d 280 (S.D.N.Y. 2014)...........................................................2, 8

*Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*,
    551 U.S. 877 (2007)..................................................................................12

*Major League Baseball Props., Inc. v. Salvino, Inc.*,
    542 F.3d 290 (2d Cir. 2008)........................................................................9

*Meredith Corp. v. SESAC LLC*,
    1 F. Supp. 3d 180 (S.D.N.Y. 2014) ...........................................................24

*Minn. Twins P'ship v. State*,
    1998 WL 35261131 (Minn. Dist. Ct. Apr. 20, 1998) ..............................11

*Morsani v. Major League Baseball*,
    663 So. 2d 653 (Fla. Dist. Ct. App. 1995) ..................................................8

*Nat'l League of Prof'l Baseball Clubs v. Fed. Baseball Club of Balt., Inc.*,
    269 F. 681 (C.C.D.C. 1920)........................................................................6

*Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*,
    468 U.S. 85 (1984)............................................................................. *passim*

*Nat'l Collegiate Athletic Ass'n v. Alston*,
    141 S. Ct. 2141 (2021)...............................................................................1

*Nishimura v. Dolan*,
    599 F. Supp. 484 (E.D.N.Y. 1984) .............................................................9

*N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*,
    883 F.3d 32 (2d Cir. 2018).........................................................................21

*Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co.*,
    472 U.S. 284 (1985)...................................................................................20

*O'Bannon v. Nat'l Collegiate Athletic Ass'n*,
    7 F. Supp. 3d 955 (N.D. Cal. 2014) ..........................................................22

*OEM Glass Network, Inc. v. Mygrant Glass Co.*,
    436 F. Supp. 3d 576 (E.D.N.Y. 2020) .......................................................19

*Payne v. Tenn.*,
    501 U.S. 808 (1991).....................................................................................7

*PepsiCo, Inc. v. Coca-Cola Co.*,
    315 F.3d 101 (2d Cir. 2002).......................................................................22

*Piazza v. Major League Baseball*,
    831 F. Supp. 420 (E.D. Pa. 1993) .........................................................8, 11

*Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*,
   507 F.3d 117 (2d Cir. 2007)............................................................................17

*Postema v. Nat'l League of Prof'l Baseball Clubs*,
   799 F. Supp. 1475 (S.D.N.Y. 1992)............................................................7, 8

*Prof'l Baseball Sch. & Clubs, Inc. v. Kuhn*,
   693 F.2d 1085 (11th Cir. 1982) ......................................................................9

*Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*,
   412 F. Supp. 3d 941 (N.D. Ill. 2019) ......................................................25, 26

*Rosenberg v. Triborough Bridge & Tunnel Auth.*,
   2021 WL 980744 (S.D.N.Y. Mar. 16, 2021) ................................................12

*Salerno v. Am. League of Prof'l Baseball Clubs*,
   429 F.2d 1003 (2d Cir. 1970)..........................................................................7

*Sell It Soc., LLC v. Acumen Brands, Inc.*,
   2015 WL 1345927 (S.D.N.Y. Mar. 20, 2015) .............................................16

*Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*,
   476 U.S. 409 (1986).........................................................................................8

*Starr v. Sony BMG Music Entm't*,
   592 F.3d 314 (2d Cir. 2010)..........................................................................19

*State Oil Co. v. Khan*,
   522 U.S. 3 (1997).......................................................................................2, 12

*In re Text Messaging Antitrust Litig.*,
   630 F.3d 622 (7th Cir. 2010) ........................................................................19

*Todd v. Exxon Corp.*,
   275 F.3d 191 (2d Cir. 2001)....................................................................22, 23

*Toolson v. New York Yankees, Inc.*,
   346 U.S. 356 (1953)....................................................................................7, 8

*Toys "R" Us, Inc. v. F.T.C.*,
   221 F.3d 928 (7th Cir. 2000) ........................................................................23

*Twin City Sportservice, Inc. v. Charles O. Finley & Co.*,
   365 F. Supp. 235 (N.D. Cal. 1972) .................................................................9

*U.S. v. Andreas*,
   216 F.3d 645 (7th Cir. 2000) ...................................................................23, 24

*U.S. v. DaVita Inc.*,
  2022 WL 266759 (D. Colo. Jan. 28, 2022)...........................................................24

*U.S. v. E. River Hous. Corp.*,
  90 F. Supp. 3d 118 (S.D.N.Y. 2015)....................................................................22

*U.S. v. Jindal*,
  2021 WL 5578687 (E.D. Tex. Nov. 29, 2021) .....................................................24

*U.S. v. Topco Assocs., Inc.*,
  405 U.S. 596 (1972).............................................................................................13

*Valassis Commc'ns, Inc. v. News Corp.*,
  2019 WL 802093 (S.D.N.Y. Feb. 21, 2019).........................................................13

*Vogel v. Am. Soc. of Appraisers*,
  744 F.2d 598 (7th Cir. 1984) ...............................................................................24

*Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*,
  857 F.2d 55, 67-68 (2d Cir. 1988) .......................................................................14

*Wyckoff v. Off. of the Comm'r of Baseball*,
  211 F. Supp. 3d 615 (S.D.N.Y. 2016)....................................................................8

*Wyckoff v. Off. of the Comm'r of Baseball*,
  705 F. App'x 26 (2d Cir. 2017) ........................................................................2, 8

*Yong Ki Hong v. KBS Am., Inc.*,
  951 F. Supp. 2d 402 (E.D.N.Y. 2013) .................................................................16

*In re: Zinc Antitrust Litig.*,
  2016 WL 3167192 (S.D.N.Y. June 6, 2016) ........................................................23

**Statutes**

Curt Flood Act of 1998, 15 U.S.C. § 26b  .................................................6, 10, 11, 12

**Other Authorities**

144 Cong. Rec. 18,174-75 (1998) (statement of Sen. Hatch)................................11, 12

144 Cong. Rec. H9942-03 (1998) (statement of Rep. Luther) ....................................11

P. Areeda & H. Hovenkamp, Antitrust Law (5th ed. 2020) ...................................22, 23

Pub. Law 105-297, Sec. 2 .............................................................................................10

S. 53, 105th Cong., S. Rep. No. 105-118......................................................................11

Statement on Signing the Curt Flood Act of 1998, 2 Pub. Papers 1884, 1885 (Oct. 27, 1998) ....................................................................................................................11

**Secondary Sources**

Joseph J. McMahon, Jr. & John P. Rossi, *A History and Analysis of Baseball's Three Antitrust Exemptions*, 2 Vill. Sports & Ent. L.F. 213 (1995) ........................................9

Nathaniel Grow, *The Curiously Confounding Curt Flood Act*, 90 Tul. L. Rev. 859 (2016) ...............................................................................................................................11, 12

Nathaniel Grow, *Defining the "Business of Baseball": A Proposed Framework for Determining the Scope of Professional Baseball's Antitrust Exemption*, 44 U.C. Davis L. Rev. 557, 580 (2010) ...................................................................................9

Stephen F. Ross & Michael James, Jr., *A Strategic Legal Challenge to the Unforeseen Anticompetitive and Racially Discriminatory Effects of Baseball's North American Draft*, 115 Colum. L. Rev. Sidebar 127 (2015) .............................................1

Stuart Banner, The Baseball Trust: A History of Baseball's Antitrust Exemption (2013) .....................................................................................................................................1

William N. Eskridge, Jr., *Overruling Statutory Precedents*, 76 Geo. L.J. 1361 (1988) .....................................................................................................................................1

## PRELIMINARY STATEMENT

One hundred years ago, the Supreme Court rejected an antitrust claim against professional baseball leagues on the dubious ground that "exhibitions of base ball … are purely [intra-]state affairs." *Fed. Baseball Club of Balt. v. Nat'l League of Prof'l Baseball Clubs*, 259 U.S. 200, 208 (1922). This so-called "baseball exemption" was never extended to any other sport. And it has been derided for years by critics both outside and inside the Court. *Flood v. Kuhn*, 407 U.S. 258, 286 n.1 (1972) (Douglas, J., dissenting) ("I would now correct what I believe to be its fundamental error.").[1] Just last Term, a unanimous Supreme Court cast the entire exemption into doubt, stating that the Court had "once dallied with something that *looks a bit like* an antitrust exemption for professional baseball." *Nat'l Collegiate Athletic Ass'n v. Alston*, 141 S. Ct. 2141, 2159 (2021) (emphasis added); *see also id.* (calling the exemption "'unrealistic' and 'inconsistent' and 'aberration[al]'" (citations omitted)). Although the exemption has yet to be overruled, the Supreme Court has made clear it is disfavored and should be interpreted narrowly.

Defendant Major League Baseball has not gotten the message. MLB brazenly violates the antitrust laws, harming the public by reducing output and raising prices while it rakes in monopoly profits. This case is a prime example of MLB's overreach. Plaintiffs are four former minor league teams who, in the past, were affiliated with MLB Clubs. Affiliations between minor and major league clubs benefit both sides of the arrangement. Minor league teams develop new players and rehabilitate injured players for their affiliated MLB teams. And affiliation with an MLB Club helps pack the stands for minor league games. In a *competitive* market, Plaintiffs could continue to

---

[1] *See also, e.g.*, Stuart Banner, The Baseball Trust: A History of Baseball's Antitrust Exemption, at xi (2013) ("Scarcely anyone believes that baseball's exemption makes any sense."); Stephen F. Ross & Michael James, Jr., *A Strategic Legal Challenge to the Unforeseen Anticompetitive and Racially Discriminatory Effects of Baseball's North American Draft*, 115 Colum. L. Rev. Sidebar 127, 146 (2015) ("The case for overruling *Flood* is strong."); William N. Eskridge, Jr., *Overruling Statutory Precedents*, 76 Geo. L.J. 1361, 1381 (1988) (the exemption is "almost comical"). Courtesy copies of secondary sources and the congressional record are appended to the Declaration of David J. Lender, Esq., filed concurrently with this memorandum.

compete for affiliations with any of the 30 MLB Clubs. And because the MLB Clubs would compete against each other, none would let its competitors decide how many affiliations it could have or who it must affiliate with. But this is not a competitive market. The agreement by and among the MLB Clubs that MLB orchestrated dictates exactly how many affiliations each MLB Club may have, and it put Plaintiffs on the do-not-call list. The result is *fewer* affiliations at a *higher* cost, and *fewer* affiliated games available to fans.

MLB can cap affiliations and boycott Plaintiffs only because of its judicially created antitrust exemption. Under the Second Circuit's most recent (unpublished) decision on the exemption—dismissing antitrust claims brought by baseball scouts—the market for minor league affiliations does appear to be exempt from antitrust regulation. *Wyckoff v. Off. of the Comm'r of Baseball*, 705 F. App'x 26, 29 (2d Cir. 2017). But the baseball exemption is not nearly as settled or unmovable as MLB portrays it to be. The Second Circuit has not issued a published decision on the exemption in fifty years. The scope of the exemption remains "far from clear," *Laumann v. Nat'l Hockey League*, 56 F. Supp. 3d 280, 295 (S.D.N.Y. 2014), and lower courts around the country have struggled to interpret the exemption and apply it to new contexts. After all, the Supreme Court's exemption "Trilogy" addressed only the "reserve clause" that restricted player contracts; the high court said nothing about other markets or other types of anticompetitive conduct. In *Flood*, the Supreme Court's latest word on the topic, the Court disavowed *Federal Baseball*'s interstate commerce rationale, maintaining the exemption solely on the ground of *stare decisis*. But in the decades after *Flood*, the Supreme Court has not hesitated to overturn its antitrust precedents when their "theoretical underpinnings" have been removed. *State Oil Co. v. Khan*, 522 U.S. 3, 21 (1997). The indefensible baseball antitrust exemption is hanging by a thread, and MLB knows it. This case is the perfect opportunity for the Supreme Court to fix its century-old mistake.

To avoid scrutiny of the exemption, MLB asserts flimsy and fact-based alternative defenses that ignore the well-pled allegations and are contrary to law. MLB argues that Plaintiffs do not have standing to sue for MLB's conspiracy to lock Plaintiffs out of the affiliation market. Of course Plaintiffs have standing: Plaintiffs are directly injured by MLB's anticompetitive conduct, and are the only private parties who could sue. MLB also contends that Plaintiffs do not adequately allege a conspiracy to boycott Plaintiffs. But without an antitrust exemption, MLB could not do what the Complaint alleges it did—reach an agreement among otherwise competing MLB Clubs regarding how many affiliations they can have and whom they should affiliate with. Last, MLB argues that Plaintiffs do not allege an unlawful agreement to restrain trade. But even MLB admits in its Motion that it designed a new minor league system specifically around output restrictions (*i.e.*, capping affiliations). Naked restrictions on output and group boycotts are classic antitrust violations.

MLB's only real defense in this case is an ill-conceived antitrust exemption that is long past its expiration date. Plaintiffs recognize that the Court is currently bound by that exemption and will need to dismiss on that basis. If the Court chooses to reach MLB's other arguments, it should reject them so that Plaintiffs can challenge the exemption on appeal.

## **BACKGROUND**

On the field, MLB Clubs compete for the pennant and the World Series. Off the field, they compete for profits, players, coaches, ticket sales, sponsorships, advertisers, and intellectual property. Compl. ¶¶ 53, 77-81; *see also Am. Needle, Inc. v. NFL*, 560 U.S. 183, 196-97 (2010) (teams "compete with one another, not only on the playing field, but to attract fans, for gate receipts and for contracts with managerial and playing personnel" as well as "for intellectual property"). For over 100 years, MLB Clubs also competed for minor league affiliations; and minor league teams competed to affiliate with MLB Clubs. Compl. ¶ 53.

Minor league teams and major league Clubs are separate entities, and an affiliation is the

commercial arrangement between these two types of organizations. This century-old arrangement was most recently embodied in the Professional Baseball Agreement ("PBA"), which outlined affiliation terms negotiated by MLB and MiLB. *Id.* ¶ 50. Under the standard affiliation, the minor league team developed baseball recruits for the MLB Club, freeing the major league team of the burden and expense of running its own "farm" system. *Id.* ¶¶ 49-50. In addition to developing players, the minor league team paid MLB 8% of its ticket sales. *Id.* ¶ 51. In return, the MLB Club assisted its affiliated minor league team in obtaining and paying players and coaches, and helped with marketing efforts and financial commitments. *Id.* ¶ 52. And baseball fans benefitted too, as affiliated minor league teams provided professional baseball games to local communities, often in smaller markets where there are no MLB Clubs. *Id.* ¶ 54.

Although unique in many ways, this market for affiliations operated like other markets. MLB Clubs competed against each other to affiliate with the best minor league teams to develop the best farm system. *Id.* ¶ 81. And minor league teams competed for those affiliations. The prior arrangement between MLB and MiLB expressly allowed for unlimited affiliations, such that each MLB Club could choose how many and which affiliates would best help it compete on and off the field against other Clubs. Walker Decl. (ECF 28-1), Ex. 1 at Art. VII(A) (the most recent PBA required "at least" 160 minor league teams). The market developed organically: over time, the number of minor league affiliates expanded and contracted and expanded again—most recently to 160 teams in 20 different leagues. Compl. ¶ 49, 55.[2] The arrangement was incredibly successful, as baseball expanded geographically to markets across North America. *Id.* ¶¶ 55, 73. And the competition helped fans, giving them more and better choices to view professional baseball, and facilitated economic development in smaller cities. *Id.* ¶¶ 73-75, 95.

---

[2] For example, the 1947 Brooklyn Dodgers promoted Jackie Robinson from one of its twenty-four affiliates.

That ended in 2020, when MLB and its Clubs implemented their "Takeover Plan" to control minor league baseball and collusively restricted the output of affiliations. According to MLB's press release, it designed a "new system" specifically to reduce the number of minor leagues and teams, and to cap affiliations at only four per MLB Club. Walker Decl. (ECF 28-3), Ex. 3 ("Each MLB Club will provide Minor League players and staffs to their four affiliates"). MLB did not just impose a naked restriction on output, MLB and its Clubs continued to affiliate only with minor league teams that they owned or that provided them political leverage. Compl. ¶¶ 63-66. Although MLB said it chose to end affiliations based on objective metrics, in reality MLB orchestrated the boycott of 40 minor league teams, including Plaintiffs, because they would not serve MLB's interest in controlling the system and extracting greater profits for itself, to the detriment of minor league teams and consumers. *Id.* ¶¶ 2, 58, 60, 111. Ultimately, the naked restriction and group boycott destroyed competition and, with it, Plaintiffs, which had been successful organizations that served their communities and provided live baseball where it would otherwise have been inaccessible and unaffordable. *Id.* ¶¶ 9, 11-12, 97 (listing Plaintiffs' championships and substantial number of players sent to the major leagues).

## **LEGAL STANDARD**

A complaint must contain only a "'short and plain statement of the claim showing that the pleader is entitled to relief,' in order to 'give the defendant fair notice of what the ... claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) (citation omitted). Antitrust cases are not subject to a "heightened pleading standard." *Id.* at 556, 570. A claim has facial plausibility when the plaintiff pleads facts that allow the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

5

<u>**ARGUMENT**</u>

I.   **THE JUDICIALLY-CREATED "BASEBALL EXEMPTION" IS THE ONLY (UNFORTUNATE) LEGITIMATE GROUND FOR MLB'S MOTION**

MLB portrays baseball's judicially-crafted antitrust exemption as well-settled and uncontroversial. But the Supreme Court has never even considered, let alone upheld, the sweeping version of the exemption that MLB asserts here. Rather, the Supreme Court's baseball "Trilogy" dealt only with the reserve system, and did not find any other conduct to be exempt from antitrust regulation. *Flood*, 407 U.S. at 282.[3] Only the lower courts have extended the exemption into other contexts not addressed by the Supreme Court. The most recent—albeit unpublished—decision from the Second Circuit seems to indicate that the conduct alleged here would be exempt as minor league affiliations are central or integral to the business of baseball. But the latest Supreme Court decision on the exemption is now fifty years old, and the latest published Second Circuit decision is even older. It is long past time for the appellate courts to revisit this judicially-created antitrust anomaly. And the judiciary is the right branch of government to correct its mistake. Contrary to MLB's contention, Congress did not codify or extend the exemption in the Curt Flood Act of 1998 ("CFA"). Just the opposite: the statute expressly provides that it does *not* "change the application of the antitrust laws" to MLB's conduct, and the legislative history shows the same thing.

A.   **The Supreme Court's Baseball Trilogy:** *Federal Baseball*, *Toolson*, **and** *Flood*

MLB does not analyze the Supreme Court Trilogy, except to suggest it was not limited to "the player-restraints context." Mot. 9. This is incorrect: each case dealt *only* with the reserve system, which restricted competition for MLB players. *Flood*, 407 U.S. at 259 ("*For the third time*

---

[3] Under the reserve system, players contracted with clubs for a specified time, during which the club could renew the player's contract unilaterally. *See Nat'l League of Prof'l Baseball Clubs v. Fed. Baseball Club of Balt., Inc.*, 269 F. 681, 687 (C.C.D.C. 1920). If a player "jumped" his contract, in violation of the reserve clause, he was rendered ineligible to play for other clubs. *Id.*

… the court is asked specifically to rule that baseball's *reserve system* is within the reach of the antitrust laws." (emphases added)); *Toolson v. New York Yankees, Inc.*, 346 U.S. 356, 357 (1953); *Federal Baseball*, 259 U.S. at 200. Although *Toolson* referred in passing to "the business of baseball," *Flood*—the final case—held that *Toolson* reaffirmed *Federal Baseball* because of baseball's reliance on the exemption for the *reserve* system. *Flood*, 407 U.S. at 273-74 ("[B]aseball was left alone to develop … upon the understanding that the reserve system was not subject to existing federal antitrust laws."). Because reliance interests are part of *stare decisis* analysis, *see, e.g.*, *Payne v. Tenn.*, 501 U.S. 808, 828 (1991), *Flood*'s interpretation of *Toolson* was necessary to its holding and was not *dictum*. And while *Flood* left in place *Federal Baseball*'s exemption for the reserve system, it did not expand the exemption further. *Flood*, 407 U.S. at 282.

## B. The Lower-Courts' Non-Uniform Application of the Judicially-Created Antitrust Exemption

Some lower courts, in contrast, have applied the exemption in other contexts, and MLB's conduct in this case is likely exempt under the Second Circuit's most recent decision. Before *Flood*, the Second Circuit addressed the exemption in *Salerno v. Am. League of Prof'l Baseball Clubs*, 429 F.2d 1003 (2d Cir. 1970) (Friendly, J.). In a highly critical opinion (Judge Friendly referred to *Federal Baseball* as "not one of Mr. Justice Holmes' happiest days"), the Court held that the exemption precluded an umpire's antitrust claims. *Id.* at 1005. But a court in this District later found that *Salerno* was limited by *Flood* and thus sustained claims brought by an umpire. *See Postema v. Nat'l League of Prof'l Baseball Clubs*, 799 F. Supp. 1475, 1489 (S.D.N.Y. 1992) (the exemption does not "immunize" baseball from antitrust scrutiny and "[a]nti-competitive conduct toward umpires is not an essential part of baseball"). Another court in this District similarly held the exemption does not apply to territorial broadcasting restrictions, which the Supreme Court had not yet addressed. *Laumann*, 56 F. Supp. 3d at 297. The court "decline[d] to apply the exemption

to a subject that is not central to the business of baseball." *Id.*

The Second Circuit's most recent decision seems to adopt an ad hoc approach similar to that of *Postema* and *Laumann.* In an unpublished summary order, the Court affirmed dismissal of claims brought by baseball scouts, but only after examining the complaint to determine whether the claims fell within the "business of baseball." *Wyckoff*, 705 F. App'x at 29 ("Plaintiffs' own allegations foreclose their argument that they are not involved in the business of baseball."); *see also Wyckoff v. Off. of the Comm'r of Baseball*, 211 F. Supp. 3d 615, 626 (S.D.N.Y. 2016) (the role of scouts "cannot be characterized as 'wholly collateral' or 'incidental' to the business of professional baseball"). Plaintiffs acknowledge that under *Wyckoff*, the conduct here is likely exempt. Minor league affiliations are central to the business of baseball.

But courts around the country are in disarray, and the Supreme Court should clarify whether any exemption should survive and, if so, how far it reaches. Some courts in other jurisdictions have applied the exemption more narrowly, so that it would not shield the conduct alleged here. They have held, for example, that *Flood* explicitly limited the exemption to the reserve clause and nothing else. *See Piazza v. Major League Baseball*, 831 F. Supp. 420, 437 (E.D. Pa. 1993) (*Flood* "confin[ed] the precedential value of *Federal Baseball* and *Toolson* to the precise facts there involved"); *Butterworth v. Nat'l League of Prof'l Baseball Clubs*, 644 So. 2d 1021, 1025 (Fla. 1994); *Morsani v. Major League Baseball*, 663 So. 2d 653, 657 (Fla. Dist. Ct. App. 1995). *Piazza*'s reasoning is compelling because it is one of the only cases to thoroughly examine *Flood*, and it also adheres to the principle that "exemptions from the antitrust laws are strictly construed and strongly disfavored." *Square D Co. v. Niagara Frontier Tariff Bureau, Inc.*, 476 U.S. 409, 421 (1986).

Even courts that hold that the exemption is not limited to the reserve clause still recognize

that it does not afford MLB blanket immunity. *City of San Jose v. Off. of the Comm'r of Baseball*, 776 F.3d 686, 690 (9th Cir. 2015). MLB admitted as much in prior representations to the Supreme Court. *See* Respondents' Brief, *Flood v. Kuhn*, 1972 WL 125826, *29 (1972) (acknowledging MLB does not have "blanket immunity" and that only its "historic and evolving internal structure and rules" are exempt). Notably, MLB does not always raise the exemption as a defense to antitrust claims. *Major League Baseball Props., Inc. v. Salvino, Inc*., 542 F.3d 290, 328 (2d Cir. 2008).

But no one knows just what the exemption covers or how to apply it, and the courts disagree amongst themselves. Like the courts in this Circuit, some other courts attempt to discern "integral" or "central" parts of the business of baseball. *See Prof'l Baseball Sch. & Clubs, Inc. v. Kuhn*, 693 F.2d 1085, 1086 (11th Cir. 1982). But that approach has led to disparate outcomes, with some courts finding that certain types of antitrust claims are *not* exempt. *See Henderson Broad. Corp. v. Houston Sports Ass'n*, 541 F. Supp. 263, 265, 271 (S.D. Tex. 1982) (broadcasting). Courts routinely sustain antitrust claims involving garden-variety commercial agreements with third parties. *See Fleer Corp. v. Topps Chewing Gum, Inc*., 658 F.2d 139 (3d Cir. 1981) (baseball card manufacturer); *Nishimura v. Dolan*, 599 F. Supp. 484 (E.D.N.Y. 1984) (cable company); *Twin City Sportservice, Inc. v. Charles O. Finley & Co*., 365 F. Supp. 235 (N.D. Cal. 1972) (concessionaire), *rev'd other grounds*, 512 F.2d 1264 (9th Cir. 1975).

Scholars have observed that "the scope of baseball's antitrust exemption has become whatever the reviewing court says it is." Joseph J. McMahon, Jr. & John P. Rossi, *A History and Analysis of Baseball's Three Antitrust Exemptions*, 2 Vill. Sports & Ent. L.F. 213, 243 (1995); *see also* Nathaniel Grow, *Defining the "Business of Baseball": A Proposed Framework for Determining the Scope of Professional Baseball's Antitrust Exemption*, 44 U.C. Davis L. Rev. 557, 580 (2010) (courts "have developed their own muddled, conflicting standards, resulting in three

general categories of divergent precedent"). All this confusion stems from a mistake the Supreme Court made a century ago in *Federal Baseball*, which the Supreme Court should now correct.

### C.     The Narrowly Confined Curt Flood Act of 1998

The exemption that shields MLB from antitrust liability in this case owes its existence solely to the judicial branch. MLB incorrectly suggests that Congress in the CFA "explicitly endorsed" the application of the exemption "to matters involving the minor leagues." Mot. 11. But the CFA did not codify the exemption as to any aspect of baseball. It *withdrew* the exemption as to MLB players; but, as the statement of purpose expressly states, the CFA did "not change the application of the antitrust laws in any other context or with respect to any other person or entity." Pub. Law 105-297, Sec. 2. In fact, after authorizing antitrust suits by major league players, the CFA explicitly *forbids* courts from making the false inference MLB now asks this Court to make: "No court shall rely on the enactment of this section as a basis for changing the application of the antitrust laws to any [other] conduct." 15 U.S.C. § 26b(b). Had Congress intended to exempt other aspects of baseball, including minor league baseball, it knew how to do so expressly. *See, e.g.*, 15 U.S.C. § 1291 ("The antitrust laws … shall not apply to" certain broadcasting agreements for professional sports).[4] But nothing in the statute endorses or codifies the exemption in any respect.

If the statutory language were not clear enough, in his signing statement President Clinton explained that the CFA "*in no way codifies or extends* the baseball exemption and would not affect the applicability of those laws to certain matters that, it has been argued, the exemption would legitimately protect (including franchise relocation rules *and the minor leagues*)." Statement on

---

[4] MLB's interpretation would also lead to the absurd result that the catchall provision of § 26b(b)(6) would codify (or "endorse," in MLB's words) an exemption for "any conduct, acts, practices, or agreements of persons not in the business of organized professional major league baseball." 15 U.S.C. § 26b(b)(6). In other words, under MLB's reading, § 26b(a) would create a cause of action for major league players while § 26b(b) would exempt *all* non-baseball activity from the federal antitrust laws, making conduct relating to the employment of major league baseball players the *only* thing covered in the entire antitrust landscape. Obviously that is not what Congress intended.

Signing the Curt Flood Act of 1998, 2 Pub. Papers 1884, 1885 (Oct. 27, 1998) (emphases added). The legislative history in Congress underscores the point. S. 53, 105th Cong., S. Rep. No. 105-118 (committee report noting "the passage of this bill does not affect the applicability or nonapplicability of the antitrust laws in any other context beyond that specified in subsection 27(a)"). Senator Hatch, the bill's Senate co-sponsor, noted that "Congress is taking no position on the current state of the law one way or the other," and "intended to incorporate the entire jurisprudence of the antitrust laws, as it now exists and as it may develop." 144 Cong. Rec. 18,174 (1998) (statement of Sen. Hatch). Reaffirming this point, Representative Luther asked that a colloquy between Senators Hatch, Wellstone, and Leahy be entered in the Record to confirm Congress was aware of the decisions *Piazza* and *Butterworth*—which held the exemption was limited to the reserve clause—but that the CFA would not disturb those decisions. 144 Cong. Rec. H9942-03 (1998) (statement of Rep. Luther).[5]

That makes sense because the CFA was enacted to address a particular concern over the employment of MLB players, and no other issue affecting baseball. MLB owners and players had failed to reach a collective bargaining agreement, leading to a strike in 1994 and the first cancelled World Series since 1904. Eventually, the parties reached a deal, agreeing, among other things, to jointly petition Congress for repeal of the baseball exemption—but only as applied to the employment of MLB players, so the players could enjoy the same legal protections as athletes in other sports. *See* Nathaniel Grow, *The Curiously Confounding Curt Flood Act*, 90 Tul. L. Rev. 859, 876-77 (2016). In a unique process, MLB players and owners controlled the drafting and

---

[5] Senator Wellstone and Congressman Luther represented Minnesota, which had a few months earlier won a ruling in its lawsuit challenging MLB franchise relocation, allowing a state attorney general's investigation to move forward. *Minn. Twins P'ship v. State*, 1998 WL 35261131 (Minn. Dist. Ct. Apr. 20, 1998) ("The Court concludes that the ruling in *Flood* confines the antitrust exemption to the narrow area of the reserve clause."). These legislators thus had a compelling reason to ensure that the CFA would not disturb that decision, lest their constituents blame them for losing a beloved sports franchise.

worked with Congress to resolve their private dispute on the narrowest grounds. *Id.* at 879-889.

MLB nonetheless argues that the CFA "explicitly endorsed" and "codified" the baseball exemption. Mot. 11. Because the CFA's language precludes that argument, MLB blows past the statutory text and points to legislative history. Mot. 12. But courts should not consider legislative history unless the text is ambiguous and the canons of construction fail to resolve the ambiguity. *Rosenberg v. Triborough Bridge & Tunnel Auth.*, 2021 WL 980744, at *2 (S.D.N.Y. Mar. 16, 2021) (Carter, J.). Here, the text is unambiguous: while the CFA does not create Plaintiffs' cause of action, it does not *prevent* it. In any event, the legislative history confirms what the text provides: Congress addressed only major league players and otherwise stayed out of the thicket. 144 Cong. Rec. 18,175(1998) (statement of Sen. Hatch) ("[W]hatever the law was before the enactment of this legislation, it is unchanged by the passage of the legislation."); Grow, *supra*, 90 Tul. L. Rev. at 901 (the exemption "remains in the hands of the judiciary, just as Congress intended.").

Even though Congress expressly refused to wade into the confusion created by judicial decisions, MLB argues that only Congress should correct the courts' mistakes. Mot. 10. But Congress expressed its intention to defer to the courts. And MLB oversimplifies judicial doctrine that requires legislative deference. It is true that courts are sometimes reluctant to reverse statutory *stare decisis*, as Congress can act to overturn it. But that doctrine has much less force in the antitrust context. *See Khan*, 522 U.S. at 5 ("[T]his Court has reconsidered its decisions construing the Sherman Act when the theoretical underpinnings of those decisions are called into serious question."); *Leegin Creative Leather Prod., Inc. v. PSKS, Inc.*, 551 U.S. 877, 900 (2007) (overruling century-old antitrust precedent after economic and doctrinal underpinnings had been routinely questioned, and rejecting several *stare decisis* arguments).

## II. PLAINTIFFS HAVE ANTITRUST STANDING TO BRING THIS CLAIM

As the targets of MLB's group boycott, Plaintiffs undoubtedly have antitrust standing.

Their injuries "stem[ ] from a competition-*reducing* aspect or effect" of MLB's conduct. *Atl. Richfield Co. v. USA Petroleum Co*., 495 U.S. 328, 344 (1990). Without the boycott and output restriction, Plaintiffs would be free to compete, and MLB Clubs would be free to "decide to affiliate with individual MiLB teams" of their choosing, Compl. ¶¶ 49, 53, allowing the free-market to determine how many and which minor league teams would obtain affiliations. *See U.S. v. Topco Assocs., Inc*., 405 U.S. 596, 610 (1972) (the Sherman Act is "the Magna Carta of free enterprise"). Plaintiffs' exclusion from the market is *the* classic antitrust injury that confers standing. *IQ Dental Supply, Inc. v. Henry Schein, Inc*., 924 F.3d 57, 65 (2d Cir. 2019) (reversing grant of motion to dismiss because the target of a direct boycott had standing to challenge the boycott); *Valassis Commc'ns, Inc. v. News Corp*., 2019 WL 802093, at \*11 (S.D.N.Y. Feb. 21, 2019) ("[E]xclusion from the … market … is a conventional form of antitrust injury and exactly the type of injury that antitrust laws were designed to prevent.") (citation omitted); *In re NFL Sunday Ticket Antitrust Litig*., 933 F.3d 1136, 1158 (9th Cir. 2019) (reversing grant of motion to dismiss, and finding "plaintiffs suffered antitrust injury due to this conspiracy to limit output"). Plaintiffs are also the *most* efficient enforcers to bring this claim. *IQ Dental Supply*, 924 F.3d at 68-69 (efficient-enforcer factors support standing for direct target of boycott). Without Plaintiffs, there would be no other private party situated to vindicate the public interest in free competition in the affiliation market.

MLB does not contest these dispositive points: that intentional exclusion from a market constitutes antitrust injury and makes Plaintiffs efficient enforcers. Instead, it focuses on Plaintiffs' *prior* affiliations with MLB Clubs, arguing that the earlier system was restrictive and thus negates Plaintiffs' standing to sue based on the current arrangement. *See* Mot. 13. But MLB's argument is factually and legally meritless, and has been squarely rejected by the Second Circuit.

First, it does not follow from the pleadings that the prior system was unlawfully anticompetitive.[6] But even accepting MLB's contention that it was, the Second Circuit has rejected MLB's argument as a matter of law. A party that participated in or even benefitted from a restrictive arrangement is not prevented from suing under the antitrust laws. In *IQ Dental Supply*, for example, the defendants argued the plaintiff lacked standing because it had benefited from their anticompetitive conduct—their boycott excluded other businesses and thereby gave the plaintiff its opportunity to enter the market. 924 F.3d at 63. The Second Circuit disagreed that this negated standing: "[r]egardless of how [plaintiff] entered the market, once [plaintiff] was in the market it had a right to do business in a market undistorted by unlawful anticompetitive conduct." *Id.* at 64. Similarly, in *Volvo N. Am. Corp. v. Men's Int't Prof'l Tennis Council*, the Second Circuit held that even a "cartel member has antitrust standing to challenge the cartel to which it belongs, to the extent that the member can demonstrate antitrust injury." 857 F.2d 55, 67–68 (2d Cir. 1988). Likewise, here, even if Plaintiffs had entered and benefitted from a market that MLB unlawfully restricted (which cannot be assumed at the pleading stage) Plaintiffs still suffer antitrust injury from the subsequent group boycott, which distorts the affiliation market. And if a cartel member can have standing to sue its own cartel, *a fortiori* Plaintiffs, who are *not* members of MLB's cartel, can have standing to sue MLB for arranging a boycott and output restriction that directly harms Plaintiffs.

MLB's argument to the contrary is based on a misreading and misapplication of *Gatt*

---

[6] The PBA provided that "[t]he Major League Clubs shall field *at least* 160 National Association teams in each playing season through the termination of this Agreement." Walker Decl. (ECF 28-1), Ex. 1 at Art. VII(A) (emphasis added). MLB seizes on the allegation that, under the PBA, MLB clubs competed with each other to affiliate with "up to" six MLB teams. Mot. 15 (quoting Compl. ¶ 53 & n.5). But the allegation indicates that there were, in fact, a total of 160 minor league affiliates when the Takeover Plan was implemented. Even if there had been a limited number of affiliations, there was not a group boycott of specific teams as there is now. In short, the legality of the prior arrangement is, at best, fact-specific and not an appropriate consideration at this stage.

*Commc'ns, Inc. v. PMC Associates*, 711 F.3d 68 (2d Cir. 2013). According to MLB, *Gatt* held that "harm caused by expulsion from an allegedly anticompetitive agreement is not the type of injury that the antitrust laws were designed to remedy." Mot. 13-14. But *Gatt*'s holding was much narrower, and that is not even the injury alleged here. *Gatt* held that a plaintiff had no standing to sue for bid-rigging when it was not the party paying the rigged prices. 711 F.3d at 77. Here, in contrast, Plaintiffs sue for an output restriction and group boycott that *excludes Plaintiffs* from the affiliation market. The plaintiff and defendant in *Gatt* were dealers for a radio manufacturer. *Gatt*, 711 F.3d at 71. The defendant orchestrated a bid-rigging scheme, which the plaintiff assisted by submitting inflated bids. *Id.* After being excluded from the scheme, the plaintiff sued the defendant, alleging the bid-rigging scheme violated the antitrust laws. *Id.* The Second Circuit affirmed dismissal—but *not* because the plaintiff was excluded from an anticompetitive market, as MLB suggests. The plaintiff lacked antitrust injury because its specific injury (termination) did not flow from "that which [made] *the bid-rigging scheme* unlawful." *Id.* at 77 (emphasis added). If the bid-rigging scheme were illegal, the Court explained, it was because it artificially inflated *prices* for *buyers*, not because it harmed competition amongst dealers. *Id.* The plaintiff was a dealer, not a buyer, and was not harmed by the inflated prices.

Here, in contrast, the anticompetitive conduct is the unlawful agreement to exclude Plaintiffs, *see* Compl. ¶¶ 1-5, 58-67, which is illegal because it prevents Plaintiffs from entering the market altogether, *id.* ¶¶ 115, 118. Plaintiffs' injuries—the inability to compete for affiliations and to have MLB Clubs compete with one another to affiliate with Plaintiffs—arise from exactly *that which* makes the agreement an antitrust violation: harm to competition. The asserted antitrust

injury in *Gatt* is nothing like the injury this case.[7]

The sleight-of-hand in MLB's standing argument is to re-characterize Plaintiffs' injuries as arising solely from the value lost from "prior participation" in an antitrust violation. Mot. 15 ("Plaintiffs' real complaint is not that the new system is anticompetitive, but that they are now on the outside looking in"). That argument ignores Plaintiffs' central allegation—which must be accepted as true—that Plaintiffs are "on the outside looking in" *because of* the boycott, and *not* as the result of any free and fair competition. *See* Compl. ¶ 3 (MLB Clubs "collectively decided to reduce their output and boycott the Ousted Teams," choosing whom to cut "without regard to competitive merit"); *see also id.* ¶ 58. Plaintiffs cannot compete for affiliation today because of MLB's unlawful conduct. To the extent MLB insinuates Plaintiffs bear some blame for a prior anticompetitive system, that is not a standing argument but an *in pari delicto* defense. MLB conspicuously avoids that term, however, and for good reason: *Gatt* explicitly rejected *in pari delicto* as a defense to an antitrust claim. 711 F.3d at 80 ("Our Court has not to date applied the in pari delicto defense in private antitrust litigation. To the contrary, we have recognized that a plaintiff's own anticompetitive conduct generally cannot be raised as a defense to liability in an antitrust action.") (citation omitted); *cf. Am. Airlines, Inc. v. Travelport Ltd.*, 2012 WL 3737037, at *8 n.8 (N.D. Tex. Aug. 7, 2012) (plaintiff "should not be barred from asserting section 1 claims based on its subscriber agreements… simply because [plaintiff] was a party to those agreements," as it "had little choice but to accept the terms").

---

[7] MLB cites a number of cases, Mot. 14, that are inapposite for the same reason: they did not involve a competitor suing for an injury arising from the defendant's suppression of competition. *In re Inclusive Access Course Materials Antitrust Litig.*, 2021 WL 2419528, at *7 (S.D.N.Y. June 14, 2021) (off-campus bookstores not injured by publishers and on-campus bookstores separately deciding to promote online textbooks); *Sell It Soc., LLC v. Acumen Brands, Inc.*, 2015 WL 1345927, at *5 (S.D.N.Y. Mar. 20, 2015) ("Plaintiff fails to allege injury that is attributable to an anticompetitive aspect of the challenged conduct." (cleaned up)); *Yong Ki Hong v. KBS Am., Inc.*, 951 F. Supp. 2d 402, 412-18 (E.D.N.Y. 2013) (no antitrust standing at *summary judgment* where supplier terminated supply to plaintiff after a licensing dispute, but plaintiff sued based on a price-fixing scheme amongst supplier and other distributors).

MLB also argues Plaintiffs lack antitrust injury because "MLB was free to reduce the number of affiliates in an effort to improve the quality of its farm system." Mot. 16. But this is easily rejected as a premature argument on the merits, which also has nothing to do with antitrust injury.[8] To discern antitrust injury, the Court must identify the practice complained of (the horizontal agreement and group boycott) and assume that it is, in fact, unlawful. *See, e.g.*, *Daniel v. Am. Bd. of Emergency Med.*, 428 F.3d 408, 437-38 (2d Cir. 2005). MLB inappropriately asks the Court to assume the opposite at the pleading stage.[9]

Finally, MLB's cursory argument that Plaintiffs are not efficient enforcers warrants little attention. Mot. 16-17 & n.10. MLB does not argue that any of the four factors, *see Gatt*, 711 F.3d at 78, weigh against standing. This is because each factor clearly weighs in favor of standing. *See IQ Dental Supply*, 924 F.3d at 68-69. Rather than deal with the factors or *IQ Dental Supply*, MLB simply cites *Gatt* and says Plaintiffs did not "recognize[ ] the error of [their] ways." Mot. 16-17 & n.10 (quoting *Gatt*, 711 F.3d at 80). Again, *Gatt* is distinguishable because Plaintiffs did not assist any scheme (assuming *arguendo* the system was even anticompetitive). Plaintiffs thus did not commit any "error"—they "had little choice but to accept the terms" of the system MLB controls. *Am. Airlines*, 2012 WL 3737037, at *8 n.8. MLB also mischaracterizes the Complaint when it says Plaintiffs want to return to an anticompetitive arrangement. Mot. 16-17 & n.10. Plaintiffs specifically ask this Court to enjoin MLB's Takeover Plan so that teams can "compete with each other to make their own decisions as to with which MiLB Clubs—and how many—to affiliate."

---

[8] It is also irrelevant at this stage. *In re Keurig Green Mountain Single-Serve Coffee Antitrust Litig.*, 383 F. Supp. 3d 187, 239 (S.D.N.Y. 2019) (a "procompetitive justification . . . is not appropriately weighed on a motion to dismiss").

[9] The cases MLB cites in support of its merits argument are thus inapposite. It cites *Port Dock & Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 123 (2d Cir. 2007), and *Arcesium, LLC v. Advent Software, Inc.*, 2021 WL 1225446, at *8 (S.D.N.Y. Mar. 31, 2021), for the propositions that a plaintiff lacks standing where the injury results from a "termination of [a] relationship" or a "refusal to renew" a contract based on a contractual right. Mot. 16. Neither case, however, involved the key ingredient: a group boycott that prevented the plaintiff from participating in the market.

Compl. at p.32. Plaintiffs seek unrestrained competition and thus remain the best enforcers to vindicate the public interest.

## III.    PLAINTIFFS PLEAD A VIOLATION OF THE SHERMAN ACT

MLB's remaining arguments are fact-based defenses on the merits that are not grounds for dismissal at the pleading stage. These arguments attempt to lure attention away from the exemption, which MLB does not want to put to the test. The Court should not take the bait.

### A.    Plaintiffs Plausibly Allege a Conspiracy to Boycott Plaintiffs

MLB's argument that Plaintiffs fail to allege a boycott is belied by the Complaint. Plaintiffs allege a horizontal agreement through which MLB and its Clubs took over MiLB. Compl. ¶¶ 58-60. This Takeover Plan was designed to streamline minor league baseball and involved "collective decision-making" about "how many and which MLB teams' affiliations to cut." *Id.* ¶¶ 1-3, 88, 97, 111.[10] Plaintiffs also explain that the MLB Clubs agreed to affiliate with teams not based upon merit, but instead based upon improper considerations that only served MLB's market power. *Id.* ¶¶ 58, 60 (MLB Clubs "jointly agreed to implement" the Plan to "consolidate their control over MiLB"); *id.* ¶ 61-67 (describing overlapping ownership of MLB and minor league teams, and noting that Plaintiffs were excluded due to their lack of overlap or close connection to MLB Clubs).

These allegations easily make out an antitrust violation at the pleading stage.[11] Competing car manufacturers cannot band together and agree on how many or which suppliers each

---

[10] Even MLB describes some of the most specific and probative evidence of that agreement, as it acknowledges in its Motion that it "reorganize[ed]" MiLB into a "new system" by eliminating two tiers of leagues, and that it issued a public press release advertising that "[e]ach MLB Club" would have four affiliates and would follow particular licensing terms. *See* Mot. 5-6 (citing Walker Decl. (ECF 28-3), Ex. 3).

[11] Plaintiffs only need to allege "enough factual matter (taken as true) to suggest that an agreement was made"—that is, to raise "a reasonable expectation that discovery will reveal evidence of illegal agreement." *Twombly*, 550 U.S. at 555. There is no heightened pleading burden in antitrust cases, and Plaintiffs do not need to specify "a specific time, place or person involved in each conspiracy allegation." *Starr v. Sony BMG Music Entm't*, 592 F.3d 314, 325 (2d Cir. 2010). Discovery into the Takeover Plan, the decision to cut specific teams and leagues, the press release, and the licensing terms, among other things, will show MLB orchestrated a group boycott. And MLB has fair notice of this conspiracy, as evidenced by its Motion, which describes and acknowledges the Takeover Plan.

manufacturer will use. And if they did, they certainly would not crow about it in a press release. The only reason MLB dares to engage in conduct like this is that it believes the antitrust exemption makes it untouchable.

MLB argues the circumstantial evidence is insufficient to establish a conspiracy to boycott. Mot. 20. That is a factual issue that should be addressed at a later stage of the proceedings, after the Supreme Court weighs in on the exemption. At the pleading stage, Plaintiffs need only allege facts to support a plausible "*inference* that a conspiracy existed." *Iowa Pub. Emp. Ret. Sys. v. Merrill Lynch, Pierce, Fenner & Smith Inc*., 340 F. Supp. 3d 285, 317 (S.D.N.Y. 2018); *In re Text Messaging Antitrust Litig*., 630 F.3d 622, 629 (7th Cir. 2010) ("We need not decide whether the circumstantial evidence that we have summarized is sufficient to *compel* an inference of conspiracy; the case is just at the complaint stage and the test [is] 'plausibility.'"). The fact that most Clubs generally affiliated with minor league teams they owned, purchased, or were closely connected to, Compl. ¶¶ 3, 56, 63-66, supports the inference of an agreement to boycott Plaintiffs. There is no requirement that Plaintiffs plead or even prove that *all* 30 Clubs own or are closely connected to *all* affiliates, as MLB suggests: the unlawful activity is the conspiracy to boycott Plaintiffs, and "it is well settled … that the law does not require every defendant to participate in the conspiracy by identical means." *In re Currency Conversion Fee Antitrust Litig*., 264 F.R.D. 100, 114 (S.D.N.Y. 2010). MLB's argument that Plaintiffs do not allege facts about the "comparative quality" of Plaintiffs, Mot. 19, is also false, Compl. ¶¶ 9, 11-12, 97 (describing Plaintiffs' championships and several players sent to the major leagues).[12]

---

[12] A plaintiff can allege a conspiracy inferred from conscious parallelism with "plus factors," such as "a common motive to conspire" or "evidence of a high level of interfirm communications." *OEM Glass Network, Inc. v. Mygrant Glass Co.*, 436 F. Supp. 3d 576, 587 (E.D.N.Y. 2020) (citation omitted). Those are present here. MLB and its members had common motive to conspire: to "improve Club owners' profitability" and "solidify MLB's singular control over all of professional baseball." Compl. ¶¶ 21, 58. MLB argues that its Clubs only had a "common motive to select affiliates other than Plaintiffs." Mot. 19. This is wrong, and MLB inappropriately tries to draw inferences in its favor. Plaintiffs allege that MLB sought to change the *status quo* of competition among MLB Clubs by solidifying MLB's

**B.     Plaintiffs Allege an Agreement That Is an Unreasonable Restraint of Trade**

MLB's suggestion that the Complaint fails to allege an unlawful agreement is also meritless. Mot. 20-25. Plaintiffs allege a naked restriction on affiliation output and group boycott of Plaintiffs. Compl. ¶¶ 58, 60-62. MLB's conduct thus can be treated as a *per se* violation of the antitrust laws. *See Anderson News*, *L.L.C. v. Am. Media, Inc.,* 680 F.3d 162, 183 (2d Cir. 2012) ("[G]roup boycotts are so likely to restrict competition without any offsetting efficiency gains that they should be condemned as *per se* violations of § 1 of the Sherman Act") (quoting *Nw. Wholesale Stationers, Inc. v. Pac. Stationery & Printing Co*., 472 U.S. 284, 290 (1985)); *F.T.C. v. Superior Ct. Trial Laws. Ass'n*, 493 U.S. 411, 423 (1990) (naked restraint on price and output is a *per se* violation).

Even if not subject to *per se* condemnation, group boycotts and naked restraints on output are amenable to quick look review. *Calif. Dental Ass'n v. F.T.C.*, 526 U.S. 756, 770 (1999). Tellingly, MLB ignores the seminal Supreme Court ruling in this area in *Nat'l Collegiate Athletic Ass'n v. Bd. of Regents of Univ. of Okla.*, 468 U.S. 85 (1984) (cited in Plaintiffs' pre-motion letter), where the NCAA's output cap on the live broadcast of college football games was unreasonable based on a quick look analysis. *Id.* at 109 ("[W]hen there is an agreement not to compete in terms of price or output, no elaborate industry analysis is required to demonstrate the anticompetitive character of such an agreement.") (citation omitted).

Here, too, "no elaborate industry analysis is required." The Takeover Plan did not redress any market failure, nor was it based on economic studies designed to identify the optimal number

---

control over the minor league system by ensuring the chosen minor league teams were owned by MLB Club owners or otherwise closely connected. Compl. ¶ 58, 61-67. Plaintiffs also allege MLB Clubs engaged in "collective decision-making," *Id.* ¶ 3, which implies (and the press release is suggestive of) substantial "interfirm" communications among conspirators. *In re Currency Conversion Fee Antitrust Litig.*, 265 F. Supp. 2d 385, 422 (S.D.N.Y. 2003) (members of association have opportunity for interfirm communications). And Plaintiffs allege "coerced participation" in the Takeover Plan—minor league teams not owned by MLB Clubs were "coerced to consolidate under MLB's direct control." Compl. ¶ 2.

of affiliations in a competitive market. Compl. ¶¶ 96-97. It was a naked restriction on output intended for MLB to increase its market power and profits. *Id.* ¶¶ 2, 58-62. Rather than capping affiliations, MLB should have allowed competitive forces to determine how many and which minor league teams would obtain affiliations and, if necessary, imposed quality-control standards. *Id*. ¶ 102.

Under quick look review, there is also "no need … to establish monopoly power in any precisely defined market … to prove the restraint unreasonable." *Bd. of Regents*, 468 U.S. at 110 n.42. The controlling *Board of Regents* decision therefore renders MLB's premature merits-based attack on the alleged market legally irrelevant. Again, Plaintiffs' allegations suffice and are plausible at the pleading stage.[13]

Finally, even if this case were subject to a full rule-of-reason analysis, Plaintiffs allege an "actual adverse effect on competition as a whole in the relevant market." *NASL*, 883 F.3d at 42. Here, the relevant market is the market for affiliations. Compl. ¶¶ 87, 91.[14] This market is clearly and rigidly defined, as it has existed over the last century. It also has no cross-elasticity of demand. *Todd v. Exxon Corp.*, 275 F.3d 191, 200-201 (2d Cir. 2001) (to establish boundaries of potential market, courts look at "the reasonable interchangeability of use or the cross-elasticity of demand

---

[13] MLB argues that the rule of reason should apply because MLB and its Clubs are involved in "league sports" and "share an interest in making the entire league successful and profitable." Mot. 21. But the cases MLB cites do not support such a broad proposition. In *N. Am. Soccer League, LLC v. U.S. Soccer Fed'n, Inc.*, ("*NASL*"), the Court reiterated that "[a] defendant cannot … justify anticompetitive arrangements by saying an industry's 'special characteristics' warrant them." 883 F.3d 32, 44 (2d Cir. 2018). And in holding that the U.S. Soccer Federation's regulation of its leagues was subject to rule-of-reason analysis (for purposes of reviewing a preliminary injunction), *NASL* relied on *Board of Regents*, which explained that sports leagues need to coordinate only *certain* rules to make their product available—such as rules about the size of the field, number of players, etc. 468 U.S. at 101. Likewise, in *American Needle*, the Court explained that the rule of reason applies to sports leagues if the restraints on competition "are essential *if the product is to be available at all*." 560 U.S. 183, 203 (2010) (emphasis added). MLB does not argue the restriction on affiliations was necessary for its product to be available. Nor could it. It operated successfully for over a century without a cap on affiliations or boycott of specific teams. Compl. ¶¶ 55, 73-75, 95.

[14] Plaintiffs allege the relevant geographic market is North America. Compl. ¶ 92. MLB does not address Plaintiffs' definition of the geographic market and waived any objection to the geographic market. *U.S. v. E. River Hous. Corp.*, 90 F. Supp. 3d 118, 160 (S.D.N.Y. 2015).

between the product itself and substitutes for it"). "[U]naffiliated teams do not have access to the pool of top player talent that will be headed up to, or down from, the big leagues." Compl. ¶ 89. MLB rules prohibit MLB-affiliated minor league Clubs from playing games with unaffiliated teams. *Id.* ¶ 91. Accordingly, "[n]either fans nor sponsors nor anyone else views an MLB-affiliated MiLB team to be interchangeable with a non-affiliated MiLB team." *Id.* ¶ 90; *In re NFL Sunday Ticket Antitrust Litig.*, 933 F.3d at 1155 ("Given that professional football games have no substitutes (as fans do not consider NFL games to be comparable to other sports or forms of entertainment), [ ] the defendants in this case have effective control over the entire market for telecasts of professional football games. The complaint therefore plausibly alleges a naked restraint on output.").[15]

These allegations suffice at the pleading stage, particularly because defining the relevant market "is typically not a goal in itself but a mechanism for considering the plausibility of antitrust claims." P. Areeda & H. Hovenkamp, Antitrust Law ¶ 531 (5th ed. 2020). Plaintiffs allege direct evidence of market power and harm to competition, *see* Compl. ¶¶ 58-62, 93-94, and so the burden to define the market at this stage is substantially reduced. *PepsiCo, Inc. v. Coca-Cola Co.*, 315 F.3d 101, 107 (2d Cir. 2002) ("[M]arket definition simply serves as a surrogate for market power," which "may be proven directly by the evidence of the control of prices."); *In re: Zinc Antitrust Litig.*, 2016 WL 3167192, at *13 (S.D.N.Y. June 6, 2016); *Broadcom Corp. v. Qualcomm Inc.*, 501 F.3d 297, 307 n.3 (3d Cir. 2007); *Toys "R" Us, Inc. v. F.T.C.*, 221 F.3d 928, 937 (7th Cir.

---

[15] *See also Bd. of Regents*, 468 U.S. at 111 (finding "intercollegiate football telecasts generate an audience uniquely attractive to advertisers"); *Int'l Boxing Club v. U.S.*, 358 U.S. 242, 249-51 (1959) (finding separate market for championship boxing); *O'Bannon v. Nat'l Collegiate Athletic Ass'n*, 7 F. Supp. 3d 955, 968 (N.D. Cal. 2014) (finding market specifically for FBS football and Division I basketball scholarships because "there are no professional [or college] football or basketball leagues capable of supplying a substitute for the bundle of goods and services that FBS football and Division I basketball schools provide"), *aff'd in part, vacated in part on other grounds*, 802 F.3d 1049 (9th Cir. 2015).

2000).[16] MLB has market power, and its Clubs engaged in a horizontal restriction on output, "the paradigm of an unreasonable restraint on trade." *Bd. of Regents*, 468 U.S. at 99-100.

Nonetheless, MLB makes premature and formalistic arguments, which are easily rejected. *Todd*, 275 F.3d at 199-200 (market definition is "deeply fact-intensive" and "courts hesitate to grant motions to dismiss for failure to plead a relevant product market").

*First*, MLB argues its new minor league system cannot involve an "output restriction." Mot. 22. Yet this case closely resembles *Board of Regents*, discussed above, in which the Supreme Court held, after a trial, that NCAA's television plan restricting the output of televised football games constituted an unlawful restraint of trade. 468 U.S. at 113. MLB ignores *Board of Regents*, and cites only a Seventh Circuit criminal case (outside the sports context), which addressed whether a price- and supply-fixing agreement constituted a *per se* violation. Mot. 22 (citing *U.S. v. Andreas*, 216 F.3d 645, 666 (7th Cir. 2000)). In finding that the scheme *was* in fact a *per se* violation—even though it "did not fit precisely the characterization of a prototypical *per se* practice"—the court explained that "[f]unctionally, an agreement to restrict output works *in most cases* to raise[ ] prices above a competitive level." *Andreas*, 216 F.3d at 667 (emphasis added). It is difficult to see how this functional analysis and discussion of typical output restrictions supports MLB's argument about the affiliation market. MLB and its Clubs, like the defendants in *Andreas*, allocated a fixed amount of the product at issue (here, affiliations), and both agreements therefore

---

[16] MLB's reliance on *1-800 Contacts, Inc. v. F.T.C.*, 1 F.4th 102, 118 (2d Cir. 2021), is misplaced because the case did not address whether direct proof of market power mitigates the burden to define the relevant market with specificity. The part cited by MLB stands for the unremarkable proposition that "[a]nticompetitive effects in a relevant market *may* be shown through direct evidence of output reductions, increased prices, or reduced quality in the relevant market." *Id.* (emphasis added).

"limited competition." *Id.* at 667-68.[17]

    *Second*, MLB suggests that Plaintiffs' market definition is not plausible because it is "complex [and] symbiotic" and does not involve goods or services "bought and sold." Mot. 23. This is incorrect. A "complex, often symbiotic set of relationships" can give rise to an antitrust claim, even if one party does "not directly buy [a] commodity" from the other; particularly where, as here, one party provides another with a "commodity essential to the successful operation of" its business and "a forum for access to" consumers of its product. *Full Draw Prods. v. Easton Sports, Inc.*, 182 F.3d 745, 752-53 (10th Cir. 1999); *Meredith Corp. v. SESAC LLC*, 1 F. Supp. 3d 180, 196 (S.D.N.Y. 2014) (finding "the relevant market is fairly defined as that for performance licenses of the music in [defendant's] repertory" and the defendant "engaged in an overall anti-competitive course of conduct designed to eliminate meaningful competition to its blanket license" so that music users could not compete by entering into direct licenses with defendant's affiliated composer and music publisher members). That is true here. Minor league teams pay MLB a percentage of their ticket revenues and, in return, MLB Clubs provide players and coaches, which are essential to the minor league's business, as well to consumer access to its product: games played by MLB-affiliated-players playing for minor league teams. Compl. ¶¶ 51-52, 54.

    *Third*, MLB contends an output restriction would increase the value of affiliations, while a group boycott would "reduce demand for affiliations, *lowering* their value." Mot. 24. This is precisely backward. MLB's output restriction decreased the supply of affiliations, thereby

---

[17] MLB also argues that Plaintiffs cannot be part of the supply side of the affiliation market. Mot. 23. But, again, MLB's formalistic argument misses the mark. If MLB Clubs are suppliers, the agreement is a naked restriction on output. *Board of Regents*, 468 U.S. at 109-113. If minor league teams are suppliers, then MLB Clubs are a buyers' cartel. *Vogel v. Am. Soc. of Appraisers*, 744 F.2d 598, 601 (7th Cir. 1984) ("[M]onopoly and monopsony are symmetrical distortions of competition from an economic standpoint."); *U.S. v. DaVita Inc.*, 2022 WL 266759, at *3, *5 (D. Colo. Jan. 28, 2022) ("Horizontal market allocation agreements are traditionally subject to per se treatment under Section 1 of the Sherman Act"); *U.S. v. Jindal*, 2021 WL 5578687, at *5 (E.D. Tex. Nov. 29, 2021) ("[B]uyers' cartels engaged in price fixing have been held to be illegal under the Sherman Act") (citation omitted); *accord* Areeda & Hovenkamp, *supra*, ¶ 2012. Either way, the § 1 claim is plausible at this stage.

*increasing* their value—the only reasonable inference at this stage. While the boycott of Plaintiffs harms competition by reducing the number of affiliated minor league teams, it does not reduce the affiliations' value because—due to MLB's output restriction—there are more minor league teams than there are available affiliations. Compl. ¶¶ 95-96.

*Fourth*, MLB contends that Plaintiffs do not allege anticompetitive harm to the relevant market. Mot. 24. But the case MLB cites, *Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*, 412 F. Supp. 3d 941, 946 (N.D. Ill. 2019), is inapposite because it addressed whether a league could limit the number of teams it allowed into its *own* top-tier division, whereas, here, there was a restriction on MLB Club's ability to operate in a different market for contracts with *separate* entities. In other words, the hockey league would have offered "a different product entirely" if it were forced to remove its top-tier restrictions. *Id.* at 953-55 (citing *Am. Needle*, 560 U.S. at 203-04). But MLB did not need to restrict the affiliation market to make its product available. For more than a century, MLB successfully exhibited professional baseball games while its Clubs competed more freely for minor league affiliations. MLB thus tries to liken these two cases by suggesting that MLB simply "reorganized" its *own* minor league system, Mot. 25—but MLB and MiLB were *separate* organizations. MLB therefore could not "reorganize" minor league baseball without a boycott: it had to orchestrate an agreement amongst its Clubs—who are direct competitors—to cap affiliations and stop dealing with specific minor league teams. That caused direct harm to an otherwise free market for affiliations. In *Reapers Hockey*, by contrast, there was "no allegation that the club defendants communicated in any way about the vote," 412 F. Supp. 2d at 955-56, and so there was no similarly anticompetitive agreement to restrict a market.

## **CONCLUSION**

MLB's Motion should be granted as to the exemption and denied on all other grounds.

DATED:  May 27, 2022                              Respectfully submitted,
        New York, New York

                                                 By: */s/ David J. Lender*
                                                 David J. Lender (NY Bar 2583722)
                                                 Gregory Silbert (NY Bar 4244984)
                                                 Eric S. Hochstadt (NY Bar 4222683)
                                                 Zachary A. Schreiber (NY Bar 5612429)
                                                 **WEIL, GOTSHAL & MANGES LLP**
                                                 767 Fifth Avenue
                                                 New York, NY 10153
                                                 Tel: (212) 310-8000
                                                 david.lender@weil.com
                                                 gregory.silbert@weil.com
                                                 eric.hochstadt@weil.com
                                                 zach.schreiber@weil.com

                                                 Mark Pinkert (*pro hac vice* pending)
                                                 **WEIL, GOTSHAL & MANGES LLP**
                                                 1395 Brickell Ave., Suite 1200
                                                 Miami, FL 33131
                                                 Tel: (305) 577-3148
                                                 mark.pinkert@weil.com

                                                 James W. Quinn (NY Bar 1304500)
                                                 Emily M. Burgess (NY Bar 5307038)
                                                 **BERG & ANDROPHY**
                                                 120 W. 45th St., 38th Floor
                                                 New York, New York 10036
                                                 Tel: (646) 766-0073
                                                 Fax: (646) 219-1977
                                                 jquinn@bafirm.com
                                                 eburgess@bafirm.com

                                                 *Counsel for Plaintiffs*