UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| NOSTALGIC PARTNERS, LLC, d/b/a THE STATEN ISLAND YANKEES; ONEONTA ATHLETIC CORPORATION, d/b/a THE NORWICH SEA UNICORNS; SPORTS ENTERPRISES, INC. d/b/a SALEM-KEIZER VOLCANOES; and TRI-CITY VALLEYCATS, INC.,<br>             Plaintiffs,<br><br>v.<br><br>THE OFFICE OF THE COMMISSIONER OF BASEBALL, AN UNINCORPORATED ASSOCIATION d/b/a MAJOR LEAGUE BASEBALL<br>             Defendant. | Case No. 1:21-cv-10876-ALC |

## STATEMENT OF INTEREST OF THE UNITED STATES

JONATHAN S. KANTER
*Assistant Attorney General*

DOHA G. MEKKI
*Principal Deputy Assistant Attorney General*

DAVID B. LAWRENCE
*Policy Director*

DANIEL S. GUARNERA
*Counsel to the Assistant Attorney General*

ERIC D. DUNN
*Attorney Advisor to the Assistant Attorney General*

DANIEL E. HAAR
NICKOLAI G. LEVIN
*Attorneys*

U.S. Department of Justice, Antitrust Division
950 Pennsylvania Avenue, NW, Room 3224
Washington, DC 20530
Telephone: 202-230-4106
E-mail: daniel.guarnera@usdoj.gov
*Attorneys for the United States of America*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES .................................................................................................... 1
INTEREST OF THE UNITED STATES ................................................................................. 1
BACKGROUND ...................................................................................................................... 1
   I.  Professional Baseball Is an Important Part of National and Local Economies ........................ 1
   II. Relevant Allegations and Procedural History ........................................................................ 3
ARGUMENT ............................................................................................................................ 4
   I.  The "Baseball Exemption" Is Aberrational and Rests on a Repudiated Commerce Clause Rationale ................................................................................................................................. 4
   II. Lower Courts Should Interpret the "Baseball Exemption" Narrowly and Not Extend It Beyond the Scope Recognized by the Supreme Court ............................................................ 8
CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Cases**

*Amateur Softball Ass'n of America v. United States*,
   467 F.2d 312 (10th Cir. 1972) .................................................................................................. 5

*American Needle, Inc. v. National Football League*,
   560 U.S. 183 (2010) .................................................................................................................. 2

*Boston Professional Hockey Ass'n v. Cheevers*,
   348 F. Supp. 261 (D. Mass. 1972) ............................................................................................ 5

*Brown v. Pro Football, Inc.*,
   518 U.S. 231 (1996) .................................................................................................................. 6

*Butterworth v. National League of Professional Baseball Clubs*,
   644 So. 2d 1021 (Fla. 1994) .................................................................................................... 10

*Federal Maritime Commission v. Seatrain Lines, Inc.*,
   411 U.S. 726 (1973) .................................................................................................................. 8

*Federal Baseball Club of Baltimore v. National League of Professional Baseball Clubs*,
   259 U.S. 200 (1922) ..................................................................................................... 5, 6, 9, 10

*Fleer Corp. v. Topps Chewing Gum, Inc.*,
   658 F.2d 139 (3d Cir. 1981) .................................................................................................... 10

*Flood v. Kuhn*,
   407 U.S. 258 (1972) .......................................................................................................... 5, 7, 9

*FTC v. Phoebe Putney Health System, Inc.*,
   568 U.S. 216 (2013) .................................................................................................................. 6

*FTC v. Ticor Title Insurance Co.*,
   504 U.S. 621 (1992) .................................................................................................................. 6

*Gardella v. Chandler*,
   172 F. 2d 402 (2d Cir. 1949) .................................................................................................... 8

*Group Life & Health Insurance Co. v. Royal Drug Co.*,
   440 U.S. 205 (1979) ............................................................................................................ 8, 11

*Henderson Broad. Corp. v. Houston Sports Ass'n, Inc.*,
   541 F. Supp. 263 (S.D. Tex. 1982) ......................................................................................... 10

*Laumann v. National Hockey League*,
   56 F. Supp. 3d 280 (S.D.N.Y. 2014) ................................................................................... 8, 10

*Major League Baseball Properties, Inc. v. Salvino, Inc.*,
   542 F.3d 290 (2d Cir. 2008) ......................................................................................... 9

*NCAA v. Alston*,
   141 S. Ct. 2141 (2021) ...................................................................................... 1, 5, 6, 8

*Northern Pacific Railway Co. v. United States*,
   356 U.S. 1 (1958) ......................................................................................................... 2, 5

*Piazza v. Major League Baseball*,
   831 F. Supp. 420 (E.D. Pa. 1993) ................................................................................ 10

*Pirone v. MacMillan, Inc.*,
   894 F.2d 579 (2d Cir. 1990) ......................................................................................... 1

*Postema v. National League of Professional Baseball Clubs*,
   799 F. Supp. 1475 (S.D.N.Y. 1992) ............................................................................. 10

*Postema v. National League of Professional Baseball Clubs*,
   998 F.2d 60 (2d Cir. 1993) ........................................................................................... 10

*Radovich* v. *National Football League*,
   352 U.S. 445 (1957) ...................................................................................................... 5, 6, 7

*Right Field Rooftops, LLC v. Chicago Cubs Baseball Club, LLC*,
   870 F.3d 682 (7th Cir. 2017) ....................................................................................... 9

*Salerno v. American League of Professional Baseball Clubs*,
   429 F.2d 1003 (2d Cir. 1970) ....................................................................................... 7

*SEC v. National Securities, Inc.*,
   393 U.S. 453 (1969) ...................................................................................................... 11

*Standard Oil Co. v. FTC*,
   340 U. S. 231 (1951) ..................................................................................................... 4

*Toolson v. New York Yankees, Inc.*,
   346 U.S. 356 (1953) ...................................................................................................... passim

*United States v. International Boxing Club*,
   348 U.S. 236 (1955) ...................................................................................................... 5, 7

*United States v. Topco Associates, Inc.*,
   405 U.S. 596 (1972) ...................................................................................................... 5

*Washington Professional Basketball Corp. v. National Basketball Ass'n*,
   147 F. Supp. 154 (S.D.N.Y. 1956) ............................................................................... 5

**Statutes**

15 U.S.C. § 26b(a) .................................................................................................................. 7

15 U.S.C. § 1012 .................................................................................................................... 11

28 U.S.C. § 517 ....................................................................................................................... 1

**Legislative Materials**

H.R. Res. 815, 116th Cong. (2020) ........................................................................................ 2

**Other Authorities**

Nola Agha, *The Economic Impact of Stadia and Teams: The Case of Minor League Baseball*, 14 Journal of Sports Econonics 227 (2013) ................................................................................. 3

Nola Agha & Dennis Coates, *A Compensating Differential Approach to Valuing the Social Benefit of Minor League Baseball*, 33 Contemporary Economic Policy 285 (2015) ................. 2

Mike Ozanian & Justin Teitelbaum, *Baseball's Most Valuable Teams 2022*, Forbes (Mar. 24, 2022) ........................................................................................................................................ 1, 2

## INTEREST OF THE UNITED STATES

The United States respectfully submits this statement pursuant to 28 U.S.C. § 517, which permits the Attorney General to direct any officer of the Department of Justice to attend to the interests of the United States in any case pending in federal or state court. The Antitrust Division of the Department of Justice enforces the federal antitrust laws, including Section 1 of the Sherman Act, and has a strong interest in their correct application. That is particularly true where parties seek special treatment under the antitrust laws as Defendant does here.

The United States takes no position on the ultimate disposition of Defendant's Motion to Dismiss ("MTD"). Instead, the United States addresses two issues. First, the so-called "baseball exemption" is "aberrational," *NCAA v. Alston*, 141 S. Ct. 2141, 2159 (2021) (internal quotation marks and brackets omitted), and does not rest on any substantive policy interests that justify players and fans losing out on the benefits of competition. Second, consistent with Supreme Court precedent and well-established principles governing the interpretation of antitrust exemptions, lower courts should limit the "baseball exemption" to conduct that is central to the business of offering professional baseball games to the public.

## BACKGROUND

### I.     Professional Baseball Is an Important Part of National and Local Economies

Baseball is America's "National Pastime," "central to our common American heritage," and "part of the national character." *Pirone v. MacMillan, Inc.*, 894 F.2d 579, 580 (2d Cir. 1990). Players like Babe Ruth, Jackie Robinson, Roberto Clemente, and Hank Aaron have transcended the sport and left an indelible mark on our national culture.

Baseball is big business, too. The average Major League Baseball team is worth over $2 billion dollars, up 9 percent since 2021. Mike Ozanian & Justin Teitelbaum, *Baseball's Most*

1

*Valuable Teams 2022*, Forbes (Mar. 24, 2022), https://www.forbes.com/sites/mikeozanian/%202022/03/24/baseballs-most-valuable-teams-2022-yankees-hit-6-billion-as-new-cba-creates-new-revenue-streams/. Major League teams compete not just to win championships, but to attract fans and earn revenue. Compl. ¶¶ 76–79; *see also Am. Needle, Inc. v. Nat'l Football League*, 560 U.S. 183, 196–97 (2010) ("[T]eams compete with one another, not only on the playing field, but to attract fans, for gate receipts, and for contracts with managerial and playing personnel."). This competition can generate significant benefits for fans, players, and other trading partners, as it does in other areas of the economy. *See, e.g.*, *N. Pac. Ry. Co. v. United States*, 356 U.S. 1, 4 (1958) ("[The Sherman Act] rests on the premise that the unrestrained interaction of competitive forces will yield the best allocation of our economic resources, the lowest prices, the highest quality and the greatest material progress, while at the same time providing an environment conducive to the preservation of our democratic political and social institutions.").

Minor League Baseball also enjoys a special place in American culture. For many communities, Minor League Baseball is the only local professional sport available. *See* Nola Agha & Dennis Coates, *A Compensating Differential Approach to Valuing the Social Benefit of Minor League Baseball*, 33 Contemp. Econ. Pol'y 285, 285 (2015). In many more communities, Minor League Baseball is a vital source of jobs, tourism, and affordable entertainment. For example, Plaintiffs estimate that the Tri-City Valley Cats, previously a Single-A affiliate of the Houston Astros, provided Troy, New York with about "$55 million in beneficial economic impacts from one year of operations" and supported 763 local jobs. Compl. ¶ 73; *see also* H.R. Res. 815, 116th Cong. (2020) ("[T]he economic stimulus and development provided by Minor League Baseball clubs extends beyond the cities and towns where it is played, to wide and

diverse geographic areas comprising 80 percent of the population in the Nation."). Other studies show that the presence of a Minor League team is associated with "significant positive effects" on local per capita income in hundreds of communities across the country. *See* Nola Agha, *The Economic Impact of Stadia and Teams: The Case of Minor League Baseball*, 14 J. Sports Econ. 227, 227 (2013). Eliminating Minor League teams can therefore have wide-ranging effects on fans, players, and communities throughout the United States.

## II.     Relevant Allegations and Procedural History

For many years, the relationship between Major League teams and Minor League teams was governed by the Professional Baseball Agreement. Compl. ¶ 49. Under this system, individual Major League teams competed to "affiliate" with individual Minor League teams, and individual Minor League teams competed for affiliations with individual Major League teams. *Id.* ¶¶ 49-53. Major League teams covered certain expenses for their Minor League affiliates in exchange for revenue sharing and talent development. *Id*. When the Professional Baseball Agreement expired in 2020, however, Defendant and the Major League teams "jointly agreed to implement a new minor league system" called the "Professional Development League." *Id.* ¶ 60; MTD at 5. In this new system, the total number of Minor League affiliates was reduced from 160 under the Professional Baseball Agreement (six per Major League team) to 120 (four per Major League team). Compl. ¶ 2; MTD at 5.

Plaintiffs are a group of former affiliates of Major League teams. They allege that the Professional Development League involves a horizontal group boycott among Major League teams against the 40 "Ousted Teams," including Plaintiffs, which can no longer compete to affiliate with Major League teams or even play against their affiliates. Compl. ¶ 111. Plaintiffs also allege that the Professional Development League involves a horizontal agreement among

Major League teams "that has artificially reduced and capped output" of affiliations below the level "that would otherwise occur in an unconstrained market." *Id.* As a result of this agreement, Plaintiffs aver that "fans, sponsors, and communities" have been "deprived of the MLB-affiliated product that would have been offered to them if competition had not been restrained." *Id.* ¶ 73. Plaintiffs seek damages, fees, and an injunction that would "permit [Major League] Clubs to compete with each other to make their own decisions as to with which MiLB teams—and how many—to affiliate." *Id*. (Prayer for Relief).

Major League Baseball has moved to dismiss on three grounds: lack of antitrust standing, failure to plead a Sherman Act violation, and baseball's "exemption" from the antitrust laws. MTD 1-3. Plaintiffs dispute the first two grounds for dismissal, and the United States expresses no views on them here. As for the exemption, "Plaintiffs recognize that [this] Court is currently bound by th[e] exemption and will need to dismiss on that basis." Plaintiffs' Opp'n to Def.'s Mot. to Dismiss, Dkt. 31, at 3 (May 27, 2022).

## ARGUMENT

The "baseball exemption" is a recurring source of litigation. Therefore, the United States seeks to set forth its views on the proper scope of the exemption, focusing on two broader points of law. First, the Supreme Court has repudiated the original Commerce Clause justification for the "baseball exemption," leaving it as an aberration with respect to other sports and other antitrust exemptions. Second, for those reasons, among others, lower courts should not expand the "baseball exemption" beyond the scope established by the Supreme Court.

**I.    The "Baseball Exemption" Is Aberrational and Rests on a Repudiated Commerce Clause Rationale**

Baseball may be our national pastime, but "our national economic policy long has been faith in the value of competition." *Standard Oil Co. v. FTC*, 340 U. S. 231, 248 (1951). The

4

Sherman Act is "a comprehensive charter of economic liberty aimed at preserving free and unfettered competition," *N. Pac. Ry. Co.*, 356 U.S. at 4, and "as important to the preservation of economic freedom and our free-enterprise system as the Bill of Rights is to the protection of our fundamental personal freedoms," *United States v. Topco Assocs., Inc.*, 405 U.S. 596, 610 (1972); *see also Alston*, 141 S. Ct. at 2147 ("In the Sherman Act, Congress tasked courts with enforcing a policy of competition on the belief that market forces yield the best allocation of the Nation's resources." (internal quotation marks omitted)).

The "baseball exemption" established in *Federal Baseball Club of Baltimore v. National League of Professional Baseball Clubs*, 259 U.S. 200 (1922), is a judicially created exception to this national economic policy established by Congress. The Supreme Court has itself recognized the exemption as "an exception and an anomaly" and "an aberration confined to baseball." *Flood v. Kuhn*, 407 U.S. 258, 282 (1972). Just last year, the Court acknowledged that although it "once dallied with something that looks a bit like an antitrust exemption for professional baseball," it "has refused to extend *Federal Baseball*'s reasoning to other sports leagues." *Alston*, 141 S. Ct. at 2159; *id.* (citing the amicus brief for Advocates for Minor Leaguers, which "gather[ed] criticisms" of the exemption). Accordingly, the Court has expressly declined to create similar exemptions for boxing, *United States v. Int'l Boxing Club*, 348 U.S. 236, 244-45 (1955), and football, *Radovich v. Nat'l Football League*, 352 U.S. 445, 450 (1957). Lower courts have likewise refused to recognize exemptions for other sports leagues. *See, e.g.*, *Amateur Softball Ass'n of Am. v. United States*, 467 F.2d 312, 314 (10th Cir. 1972) (amateur softball); *Bos. Prof'l Hockey Ass'n v. Cheevers*, 348 F. Supp. 261, 265 (D. Mass. 1972) (ice hockey); *Washington Prof'l Basketball Corp. v. Nat'l Basketball Ass'n*, 147 F. Supp. 154, 155 (S.D.N.Y. 1956) (basketball).

Indeed, the Supreme Court recognized as far back as 1957 that "were [it] considering the question of baseball for the first time upon a clean slate" it would have decided the question differently. *Radovich*, 352 U.S. at 452. Because of the exemption's anomalous foundations, the Supreme Court has "limit[ed] the rule [] established [in *Federal Baseball*] to the facts there involved, i.e., the business of organized professional baseball." *Id*. at 451.

In addition to being unique among sports leagues, the "baseball exemption" is also distinct among antitrust exemptions in that it was not created to reconcile competing legal authorities or substantive policy goals. For example, the "state-action doctrine" exempts certain actions taken by state governments from the scope of the federal antitrust laws. The Supreme Court has explained that "nothing in the language of the Sherman Act or in its history suggested that Congress intended to restrict the sovereign capacity of the States to regulate their economies," *FTC v. Phoebe Putney Health Sys., Inc.*, 568 U.S. 216, 224-25 (2013) (internal quotation marks omitted), and thus the state-action doctrine is intended "to foster and preserve the federal system," *FTC v. Ticor Title Ins. Co.*, 504 U.S. 621, 633 (1992). Similarly, the "nonstatutory labor exemption" immunizes certain activity from the Sherman Act to "accommodate[e] . . . the congressional policy favoring collective bargaining." *Brown v. Pro Football, Inc.*, 518 U.S. 231, 254 (1996).

By contrast, the "baseball exemption" rests on a repudiated Commerce Clause rationale. In *Federal Baseball*, the Supreme Court concluded that "[t]he business [of] giving exhibitions of base ball" involved "purely state affairs" and therefore did not satisfy the interstate-commerce element of the Sherman Act.[1]  259 U.S. at 208-09. In *Toolson v. N.Y. Yankees, Inc.*, 346 U.S.

---

[1] The Supreme Court has suggested that *Federal Baseball*'s Commerce Clause analysis was dubious at the time the case was decided. *See Alston*, 141 S. Ct. at 2159 ("[T]he Court [in

6

356 (1953), the Court "was asked to overrule [*Federal Baseball*] on the ground that it was out of step with subsequent decisions reflecting present-day concepts of interstate commerce." *Flood*, 407 U.S. at 275. *Toolson* ultimately upheld *Federal Baseball* on "a narrow application of the rule of stare decisis" and "[w]ithout re-examination of the underlying issues." *Id.* at 276. But the Court went further in *Flood* and flatly proclaimed that "[p]rofessional baseball is a business and it is engaged in interstate commerce." *Id.* at 282. Nonetheless, the Court "adhere[d] once again to *Federal Baseball* and *Toolson* and to their application to professional baseball" in light of stare decisis and Congress's "positive inaction." *Id.* at 283-84; *see also id*. at 284 ("Under these circumstances, there is merit in consistency even though some might claim that beneath that consistency is a layer of inconsistency.").

*Flood* also mentioned that the "baseball exemption" "rests on a recognition and an acceptance of baseball's unique characteristics and needs." *Id.* at 282. But *Flood* did not identify what these "unique characteristics and needs" are—*Federal Baseball* and *Toolson* did not discuss baseball's "uniqueness" either—or what distinguishes baseball from other sports for which the Court has declined to create similar exemptions.[2] *See, e.g.*, *Int'l Boxing Club*, 348 U.S. at 244-45; *Radovich*, 352 U.S. at 450.

---

*Federal Baseball*] reasoned that 'exhibitions' of 'base ball' did not implicate the Sherman Act because they did not involve interstate trade or commerce—even though teams regularly crossed state lines (as they do today) to make money and enhance their commercial success." (citation omitted)); *see also Salerno v. Am. League of Prof'l Baseball Clubs*, 429 F.2d 1003, 1005 (2d Cir. 1970) (Friendly, J.) ("[w]e freely acknowledge our belief that *Federal Baseball* was not one of Mr. Justice Holmes' happiest days").

[2] To the extent the Court was referencing the "reserve system" at issue in *Flood* itself, 407 U.S. at 282, that justification for the exemption was significantly undermined by the use of collective bargaining agreements and Congress's enactment of the Curt Flood Act of 1998, 15 U.S.C. § 26b(a), which subjected the reserve system to the antitrust laws.

7

Thus, today, the "baseball exemption" that was born from *Federal Baseball*'s interstate-commerce analysis persists as a freestanding exemption despite *Flood*'s repudiation of its original rationale. *Accord Gardella v. Chandler*, 172 F. 2d 402, 408-09 (2d Cir. 1949) (Frank, J., concurring) ("No one can treat as frivolous the argument that the Supreme Court's recent decisions have completely destroyed the vitality of [*Federal Baseball*] decided twenty-seven years ago, and have left that case but an impotent zombi.").

## II. Lower Courts Should Interpret the "Baseball Exemption" Narrowly and Not Extend It Beyond the Scope Recognized by the Supreme Court

While *Federal Baseball* and its progeny remain binding precedent, lower courts should narrowly construe the judicially created exemption for the "business of baseball," *Toolson*, 346 U.S. at 357, and should not extend its scope beyond what the Supreme Court has articulated—conduct that is central to providing professional baseball games to the public.

The Supreme Court has repeatedly emphasized that exemptions from the antitrust laws should be "strictly construed." *Fed. Mar. Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 733 (1973) ("a broad reading . . . would conflict with our frequently expressed view that exemptions from antitrust laws are strictly construed"). That is true whether immunity is established by Congress or implied by courts. *See, e.g.*, *Grp. Life & Health Ins. Co. v. Royal Drug Co.*, 440 U.S. 205, 231 (1979) (the "well settled" principle "that exemptions from the antitrust laws are to be narrowly construed . . . is not limited to implicit exemptions from the antitrust laws, but applies with equal force to express statutory exemptions"). After all, "[i]n the Sherman Act, Congress tasked courts with enforcing a policy of competition." *Alston*, 141 S. Ct. at 2147. These principles apply with special force here given the aberrational nature of the "baseball exemption," as discussed above. *See Laumann v. Nat'l Hockey League*, 56 F. Supp. 3d 280, 297 (S.D.N.Y. 2014) (recognizing that "[e]xceptions to the antitrust laws are to be construed

8

narrowly," and, "[m]oreover, the Supreme Court has expressly questioned the validity and logic of the baseball exemption and declined to extend it to other sports").

In that light lower courts should not extend the "baseball exemption" beyond the scope recognized by the Supreme Court in its baseball "trilogy," which limited the exemption to conduct that is central to the actual exhibition of professional baseball games. In *Federal Baseball*, the Court identified "[t]he business" at issue as "giving exhibitions of base ball." 259 U.S. at 208. Indeed, the distinction the Court drew between exhibitions (games) and activity "incident" to the exhibitions, such as the teams' travel, was central to the Court's reasoning. "[O]ne or the other club cross[ed] a state line in order to make the meeting possible," the Court acknowledged, but the games themselves—the "business" in dispute—were "purely state affairs" and thus outside the scope of the Commerce Clause (as interpreted in *Federal Baseball*). *Id.* *Toolson* likewise characterized the scope of *Federal Baseball*'s holding as "the business of *providing public baseball games for profit* between clubs of professional baseball players." 346 U.S. at 357 (emphasis added). And *Flood*, in which only the reserve clause was at issue, merely "adhere[d]" to these earlier cases. 407 U.S. at 277.[3]

Moreover, while *Flood* accepted that "baseball's unique characteristics and needs" justified retaining *Federal Baseball*'s exemption, 407 U.S. at 282, that justification "suggest[ed]

---

[3] In *Right Field Rooftops, LLC v. Chicago Cubs Baseball Club, LLC*, 870 F.3d 682 (7th Cir. 2017), the court concluded that the Chicago Cubs' attempt to set minimum prices for seating on rooftops adjacent to Wrigley Field was "part and parcel" of "providing public baseball games for profit." *Id.* at 689. That "part and parcel" standard, at least as applied in *Right Field Rooftops*, extends the exemption far beyond conduct central to offering public baseball games, since games can readily be held without teams' control over the pricing of seating outside their stadiums. Under that standard, a baseball team could argue that an agreement related to selling team merchandise is "part and parcel" to the business of baseball. *Cf. Major League Baseball Properties, Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008) (applying the Sherman Act to an antitrust challenge to licenses of intellectual property involving Major League Baseball teams).

that baseball might not be exempt from liability for conduct *not* touching on those characteristics or needs," *Postema v. Nat'l League of Prof'l Baseball Clubs*, 799 F. Supp. 1475, 1488 (S.D.N.Y. 1992) (emphasis added), *rev'd in irrelevant part*, 998 F.2d 60 (2d Cir. 1993). Courts have therefore found that conduct "not central to the business of baseball" falls outside the exemption. *Laumann*, 56 F. Supp. 3d at 297 (analyzing the exemption in a challenge to broadcasting contracts with professional hockey and baseball teams). Thus, while the exemption may cover "antitrust challenges to [Major League Baseball's] league structure and its reserve system," *Postema*, 799 F. Supp. at 1489, it would *not* cover conduct beyond the scope of the offering of exhibitions of professional baseball.[4] Such conduct would include agreements between baseball teams and baseball card manufacturers to fix the prices at which cards are sold to consumers, *cf. Fleer Corp. v. Topps Chewing Gum, Inc.*, 658 F.2d 139 (3d Cir. 1981) (analyzing whether agreements between the Major League Baseball Players Association and trading card companies violated the Sherman Act without discussing the "baseball exemption"), or restraints on broadcasting baseball games, *see Henderson Broad. Corp. v. Houston Sports Ass'n, Inc.*, 541 F. Supp. 263, 265 (S.D. Tex. 1982) ("broadcasting is not central enough to baseball to be encompassed in the baseball exemption").[5]

---

[4] Conduct is not necessarily exempt just because it occurs during or incident to games. *See supra* note 3.

[5] A few courts have interpreted the "baseball exemption" to be limited to the reserve clause rather than providing professional baseball games to the public. For example, *Piazza v. Major League Baseball*, 831 F. Supp. 420, 4536 (E.D. Pa. 1993), noted that "*Flood* refers to the reserve clause at least *four* times," *id.* at 437, and concluded that "*Flood v. Kuhn* stripped from *Federal Baseball* and *Toolson* any precedential value those cases may have had beyond the particular facts there involved, *i.e.*, the reserve clause," *id.* at 436; *see also Butterworth v. Nat'l League of Prof'l Baseball Clubs*, 644 So. 2d 1021, 1024 (Fla. 1994) (similar). *Piazza*'s conclusion regarding the exemption's scope does not follow, however, because *Federal Baseball* and *Toolson* both involved allegedly anticompetitive conduct in addition to the reserve clause. *See, e.g., Federal Baseball*, 259 U.S. at 207 (describing plaintiff's allegations that "defendants

10

Finally, precedent applying the McCarran-Ferguson Act's statutory exemption for the "business of insurance" is instructive. *See* 15 U.S.C. § 1012. The Supreme Court explained that it would be "plainly contrary to the statutory language" to read the exemption as applying broadly to the "business of insurance companies" rather than the narrower concept in the text— "the business of insurance." *Royal Drug*, 440 U.S. at 216-17. Similarly, courts should not interpret the scope of the "business of baseball" exemption to cover any business that baseball organizations are involved in. In *SEC v. National Securities, Inc.*, 393 U.S. 453 (1969), the Supreme Court explained that the "business of insurance" exemption reached only "core" aspects of the relationship between an insurance company and a policy holder—*e.g.*, "the type of policy which could be issued, its reliability, interpretation, and enforcement"—not every kind of agreement between an insurance company and any of its trading partners. 393 U.S. at 468. The "business of baseball" should likewise be interpreted to cover only the core aspects of professional baseball—which, in light of *Federal Baseball*, means conduct closely tied to the public exhibition of professional baseball games.

To the extent the Court analyzes the scope of the "baseball exemption," the United States respectfully requests that the Court define the exemption narrowly and decline to extend its scope beyond conduct that is central to the offering of professional baseball exhibitions.

---

destroyed the Federal League by buying up some of the constituent clubs and in one way or another inducing all those clubs except the plaintiff to leave their League"); *Toolson*, 346 U.S. at 361 n.10 (Burton, J., dissenting) (referencing plaintiffs' allegation that "the defendants have, by their agreements, combined to monopolize professional baseball in the United States").

11

Respectfully submitted,

JONATHAN S. KANTER
*Assistant Attorney General*

DOHA G. MEKKI
*Principal Deputy Assistant Attorney General*

DAVID B. LAWRENCE
*Policy Director*

DANIEL S. GUARNERA
*Counsel to the Assistant Attorney General*

ERIC D. DUNN
*Attorney Advisor to the Assistant Attorney General*

DANIEL E. HAAR
NICKOLAI G. LEVIN
*Attorneys*

/s/ Daniel S. Guarnera
DANIEL S. GUARNERA
U.S. Department of Justice
Antitrust Division
950 Pennsylvania Avenue NW
Washington, DC 20530

## CERTIFICATE OF SERVICE

I hereby certify that on this 15th day of June, 2021, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which sent a notification of such filing to all counsel of record in this matter.

/s/ Daniel S. Guarnera
DANIEL S. GUARNERA
U.S. Department of Justice
Antitrust Division
950 Pennsylvania Avenue NW
Washington, DC 20530