UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------------ x

NOSTALGIC PARTNERS, LLC, D/B/A
THE STATEN ISLAND YANKEES; ONEONTA
ATHLETIC CORPORATION, D/B/A THE
NORWICH SEA UNICORNS; SPORTS
ENTERPRISES, INC., D/B/A SALEM-KEIZER
VOLCANOES; TRI-CITY VALLEYCATS, INC.,

                            **Plaintiffs,**

        -against-

THE OFFICE OF THE COMMISSIONER OF
BASEBALL, AN UNINCORPORATED
ASSOCIATION D/B/A MAJOR LEAGUE BASEBALL

                            **Defendant.**

21-cv-10876 (ALC)

**OPINION GRANTING MOTION TO DISMISS**

------------------------------------------------------------------ x

**ANDREW L. CARTER, JR., District Judge:**

Four Minor League Baseball ("MiLB") teams allege that Defendant, Major League Baseball ("MLB"), violated Section 1 of the Sherman Act by orchestrating a horizontal agreement among its 30 MLB Clubs to exclude Plaintiffs and 36 other MiLB teams from MLB's new Professional Development League.

Defendant moves to dismiss on three grounds: 1) Plaintiffs lack antitrust standing;  2) Plaintiffs fail to state an antitrust violation; 3) MLB's antitrust exemption bars Plaintiffs' claim.

1

I find that the plaintiffs have established antitrust standing and have adequately pleaded an antitrust violation. MLB's antitrust exemption, which has existed since 1903, is a different skein of yarn.

Although Congress chipped away at the exemption in 1998, the exemption—as modified—has been consistently upheld by courts, including the Second Circuit. Plaintiffs believe that the Supreme Court is poised to knock out the exemption, like a boxer waiting to launch a left hook after her opponent tosses out a torpid jab. It's possible. But until the Supreme Court or Congress takes action, the exemption survives; it shields MLB from Plaintiffs' lawsuit.

BACKGROUND

Major league baseball teams compete against each other for the best players and for opportunities to win the World Series. They also compete against each other for revenue. In this competitive milieu, major league clubs work closely with their minor league affiliates. New players start in the minor leagues, and major league teams send injured stars to the minors to rehab injuries. The prospect of seeing future or rehabilitating major leaguers helps minor league teams fill stands and sell merchandise. Cooperation between major league teams and their minor league affiliates benefits fans, allowing them the opportunity to see more professional baseball games in more communities. Complaint ¶ 54.

From 1903 until 2020, the relationship between MLB Clubs and MiLB teams was governed by the Professional Baseball Agreement ("PBA"), a contract between MLB and the National

Association of Professional Baseball Leagues, an organization of minor leagues and minor league clubs. Compl. ¶49-60. Under the PBA, while major league clubs paid all of the payroll costs for players, managers, and trainers, minor league teams paid 8 percent of ticket sales to their major league counterparts. Individual MLB Clubs and MiLB teams were all separately owned and economically distinct franchises with the exception of 25 MiLB teams that are owned by their affiliate MLB Club. Compl. ¶¶ 2, 13. Unfettered, each team would be able to choose as few or as many minor league affiliates as they wished. But the PBA prevented MLB Clubs from having more than six MiLB affiliates. This system resulted in 30 MLB Clubs with 160 affiliates, out of a possible 180. Compl. ¶53-55.

In September 2020, MLB allowed the PBA to expire and announced a new organizational plan—the Professional Development League ("PDL"). Under the PDL, MLB contracts directly with MiLB teams through PDL license agreements instead of contracting with the National Association. The new plan reduced the number of MiLB leagues from six to four and limited MLB Clubs to a maximum of four affiliates, thereby reducing the total number of MiLB affiliations. Compl. ¶60. Plaintiffs are among the 40 minor league teams who lost their affiliations.

PROCEDURAL HISTORY

On December 20, 2021, Plaintiffs filed the complaint. Defendants filed the motion to dismiss on April 22, 2022; Plaintiffs opposed on May 27. On June 15, the United States filed a statement of interest. Defendants filed a reply on June 17. The reply also addressed the

statement of interest filed by the United States. Plaintiffs submitted a response to the statement of interest on July 1. The motion is fully briefed.

DISCUSSION

1)        PLAINTIFFS HAVE ESTABLISHED ANTITRUST STANDING.

For antitrust standing, a private plaintiff must plausibly allege (a) antitrust injury and (b) that it is an efficient enforcer of the antitrust laws. *Gatt* at 76.

    A)        ANTITRUST INJURY

"[The Second Circuit's] jurisprudence culminating in *Gatt Communications, Inc. v. PMC Associates, LLC* established a three-part test for determining whether the plaintiff has alleged an antitrust injury: "(1) the court must identify the practice complained of and the reasons such a practice is or might be anticompetitive; (2) the court must identify the actual injury the plaintiff alleges…[which] requires us to look to the ways in which the plaintiff claims it is in a worse position as a consequence of the defendant's conduct; and (3) the court compares the anticompetitive effect of the specific practice at issue to the actual injury the plaintiff alleges." *IQ Dental Supply, Inc. v. Henry Schein, Inc.*, 924 F. 3d 57 at 62-63 (2d Cir. 2019) (internal quotations and citations omitted).

      i)      STEP 1

At step 1, the plaintiffs must allege that the Defendants have engaged in unlawful anticompetitive conduct. *Port Dock and Stone Corp. v. Oldcastle Ne., Inc.*, 507 F.3d 117, 122 (2d Cir. 2007). "The bar for such a showing is a low one." *IQ* at 63. As stated below, Plaintiffs sufficiently allege unlawful anticompetitive conduct by the Defendants, claiming that Defendant orchestrated a plan to reduce minor league affiliations, resulting in an actual adverse effect on competition in the market for minor league affiliations.

      ii)      STEP 2

At step 2, a court must "look to the ways in which the plaintiff claims it is a worse position as a consequence of the defendant's conduct." *Gatt Communs., Inc., v. PMC Assocs., L.L.C.*, 711 F.3d 68, at 76. (internal citation and quotation omitted). Defendant's anticompetitive actions resulted in Plaintiffs losing their affiliations. Without their affiliations, ousted teams cannot attract top talent and are barred from playing against affiliated MiLB teams, which Plaintiffs argue "effectively destroy[s]" them. Compl. ¶ 1. This is sufficient.

      iii)      STEP 3

At step 3, the plaintiffs "must demonstrate that the Defendant's anticompetitive conduct caused its actual injury." *IQ* at 64-65. Plaintiffs are prevented from competing for affiliation with any

of the 30 major league teams; therefore, the actual injury flows from the defendant's cap on affiliations.

But Defendant claims that Plaintiffs were previously involved in a scheme that they now claim is anticompetitive.[1] Defendant claims that "harm caused by expulsion from an allegedly anticompetitive agreement is not the type of injury that the antitrust laws were designed to remedy." Def Mot p. 13-14. According to Defendants, this bars Plaintiffs' claim. This is incorrect.

"A party that participated in or even benefited from a restrictive arrangement is not prevented from suing under the antitrust laws." Plaintiff Opp. p.14. The Second Circuit has held that "regardless of how [plaintiff] entered the market, once [plaintiff] was in the market it had a right to do business in a market undistorted by unlawful anticompetitive conduct." *IQ Dental Supply*, 924 F. 3d at 64. In *Volvo N. Am. Corp. v. Men's Int'l Prof'l Tennis Council*, the Second Circuit held that even a "cartel member has antitrust standing to challenge the cartel to which it belongs, to the extent that the member can demonstrate antitrust injury." 857 F.2d 55, 67-68 (2d Cir. 1988). Plaintiff Opp. p 14

Defendants further claim that the Second Circuit's holding in *Gatt* precludes a finding that Plaintiffs have antitrust standing. That cricket won't sing.

---

[1] Plaintiffs have clarified that their claim is that, regardless of how they entered into the market, their injury stems from being prevented from *currently* competing for affiliations with major league teams.

a)	FACTS OF GATT

Gatt sold commercial land and mobile radios in New York State. Vertex manufactured and distributed radios. Gatt and Vertex entered into an agreement enabling Gatt to serve as a licensed dealer of Vertex radios. This agreement was subject to termination by either party without cause. PMC, the defendant, also a dealer of Vertex radios, served as Vertex's sales representative in New York. Vertex told Gatt that PMC would orchestrate and support Gatt's efforts to sell Vertex radios. Several New York City and New York State agencies purchased large quantities of Vertex radios by soliciting bids from Vertex dealers. *Gatt* 71-72.

PMC, Gatt, and others launched a bid-rigging scheme. PMC would decide ahead of time which dealer would win bids by encouraging other dealers in the scheme to refrain from submitting bids or submit inflated bids. Every dealer would get a share of bids. The plaintiff participated in this scheme and won some bids, but the plaintiff didn't like the value or number of bids that it won. As a result, the plaintiff decided to break ranks and submit a bid for a sale of Vertex radios to the Transit Authority even though PMC warned them not to bid on the project. Plaintiff won the bid, angering the defendant. Defendant convinced Vertex to terminate the license agreement with Gatt. *Gatt* 72-73.

b)	ANALYSIS OF GATT

The Circuit held that the plaintiff lacked antitrust injury because its injury—termination of a license agreement—did not flow from what made the bid-rigging scheme unlawful. The harm

that flowed from the bid-rigging scheme was artificially inflated prices for the government purchasers, not harm to competition between dealers. The plaintiff was not injured by the inflated prices. *Gatt* at 79.

It is not enough for a plaintiff to suffer injury in an anticompetitive environment; an unlawful, anticompetitive act must cause the injury. In *Gatt*, the plaintiff and defendants created the illusion of competition by having competing bids submitted to government agencies, but the winner was predetermined. While expelling Plaintiff from the bid-rigging scheme reduced the number of conspirators, it didn't reduce the number of competitors, since the competitors were competitors in name only.

Moreover, the bid rigging scheme affected only one brand of commercially available radios. This didn't take place in a stand-alone, unique market, like professional baseball. ("Gatt has alleged a conspiracy involving only one brand of commercial land mobile radios and has not pleaded that the brand constitutes a stand-alone market." *Gatt* at 77.). Even if Defendant terminated the license to retaliate against Plaintiff and to continue perpetuating the bid rigging scheme, the anticompetitive act—assuming it was in fact anticompetitive—was the orchestrating of the bid-rigging scheme, not the termination of Plaintiff's license agreement. The anticompetitive act harmed the purchasers, not the Plaintiff.

Here, the anticompetitive act serves to reduce competition between rivals by preventing plaintiffs from competing with each other for affiliations and preventing MLB clubs from competing with each other to affiliate with more minor league teams. The plaintiffs' injury—their inability to compete for affiliations with major league teams—is directly linked to the anticompetitive act.

B)        EFFICIENT ENFORCER TEST

The efficient enforcer analysis requires an examination of the following four factors:

> "(1) The directness or indirectness of the asserted injury; (2) the existence of an identifiable class of persons whose self interest would normally motivate them to vindicate the public interest in antitrust enforcement; (3) the speculativeness of the alleged injury; and (4) the difficulty of identifying damages and apportioning them among direct and indirect victims so as to avoid duplicative recoveries." *Gatt* at 78, citing *Paycom Billing Servs. v. MasterCard Int'l, Inc.*, 467 F.3d 283 at 290-91 (2d. Cir. 2006).

The Defendant claims in a footnote, that plaintiffs are not efficient enforcers, relying again on a misinterpretation of *Gatt*. Def. motion p. 16-17 note 10. As stated above, the plaintiffs have suffered direct injuries as a result of the anticompetitive agreement, as a result, they are in the class of persons whose self interest has motivated them to vindicate the public interest. The injury is not speculative, and there should be no great difficulty apportioning damages among direct and indirect victims. Plaintiffs satisfy the requirements of the efficient enforcer analysis.

2)        PLAINTIFFS HAVE SUFFICIENTLY PLEADED AN ANTITRUST CLAIM.
          UNDER SECTION 1 OF THE SHERMAN ACT.

To state a Section 1 Sherman Act claim, a plaintiff must plausibly allege an agreement between two or more entities that amounts to an unreasonable restraint of trade. *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible if "it allows the court to draw the reasonable inference" that an unlawful agreement occurred. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

      A)            AGREEMENT TO RESTRAIN TRADE

The "central evil addressed by Sherman Act § 1 is the "elimin[ation of] competition that would otherwise exist." *Am. Needle, Inc. v. NFL*, 560 U.S. 183, 195 (2010). The threshold question in § 1 cases is whether there was an agreement with effects on competition at all. *Twombly*, 550 U.S. at 553 (the critical question is whether the "conduct [restraining trade] stem[s] from independent decision or from an agreement, tacit or express"). Such an agreement must "join together separate decision makers" with "separate economic interests" to constitute the type of concerted action the Sherman Act seeks to prohibit. *Copperweld Corp. v. Indep. Tube Corp.*, 467 U.S. 752, 769 (1984). But "a conclusory allegation of agreement" is insufficient. *Twombly*, 550 U.S. at 557.

To allege the existence of an agreement at the motion to dismiss stage, a plaintiff may show direct evidence, such as "a recorded phone call in which two competitors agreed to fix prices at a certain level." *Mayor And City Council of Balt. v. Citigroup, Inc.*, 709 F.3d 129, 136 (2d Cir. 2013). In the absence of direct evidence, a plaintiff must present circumstantial facts to support the inference of an agreement such as a common motive to conspire or "evidence of conduct that goes against the individual economic self-interest of the alleged conspirators." *Id*. In *NCAA v. Board of Regents*, 468 U.S. 85 (1984), the Court held that a television plan

among NCAA college football teams constituted a horizontal agreement that restricted trade. The plan put a limit on the number of games for which a team could sell television broadcasting rights, thereby limiting output of broadcasting contracts and televised college football. *Id* at 94. Despite rejecting the petitioner's characterization of the agreement as a boycott, the Court agreed that the plan was evidence of "an agreement among competitors on the way in which they will compete with one another." *Id*. at 99. This finding was supported by evidence that if it were not for the artificial limit imposed by the plan, competition between teams would yield a greater number of broadcasting contracts and televised football. *Id*. at 108.

Here, Plaintiffs point to MLB's widely publicized reorganization plan as direct evidence of an agreement among competitors to restrict output of Club affiliations. Compl. ¶ 60. Like in *Board of Regents*, Plaintiffs successfully allege that a competitive market without the agreement would have produced a greater number of affiliations, as shown by the greater output under the PBA.[2]

      B)                UNREASONABLE RESTRAINT OF TRADE

If a plaintiff makes a plausible allegation of an agreement to restrain trade, they must then allege that the restraint of trade is unreasonable per se, under the rule of reason, or under an abbreviated rule of reason—the "quick look" test. *Nat'l Soc'y of Prof'l Eng'rs v. United States*, 435 U.S. 679, 692 (1978).

---

[2] MLB objects to lPlaintiffs' characterization of the plan as a boycott, a legal conclusion that "[carries] no weight on a motion to dismiss." Def. Mot. at 20. At this stage, establishing a boycott is inconsequential since Plaintiffs have advanced a well-pleaded allegation of an agreement to restrain trade in some way. *Twombly*, 550 U.S. at 553.

        i)      Per Se Rule

"Per se rules are invoked when surrounding circumstances make the likelihood of anticompetitive conduct so great as to render unjustified further examination of the challenged conduct." *Bd. of Regents*, 468 U.S. at 100. Courts apply this test only in circumstances when they have had sufficient experience that allows them to "predict with confidence that [the agreement] would be invalidated in all or almost all instances." *NCAA v. Alston*, 141 S. Ct. 2141, 2156 (2021).

Price and output restrictions "are the paradigmatic examples of restraints of trade that the Sherman Act" seeks to prohibit, so they tend to be condemned as illegal per se in most contexts. *Bd. of Regents*, 468 U.S. at 107-08. Group boycotts can also be subject to the per se rule if they have no plausible procompetitive justifications. *Nw. Wholesale Stationers, Inc. v. Pacific Stationery & Printing Co.*, 472 U.S. 284, 295 (1985).

But certain industries and entities require a more thorough inquiry even if the alleged agreement is plainly anticompetitive. *Eng'rs*, 435 U.S. at 692. The Supreme Court has said that it would be "inappropriate" to apply the per se rule to agreements within sports leagues because "a certain degree of cooperation" between competitors is often essential "if the product is to be available at all." *Bd. of Regents*, 468 U.S. at 101; *Am. Needle*, 560 U.S. at 188.  Application of the per se rule in cases involving sports leagues—including this one—is inappropriate since it would not allow a subsequent consideration of procompetitive justifications.

      ii)      ABBREVIATED RULE OF REASON–"QUICK LOOK" REVIEW

The rule of reason analysis seeks to determine whether the challenged practice is, on balance, pro- or anti-competitive. *Eng'rs*, 435 U.S. at 692.  Certain conduct like price or output restrictions may allow for an abbreviated rule of reason analysis—the "quick look" review—without a need to identify the relevant market. *Bd. of Regents*, 468 U.S. at 109. Courts will evaluate conduct under a "quick look" review when a full rule of reason analysis is unnecessary to show that any procompetitive benefit does not outweigh the anticompetitive effects. *Id*. Under this level of review, a plaintiff is only required to allege an actual adverse effect on competition without identifying the relevant market. *Id*.

In the present case, Plaintiffs call for a quick look review due to MLB's alleged constraints on the output of affiliations. However, a quick look review without addressing the relevant market would be insufficient to evaluate the effects on competition from changes to MLB and MiLB's complex relationship.  As in *Alston*, this "dispute presents complex questions requiring more than a blink to answer." *Alston*, 141 S. Ct. at 2157.

      iii)      FULL RULE OF REASON ANALYSIS

At the motion to dismiss stage, the full rule of reason inquiry only requires the plaintiff to "identify the relevant market affected by the challenged conduct and allege an actual adverse effect on competition in the identified market." *Watkins v. Smith*, No. 12cv4635, 2012 U.S. Dist.

LEXIS 165762, 2012 WL 5868395, at *7 (S.D.N.Y. Nov. 19, 2012), *aff'd*, 561 F. App'x 46 (2d Cir. 2014).  In cases involving sports leagues, the most difficult factual inquiry can be the definition of a relevant market. *Bd. of Regents v. Nat'l Collegiate Athletic Asso*., 546 F. Supp. 1276, 1296 (W.D. Okla. 1982) ("Because we cannot know what the characteristics of the industry would be in a free market situation, the definition of a relevant market necessarily involves some guesswork."). A plaintiff must "allege a proposed relevant market that . . . encompasses all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor." *Emigra Grp., LLC v. Fragomen, Del Rey*, *Bernsen & Loewy, LLP*, 612 F. Supp. 2d 330, 359 (S.D.N.Y. 2009) (the "outer boundaries [of a market] are determined by the reasonable interchangeability of use or the cross-elasticity of demand between the product itself and substitutes for it.").

In cases involving NCAA college football teams and NFL teams, the Supreme Court found that the markets for broadcasting rights, intellectual property licenses, and even student-athlete labor constituted relevant markets for purposes of evaluating potential antitrust violations. *Bd. of Regents*, 468 U.S. 85; *Am. Needle*, 560 U.S. 183; *Alston*, 141 S. Ct. 2141. Consequently, the Court determined that because there are no other products that would be reasonable substitutes for televised college football, NFL merchandise, or Division I talent, the relevant market was limited to the products in question. *Bd. of Regents*, 468 U.S. at 111.

Plaintiffs allege that the relevant market affected by MLB's conduct is the market for MiLB affiliations. Compl. ¶ 87. Plaintiffs allege that there are no reasonable substitutes for MiLB affiliations, explaining that non-affiliated MiLB teams cannot reach the same pool of talent,

14

sponsors, or fans, particularly because they are barred from playing against affiliated MiLB teams. Just as the NCAA and NFL have complete control over the market for college and professional football in the United States, MLB has complete control over the market for baseball. Plaintiff's narrowly defined market is appropriate.

Addressing the second portion of the full rule of reason analysis—at the motion to dismiss stage—I find that the Plaintiffs have pleaded sufficient facts to show an actual adverse effect on competition in the identified market. Although professional baseball's prior regime instituted a cap on affiliations, the current lack of variety concerning the number of minor league affiliates for each club buttresses Plaintiff's claim that MLB has reduced competition in the market. Whether a major league club has the highest or lowest revenue, whether the team started in the 1870s or in 1998, whether a team's home fans refer to groups of people as y'all, you all, or yinz, whether they prefer thin crust or deep dish pizza, whether they crave abalone or chicken fried steak, whether the team constantly contends or sporadically succeeds, each major league team has exactly four minor league affiliates.

3)      BASEBALL'S ANTITRUST EXEMPTION BARS THE LAWSUIT.

Section 1 of the Sherman Act forbids "[e]very contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce." 15 U.S.C. Section 1. "Since 1922, however, the Supreme Court has recognized a judicially created exemption from antitrust regulation for the business of baseball." *See Fed. Baseball Club of Balt. v. Nat'l League of*

*Prof'l Baseball Clubs*, 259 U.S. 200, 208-09, 42 S. Ct. 465, 66 L. Ed. 898, 20 Ohio L. Rep. 211 (1922).

In *Federal Baseball*, the Court held that "'giving exhibitions of base[]ball" was a "purely state affair[]" not subject to regulation by the federal government.'" *Wyckoff v. Office of the Comm'r of Baseball*, 211 F. Supp. 3d 615 at 621 (S.D.N.Y. September 29, 2016) (internal citations and quotations omitted). The Supreme Court reaffirmed the exemption in *Toolson*. "[T]he business of providing public baseball games for profit between clubs of professional baseball players was not within the scope of the federal antitrust laws." *Toolson v. New York Yankees, Inc.*, 346 U.S. 356, 357, 74 S. Ct. 78, 98 L. Ed. 64 (1953).

In *Flood v. Kuhn*, the Supreme Court recognized that professional baseball is engaged in interstate commerce, but reaffirmed the antitrust exemption. *Flood v. Kuhn*, 407 U.S. 258, 282-84, 92 S. Ct. 2099, 32 L. Ed. 2d 728 (1972). The Court recognized that the exemption was long standing and should be remedied by "Congress and not this Court." *Id* at 284.[3] In *Wycoff*, the Second Circuit, analyzing baseball's antitrust exemption, affirmed dismissal of claims brought by baseball scouts, finding that the claims fell within the "business of baseball." *Wycoff*, 705 F. App'x at 29.

Here, the United States has filed a statement of interest, urging the Court to scrutinize baseball's exemption narrowly. Even analyzing the exemption narrowly, the exemption is wide enough to

---

[3] In 1998, Congress passed an act, deciding that the antitrust exemption would not apply to "conduct, acts, practices or agreements…directly relating to or affecting employment of major league baseball players to play at the major league level." 26(b)(a). This exception to baseball's exemption is not relevant to this case.

encompass the claims here.  As Plaintiffs concede, *Wycoff's* interpretation of baseball's exemption forecloses their case since minor league affiliations are central to the business of baseball.  Plaintiff's Opp. p. 8.  Baseball's antitrust exemption will not brook this lawsuit; the case is dismissed.

## CONCLUSION

For the reasons stated above, the complaint is dismissed.  The Clerk of Court is directed to close this case.

**SO ORDERED.**

**Dated: October 26, 2022**
      **New York, New York**

   <u>/s/ Andrew L. Carter, Jr.</u>
**ANDREW L. CARTER, JR.**
**United States District Judge**